IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No: 21 cr 461 |
| : | |
| DEVLYN THOMPSON : | |
| : | Let this be filed |
| Defendant. : | Royce C. Lamberth |
| | U.S.D.J. 8/6/21 |

## STATEMENT OF OFFENSE

1. The Government respectfully submits the following Statement of Offense in support of a plea of guilty by defendant DEVLYN THOMPSON (hereinafter "defendant THOMPSON") to Count One of the Information in the above-captioned matter, which charges a violation of Title 18, United States Code, Sections 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon).

### Evidence of the Offense

2. If this case were to go to trial, the government would prove the following facts beyond a reasonable doubt:

### Background

3. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

4. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

1

5. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

6. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

7. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

8. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however,

shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

9. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### THOMPSON'S Conduct

10. On January 6, 2021, defendant THOMPSON was captured on video assaulting law enforcement with a baton at one of the entrances to the U.S. Capitol. Defendant THOMPSON was wearing a distinctive bright light green and blue Seattle Seahawks cap with bright white wool lining. (Image One).



**Image One**

11.     Defendant THOMPSON was among a crowd of protesters inside and outside the tunnel, who were pushing against, and assaulting, D.C. Metropolitan Police Department (MPD) and U.S. Capitol Police Officers in the tunnel. The protestors were attempting to gain entry through law enforcement who had gathered at the doorway. For several minutes, defendant THOMPSON and others were forcibly trying to make entry through the officers. Inside the doorway area, others in the group in the tunnel with defendant THOMPSON: (1) yelled obscenities and called the officers "traitors" as they forcibly tried to gain entry past the officers who were blocking the entrance to the U.S. Capitol; (2) yelled regularly for volunteers to continue the assault on the officers by yelling to the crowd "we need more fresh bodies" and "we need more patriots;" (3)

sprayed OC/pepper spray and bear spray at the officers; (4) threw objects and projectiles at the officers, including flag poles; (5) grabbed and took law enforcement riot shields from the officers to prevent the officers from defending themselves; and (6) assisted others in the crowd to commit additional acts of violence against the officers

12. Defendant THOMPSON himself approached the doorway inside the tunnel. After entering the tunnel, Defendant THOMPSON observed numerous acts of violence against the officers while the building alarm to the U.S. Capitol was visibly and audibly sounding. The doorway that defendant THOMPSON approached had broken glass, and armed law enforcement officers were blocking the entire entrance to the doorway. Defendant THOMPSON assisted other protesters in moving a law enforcement riot shield form the front of the line, where it was taken from a law enforcement officers, to the back of the line, and later, pushing a law enforcement riot shield toward the front of the line where a group of rioters were using the shields taken from the officers against the law enforcement officers at the front.

13. Defendant THOMPSON personally observed law enforcement officers order the rioters to stop, physically push the crowd back, and deploy OC/pepper spray on the rioters in an effort to try and stop the ongoing assault. At some point inside the tunnel, defendant THOMPSON bent down and gained possession of a metal baton that he found on the floor of the tunnel. Defendant THOMPSON approached the entrance to the U.S. Capitol where law enforcement was blocking the door, THOMPSON swung the baton overhead and downward against the police line, in an apparent effort to knock a can of pepper spray from the officer's hand in order to stop the officer from pepper spraying the protesters. Defendant THOMPSON has told the government he was not trying to hurt the officer. Images Two and Three below are screenshots of a publicly posted video showing Thompson inside a tunnel leading into the U.S. Capitol.



Image Two



**Image Three**

Defendant THOMPSON struck Sergeant W.B. of the District of Columbia Metropolitan Police Department (MPD) on the arm. At the time, Sgt. W.B. was actively resisting defendant THOMPSON and the crowd in the tunnel that was alongside Defendant THOMPSON, and Sgt. W.B. had an OC/pepper spray cannister in his hand. Image Three shows defendant THOMPSON striking at Sgt. W.B.'s hand with the baton while other rioters were assaulting the police line. After

more OC spray was deployed by the rioters and the officers, defendant THOMPSON finally retreated from the front of the line.

14. Prior to entering the tunnel area, defendant THOMPSON was with other protesters in the front of the steps leading up the West Terrace, and actively opposing the police line that was holding protesters back. Defendant THOMPSON took exception to how he believed one more or the protesters was being handled by law enforcement, and he began to yell at and point at least one law enforcement officer. During the encounter, defendant THOMPSON yelled at a law enforcement officer who was holding the line, "You wanna fight, let's fight! One on one." He also audibly told law enforcement and others, "What is there left if we can't even talk to our representatives? . . . you guys are protecting that system."

15. When defendant THOMPSON struck the law enforcement officer, who was an officer from the Metropolitan Police Department assisting the United States Capitol Police, the defendant knew that the officer was engaged in the performance of official duties.

16. Shortly after seeing the FBI public notice that he was one of the individuals wanted by the FBI, defendant Thompson hired private counsel who immediately contacted the U.S. Attorney's Office. Thompson agreed, through his lawyer, to cooperate with the government's investigation and participated in three proffer sessions with various members of the U.S. Attorney's Office and FBI; and when asked, voluntarily turned over access to all his social media accounts. The U.S. Attorney's Office has acknowledged Thompson's cooperation to date.

17. This statement of offense is a summary of defendant THOMPSON's conduct and is not intended to be a complete accounting of all facts and events related to the offenses charged in this case, nor all evidence relevant to aggravation or mitigation. The limited purpose of this statement of offense is to demonstrate that a factual basis exists to support Thompson's guilty plea

to the offense of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, as charged in Count One of the Information in this case.

Respectfully submitted,

CHANNING D. PHILLIPS  
United States Attorney for the  
District of Columbia

*Tejpal Chawla*  
_____  
Tejpal S. Chawla  
D.C. Bar 464012  
U.S. Attorney's Office  
555 4th Street, N.W. – 11th Floor  
Washington, DC 20530  
(202) 252-7280  
tejpal.chawla@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I have read this factual proffer and have discussed it with my attorney, Michael E. Moser, Esquire. I fully understand this factual proffer. I agree and acknowledge by my signature that this proffer of facts is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

Date: 07/09/2021

Devlyn Thompson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this factual proffer, and have reviewed it with my client fully. I concur in my client's desire to adopt this factual proffer as true and accurate. To my knowledge, my client's decision to agree to and adopt this factual proffer is an informed and voluntary one.

Date: 7.9.21

Thomas Durkin, Esquire
Counsel for the Defendant

11