# Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DEVLYN THOMPSON,<br>Defendant. | Docket No. 0090 1:21CR00461-001<br><br>HONORABLE ROYCE C. LAMBERTH<br><br>DECLARATION OF JACK T. DONSON |

## **STATEMENT OF EXPERTISE**

1. I am the Co-Founder and Vice President of Prisonology LLC. Prisonology provides Continuing Legal Education (CLE), consulting, and expert testimony on matters concerning the Federal Bureau of Prisons (BOP). I have testified in district courts across the country and the United Kingdom based on my experience and knowledge about federal prison issues.

2. I have worked in the field of corrections for more than thirty-three years, with twenty-three years in BOP security classification, correctional programs, treatment and re-entry. Since retirement, I actively follow policy initiatives and attend conferences, including the annual U.S. Sentencing Commission Conference. I serve on the ABA and National Association of Criminal Defense Lawyers' (NACDL) Corrections Committees advising on prison issues relative to the BOP. In my capacity (pro bono) as Director of Programs and Case Management Services for FedCURE; I have had regular contact with BOP central office administrators regarding inmate and policy issues.

3. During my career, I managed a caseload of approximately 150 inmates as a Correctional Treatment Specialist. In that capacity, I was responsible for the

development and monitoring of inmate correctional treatment plans, inmate counseling, security classification, program placement and re-entry. I held assignments as a Case Management Coordinator (CMC) and Correctional Programs Officer (Unit Manager) and had many collateral administrative responsibilities including training staff, writing local policy, conducting facility audits and monitoring institutional programs including the screening of new designations. I have experience working with Minimum (camp), Low, Medium, Administrative (pre-trial and high security), and Witness Security populations. I have expertise with the U.S. Parole process, DC Code offenders and BOP sentence computations. Prior to employment with the federal government, I was employed in the Commonwealth of Pennsylvania as a Probation and Parole Officer.

4.     I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I have been a Lecturer at Marywood University where I taught several Criminal Justice courses including a course entitled The American Prison. A true and correct copy of my curriculum vitae is attached. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

## CASE EVALUATION

5.     Prisonology was retained by the law office of Elizabeth Kelley on behalf of her client, Devlyn Thompson (Mr. Thompson), to evaluate court records from a correctional treatment perspective and provide information for sentencing. I will lay out a realistic context regarding the challenges a person diagnosed with autism spectrum disorder (ASD) endures in a controlled prison environment and provide the court with information for a practical judicial recommendation to best address his unique circumstances should a term of incarceration be imposed. I have reviewed the pre-sentence report, plea agreement, and mental evaluation submitted by Dr. Laurie Sperry, Ph.D.

## CLASSIFICATION (BRAVO)

6. The BOP classifies facilities into several categories including Minimum (Camp), Low and Medium Federal Correctional Institutions (FCI) (Federal Correctional Institutions) and High Security (USP or US Penitentiaries). There are also administrative facilities such as Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC/FDC) and Federal Medical Centers (FMC) which house all security levels.

7. After sentencing, defendants are assigned a security classification with a system referred to as the BRAVO (Bureau Risk Assessment Verification and Observation) system to determine the appropriate degree of control and supervision required for facility designation. Some of the factors used in the classification system include age, history of violence and/or escape, criminal history score and severity of the instant offense. Each factor has a corresponding point value when totaled determine a security level. The three most important considerations in the selection of the designated facility are the security classification, physical/mental health and correctional program needs. Below is the chart from the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification):

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| **LOW** | **12-15 Points** | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

8. Points alone do not determine the security level as the classification manual also includes what are referred to as "Public Safety Factors" (PSF's) which can override the security scoring to determine a higher security classification.

9. Based on my professional opinion, Mr. Thompson will be classified as Low security with twelve (12) security classification points. He will likely be assigned two public safety factors including a "*Greatest Severity Offense*" and a "*Threat to Government Officials.*" While the Greatest Severity Offense PSF is mandatory due to the nature of the instant offense, the Threat to Government Officials classification is at the discretion of the BOP with input from the Secret Service (see exhibit one, BPA0-337- Inmate Load and Security Designation worksheet). Even one PSF will preclude federal prison camp placement unless it is waived by the BOP, which is very unlikely given the agency's conservative application of discretion and the high-profile nature of the offense. This means that Mr. Thompson will serve any custodial term in a secure federal prison with inmates who have more of a criminal history and orientation including sex offenders, high level drug offenders and people serving sentences longer than ten years.

10. The BOP attempts to designate a person within five hundred miles of their legal residence (in Mr. Thompsons' case, Seattle, WA) to facilitate family visitation due to the positive impact it has on institutional adjustment. It also reduces the burden of travel especially for elderly family members. While I am unable to determine the exact facility designation for Mr. Thompson, the two most likely FCI's meeting his classification needs are FCI Terminal Island (San Pedro, CA – 1,157 miles from Seattle) and FCI Lompoc (Lompoc, CA – 1,078 miles). The BOP has the discretion to place Mr. Thompson in FCI Sheridan, however, it is a medium security facility which would be detrimental to his safety.

11. An area of concern from the documentation reviewed from a correctional treatment perspective which complicates the designation is ASD. Doctor Laurie Sperry's evaluation includes some profound observations when

considered in the context of a correctional treatment environment. Aside from the BOP having very limited programs specifically targeted to people on the autism spectrum, the very nature of a secure prison setting involves many of the elements in Dr. Sperry's report which will place Mr. Thompson at a greater risk to exploitation and likelihood of protective custody. The daily quality of life challenges he will face in a secure prison environment has the potential to provide for an excruciating existence.

12. <u>Programming</u>: The BOP publishes a National Programs Guide and a more recent July, 2021, First Step Act Approved Programs Guide. A review of both publications indicates there is only one reference to Autism. That reference involves The Skills Program and is included in the more recent FSA publication. The most relevant and telling statement from the guide exemplifies what Mr. Thompson will face during a custodial term. When describing the Skills Program, the BOP states inmates with autism spectrum disorder, " *are more likely to be victimized and/or manipulated by more sophisticated inmates. As a result, they may be placed in the special housing unit for their protection or may have frequent misconduct reports because of their limited decision-making skills.*"   It should be noted the only Low security Skills Program is in Danbury, CT, a significant distance from Mr. Thompson's residence in Seattle, WA.

13. <u>Gullibility and vulnerability</u>:  FCI units ordinarily have one correctional officer for approximately 150 inmates. It is very difficult to police predatory behaviors given staffing limitations. It is not known how Mr. Thompson would react to the institution sub-cultural norms including subtle predatory behaviors like "friendly extortion".  From the very first day of arriving at a BOP facility, inmates are informally vetted and asked to "show their papers". In a secure environment, this vetting behavior is to identify sex offenders referred to as "Chomos" and cooperators referred to as "Rats". It is these types of sub-

cultural practices that are difficult to navigate even for a person without autism. The BOP has recognized this disruptive practice and recently included a high severity prohibitive act in the BOP disciplinary code "*Requesting, demanding, pressuring, or otherwise intentionally creating a situation, which causes an inmate to produce or display his/her own court documents for any unauthorized purpose to another inmate*". As indicated on page thirty-three of Dr. Sperry's report, I find credibility that a term of incarceration would pose what she refers to as "the potential for a criminal apprenticeship leading to the likelihood of recidivism because of the exposure to and acceptance of offending behavior within the maladaptive world of the prison environment."

14. <u>Protective Custody</u>: The potential for protective custody raises another difficult issue because inmates who request protective custody are asked to inform on the inmate perpetrator(s) which raises the possibility he will be labeled as a "rat," or informant. If he chooses not to inform on others, he will be ordered out of the special housing unit or receive an incident report for refusing population. Placement in the Special Housing Unit (SHU) requires 23 hours lockdown with one hour of recreation at most, within a small caged in area. This places mental stress on inmates and restricts programs as well as visiting limitations. If staff determine there is a verifiable threat, he will remain in protective custody for many weeks, usually months pending transfer. This vicious cycle replays itself throughout the inmate's term, most typically with sex offender cases and cooperators. The BOP has also recognized this problem and has developed "Re-integration Units" around the country to handle inmates who perpetually are housed in administrative segregation due to repeated protective custody.

15. <u>Communication:</u> In my role as a Correctional Treatment Specialist, I often interfaced with inmates and understood how their personal characteristics

influenced their ability to succeed in a prison environment. One of the most challenging areas for any inmate is communication which can be problematic for those who have Autism. Autistic individuals ordinarily do not possess the communication skills necessary to navigate the prison environment. For instance, failure to maintain eye contact, a common characteristic of Autism, can be misinterpreted as evasiveness, deception or disrespect. This is not only an issue for staff-to-inmate interactions but is extremely problematic for inmate-to-inmate interactions. Dr. Sperry's evaluation pointed to inherent behaviors such as prolonged staring, fixation on objects, showering five times daily, rocking, head banging and executive functioning deficits all of which can be problematic behaviors in the secure prison environment. Communication between inmates and staff is critical, particularly in emergency situations. Autistic individuals commonly have processing delays and may need extra time to respond to questions or instructions. They take things very literally and may not fully understand instructions unless they are concise. The failure to immediately get on the ground upon an order from staff or respond to a staff command in an institutional emergency situation can result in being physically taken down and/or make the individual subject to the disciplinary system for failure to comply. In emergency situations, prison staff members may be unaware of an individual inmate's chronic mental disabilities, nor is it a priority in an institution emergency.

16. <u>Daily Living</u>: Autistic individuals may experience sensitivity to loud noises, bright lights, strong smells and do not like being touched. Federal prison living environments are bright, noisy given the need for security and odorous, because of the ability for inmates to cook with microwaves within the units. Male and female correctional officers routinely pat search inmates throughout the facility daily given security protocols. There is a loud public address (PA) system

which makes announcements throughout the day such as paging inmates, announcing activities and announcing controlled movements. Relative to peer relationships, the BOP prison sub-culture includes the concept referred to by staff and inmates as a "car" which means that inmates of similar interests and circumstances travel the facility as a group seeking safety in numbers. This is especially applicable to sex offenders who are the most persecuted in a prison environment. Dr. Sperry's report refers to the absence of interest in peers and affiliation with others which can inhibit the car concept for a greater potential of victimization as Mr. Thompson might choose to be alone rather than travel with a group. The high-profile nature of the instant offense may also exacerbate challenges from some elements in the inmate population who were opposed to the instant offense.

## **CONCLUSION**

17. Mr. Thompson faces unique and difficult challenges during incarceration because the BOP classification policy requires placement in a secure, federal correctional institution due to the severity of the instant offense and associated public safety factor. A review of the BOP national programs catalogue and website only refers to one program (SKILLS) as accommodating people with ASD. However, that program is in Connecticut over three-thousand miles from the family and it is not specifically designed for people with autism. The characteristics of his diagnosis makes him highly susceptible to victimization in the secure prison environment because of the inherent elements of the prison sub-culture which may lead to manipulation, ostracization, protective custody and even assault. It is likely Mr. Thompson will serve any term of incarceration isolated far from his family in a higher security environment than is needed based on his lack of a criminal history and orientation. His punishment will not only be more intense and stressful than the court may realize, but there is also the

potential for his indoctrination into the criminal sub-culture which Dr. Sperry refers to as a "criminal apprenticeship". **If the court is inclined to support counsel's recommendation on sentencing, it should be aware Mr. Thompson would be already past the statutory residential re-entry center eligibility of twelve months and it would be practical for the court to provide a non-binding judicial recommendation for the BOP to consider a direct designation to a halfway house in the Seattle area. If a longer term of incarceration is imposed, it would be practical for the court to strongly recommend the BOP consider waiving the public safety factor to facilitate placement in a minimum, prison camp environment where he would least likely be victimized.** It is also my professional opinion that the most logical sentence from a correctional treatment perspective for treatment and/or targeted program objectives would best be accomplished in the community with stringent conditions of supervised release during a period of home detention.

I state under penalty of perjury that the foregoing is true and correct.

Dated: December 12, 2021

                                                          Jack T. Donson