**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-461 (RCL)** |
| **DEVLYN THOMPSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Devlyn Thompson to forty-eight (48) months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.       INTRODUCTION

The defendant, Devlyn Thompson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

The government recommends that the Court sentence Thompson to 48 months' incarceration, which is at the lower end of the advisory Guidelines' range of 46-57 months, which the government submits is the correct Guidelines calculation. A 48-month sentence would reflect the gravity of Thompson's actions after having joined a violent mob at the U.S. Capitol, while also acknowledging his exceptionally early cooperation and admission of guilt.

1

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, thousands of rioters, Thompsons among them, unlawfully broke police lines around the U.S. Capitol Grounds in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The mob of rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Thompson's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol.

Temporary and permanent barricades were in place around the exterior of the building and grounds, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

While the vote certification proceedings were still underway, the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police continued to try and keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶ 2.   PSR at ¶ 15.

### *At Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.   *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol,

117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at
https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-
attack.

One of the most violent confrontations on January 6 occurred near an entrance to the
Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually
consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction
of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that
was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with
glass.   On the other side of the two sets of swinging doors is a security screening area with metal
detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The
exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the
West Front of the Capitol Building.   This archway is also of great symbolic significance as it has
been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and
is the entrance for the President-Elect and other dignitaries on Inauguration Day.   Figure 1;
"Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-
do/programs-ceremonies/inauguration.



**Figure 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

    At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way

5

into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and

physically engaged them with batons and OC spray.   At a later hearing on the events of January

6, Congressman Stephanie Murphy described her experience nearby this location in response to

testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors

between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer
> of power, and it was an attack on this Capitol building, and it was also an attack on
> real people.   And most people don't know this -- and I don't think even you know
> this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January
> 6th, 2021, while you were holding back the mob at the Lower West Terrace
> entrance, I was holed up with Congresswoman Kathleen Rice in a small office
> about 40 paces from the tunnel that you all were in.   That's about from the distance
> where I'm sitting here on the dais to that back wall.   And from that office in close
> proximity to where you all held the line, I listened to you struggle.   I listened to
> you yelling out to one another.   I listened to you care for one another, directing
> people back to the makeshift eyewash station that was at the end of our hall.   And
> then, I listened to people coughing, having difficulty breathing, but I watched you
> and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD
> Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before
> the House Select Comm. to Investigate the January 6th Attack on the United States
> Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available
> at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-
> attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area

continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed,

and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-

hand combat, and some of the most violent acts against law enforcement, including the abduction

and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer

Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of

objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell).

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the

lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers

and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.

### B.     Defendant's Role in the January 6, 2021 Attack on the Capitol

#### *Background and Approach to the Capitol*

Thompson, an employee for a rental property management company, traveled from Atlanta, Georgia, where he was temporarily residing, to participate in the "Save America" rally in Washington, D.C.   A PowerPoint presentation which shows Thompson's track on January 6, 2021 is located at Exhibit 1.   Thompson, a long-time resident of Washington State, was wearing a black

University of Washington hooded coat and a distinctive green and blue Seattle Seahawks[1] ushanka

hat with white fluffy fleece lining.   *See* Figure 2 (at Exhibit 1, page 16 ).[2]



---

[1]  The official Seahawks colors are College Navy, Wolf Gray, and Action Green.   "Seattle Seahawks Team Capsule," *2021 Official National Football League Record and Fact Book*, NFL Enterprises, LLC, August 11, 2021 at 215.   *Available at* https://static.www.nfl.com/league/apps/league-site/media-guides/2021/2021_NFL_Record_and_Fact_Book.pdf#page=215 (last accessed 12/9/2021)

[2]  The government is not adding figures as attachments to this memorandum, only items identified as exhibits.   The figures can be provided separately if the Court wishes.

**Figure 2**

After attending the rally at the Ellipse, Thompson crossed into the restricted area of the U.S. Capitol Grounds without authorization and joined others on the front line of the steps of the West Plaza to the Capitol Building who were attempting to gain access through the police line toward the U.S. Capitol building.   At approximately 2:21 PM, Thompson observed rioters resisting law enforcement commands to back up, law enforcement pushing rioters, and deploying OC spray to try and repel rioters.   Thompson became angry and responded aggressively. Thompson yelled at officers, pointed out individual officers, and yelled at the law enforcement officers who were blocking his path.   He pointed at one officer and yelled, "where's your boy at?," "you hiding him," "you wanna fight, lets fight!   One on one."   At least one other rioter tried to calm Thompson down.   A still image from the video one of the body worn cameras ("BWC") (Video Exhibit 2 at 2:00) shows Thompson at the front line (with a red arrow showing Thompson).



**Figure 3**

A few minutes later, at approximately 2:30 PM, rioters at Thompson's location overwhelmed the police line and moved their way up the West Front façade of the U.S. Capitol building.

### *Thompson's Violent Actions During the Battle for the Lower West Terrace Doors*

After the police line at the bottom of the Terrace was overcome, Thompson climbed a balustrade and joined a crowd of rioters on the inaugural stage. After smoking a cigarette and making a phone call, at approximately 2:52 PM, Thompson joined dozens of other rioters in the Lower West Terrace tunnel who were actively assaulting MPD and Capitol Police officers with their hands and all manner of weapons, including their poles, batons, full bottles, and chemical spray. For approximately the next 13 minutes, between approximately 2:52 PM and 3:05 PM, Thompson was in the tunnel zone and was actively assisting, aiding, and abetting the mob that was assaulting officers and trying to break through the police line to gain access to the Capitol Building. Thompson's actions were videotaped from several angles by CCTV cameras, social media, and video obtained from fellow rioters who were inside the tunnel area. *See* Figures 4-12 (still images taken from U.S. Capitol Closed Circuit (CC) Video Camera)[3]; Video Exhibit 3 (with still images at Figures 13-18), "*UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol*, uploaded January 7, 2021, located at https://www.youtube.com/watch?v=cJOgGsC0G9U ("Unbelievable Video"));[4] Video Exhibit 4 (with still images at Figures 19-21) which is a

---

[3] This video, which has no sound, was produced to the defense, and identified as Sensitive under the Protective Order. The government does not intend to use the video at sentencing (and is not attaching it to this memorandum), but it can be provided to the Court upon request.

[4] The Unbelievable Video captures much of the time that Thompson was inside the tunnel area and follows alongside Thompson as he moved his way to the front of the line where law enforcement was blocking the entrance. The CC video feed shows Thompson coming through the tunnel area to the front of the line, and body worn camera captures Thompson's assault with

nonpublic video recovered during the investigation; and Video Exhibits 5 and 6 (with still Figures 22-23) which are body worn camera footage from officers in the tunnel.   Undersigned counsel has reviewed the CCTV footage for the thirteen minutes that Thompson was in the tunnel area which covers the entrance to the tunnel area, and counted over 190 rioters who entered the tunnel space where law enforcement officers were being assaulted, many of whom rotated in and out after personally assaulting officers in the tunnel.

These videos show that Thompson observed fellow rioters moving to the front while armed with all manner of weapons, including poles, batons, tasers, OC/bear spray, and even speakers. The video shows fellow rioters working together to attack the officers, and even using strobe flashlights to visually impair and temporarily blind the officers while other rioters assaulted them. Several images from the video showing these acts include the following (with Thompson circled in red):

(1) Fellow rioters using OC or bear spray (in yellow) against officers (Figures 4, 5 and 19).

the baton on the officers.   Thompson is visible in the video from between time marks 01:05 and 13:30.



**Figure 4**



**Figure 5**



**Figure 19**

(2)     Fellow rioters throwing objects, poles, and bottles at officers (thrown objects circled in yellow) at Figures 6, 7, and 8.



**Figure 6**

15



**Figure 7**



**Figure 8**

(3)    A fellow rioter activating and displaying a taser (circled in yellow) as he approached the line to law enforcement (Figures 9 and 13).



**Figure 9**



**Figure 13**

As Thompson approached the tunnel at approximately 2:48 PM (as Figure 10 shows) dozens of rioters were already assaulting officers in front of him.



**<u>Figure 10</u>**

As Thompson approached the front of the line, he assisted his fellow rioters in several important ways.[5]  First, he helped members of the mob take multiple riot shields from the law enforcement officers blocking the doorway to the U.S Capitol, thus enabling other members of the mob to

---

[5] The Unbelievable Video captures the tunnel assault with Thompson from essentially the start of the video until the 13:25 mark when Thompson is hit with OC spray from the officers and then leaves the tunnel area.

assault the officers with greater effect.   Later, Thompson assisted the fellow rioters by bringing forward the stolen riot shields for the rioters to use against the officers.   *See* Factual Proffer at ¶ 12.   As Thompson was bringing forward the shields, fellow rioters yelled for them to "Use the shields! [against law enforcement officers]," and for the rioters to then, "Lock your shields!" in an effort to thwart law enforcement officers' attempts to ward off the assault.   Images showing Thompson handling the shields are below:



**<u>Figure 11</u>**



**Figure 20**



**Figure 12**

Second, Thompson joined in effort by the mob to jointly push together against the front-line officers in an effort to force their way through the police.   The pressure created by dozens of rioters pushing on the front line was significant, and the Unbelievable Video shows Thompson involved in this pushing between the 5:00-6:00 mark.   The video also shows the rioters crushing a fellow rioter as they did so, and Sgt. W.B. calling on the mob to stop as they were crushing a female rioter at the front of the line.   Third, Thompson helped fellow rioters by helping them throw a large audio speaker toward the police line, which is at approximately at time stamp 9:00 in the Unbelievable Video.   Images from those videos showing Thompson's efforts are as follows:



**Figure 14**



**Figure 15**

The speaker landed on the line area where rioters were confronting law enforcement, and ironically the speaker struck one of Thompson's fellow rioters in the head (brown jacket), drawing blood.[6] In the Unbelievable Video (@ 9:07 time mark) the fellow rioter asked who threw the speaker, looked at his right hand with blood from his head, and he then retreated from the tunnel area.   An image from the video showing the blood is below (circled in yellow).

---

[6]  The individual that Thompson hit with the speaker was later identified as Wilmar Jeovanny Montano Alvarado.   Alvarado sustained a gash to his head and required medical treatment.   He was also subsequently charged in case number 21-cr-154.



**<u>Figure 16</u>**

These events presaged Thompson's own assault on law enforcement officers with a dangerous weapon.   As Thompson neared the front of the police line in the tunnel area, and saw more and more violent assaults against the officers, Thompson found a metal baton in the tunnel and decided to arm himself as the continued his approach.   Factual Proffer ¶ 13. The Video Exhibit 4 footage shows Thompson with a metal baton in his hand (at the 12:55 mark), approximately 2 minutes before he got to the very front of the tunnel (baton in yellow).



**Exhibit 21**

Once Thompson got to the front of the tunnel to the line with officers (@ the 9:57 time on the Unbelievable Video), the BWC video footage (Video Exhibits 5 and 6) confirms that a bald rioter with a red shirt[7] had fallen to his knees on the front line in the doorway and he told the police and fellow rioters that he had asthma and was having difficulty breathing, and that he needed help (Figure 22).   That footage shows that the individual told officers he "can't breathe" and asked for an ambulance.   Sgt. W. B. engaged with the fallen rioter and offered him help with an ambulance as soon as they could establish a line against the rioters.

---

[7] This individual, later identified as John Steven Anderson, was charged in case number 21-cr-215.



**<u>Figure 22</u>**

Moments thereafter, Sgt. W.B. who was on the front line with a chemical spray in hand, repeatedly

yelled at the protestors to stop and move back, but they refused.   Sgt. W.B. deployed the chemical

spray to push back rioters, but more rioters kept coming to the front to attack the officers, including

Thompson.   Thompson struck one time at Sgt. W.B. with the baton, hitting the sergeant in the

hand.   Factual Proffer at ¶ 13.   The Unbelievable Video captures the assault with the baton at the

10:16 mark, and the impact on Sgt. W.B.'s hand (Figures 17-18).





**Figure 18**



**Figure 23**

A few minutes after Thompson left the front line of the tunnel, Sgt. W.B. and other officers were able to carry the rioter in red through the broken glass door, through their own police line, to provide him first aid.   After striking Sgt. W.B., Thompson stayed near the front of the line for another minute until he was struck with a blast of chemical spray, after which he left the tunnel area.

A review of the videos shows that during the 13 minutes that Thompson was inside the tunnel, rioters were yelling and cursing at officers, resisting their commands, and made clear they were intent on obstructing the ongoing Congressional proceeding once they could pass the police

line.   The rioters yelled "Traitors" to the officers, "This is our country!," "This is our house!," they chanted "Whose House! Our house!" and regularly called to the mob for new bodies and fresh patriots to come to front of the line to fight the police.

After leaving the tunnel at 3:05 PM, Thompson appears to have spent some time recovering.   After approximately a twenty-minute respite, however, Thompson took off his hat and returned to the mouth of the tunnel as an engaged observer with the mob.   As Exhibit 1 at pages 32-44 shows (and the videos cited thereto), for nearly two hours thereafter, Thompson stood there, in the vicinity of some of the most violent conduct on January 6, observing, commenting, and occasionally chanting while windows were smashed, and the police line was repeatedly attacked.   This is particularly apparent when watching the video at Government Exhibit 1C (which includes footage of multiple law enforcement officers being dragged from the tunnel and assaulted by the mob), and viewing the images at Exhibit 1 pages 38 and 40 (showing assaults on officers with sticks and crutches), and pages 41-42 (showing protestor using a stolen piece of furniture as a weapon).   While in the crowd and observing repeated attacks on law enforcement officers with all manner of weapons (including hockey sticks, poles, batons, clubs, shields, crutches, chemical spray, and other objects), Thompson yelled with the crowd in a "I can't breathe" in an apparent effort to make fun of George Floyd's last words and the Black Lives Matter movement.   Thompson was among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave as he occupied the inaugural stage until shortly after 5 p.m. when heavily armored Virginia State Police Officers arrived and deployed ordinance that forced the mob from the stage.

***Injuries***

28

Sgt. W.B. confirmed after January 6, 2021 that he had a bruise at the area on his hand where Thompson had struck him, but he did not need or seek any medical treatment for the bruise.   A significant number of other officers suffered injuries while inside the tunnel area, including concussions, cuts, exposure to chemical irritants, bruises, and other injuries.   However, it is not possible to know whether any of these injuries were inflicted by Thompson while he and the other members of the mob were heaving together against the police line.   In his enthusiasm to throw a box speaker at the police line, Thompson did cause a head wound to a fellow rioter, who needed medical treatment for a gash on his head.

### *Cooperation*

As noted in the Factual Proffer, Thompson approached law enforcement immediately after he learned that the FBI was looking for information about him.   To his credit, Thompson obtained counsel, contacted the Department of Justice on January 21 and again on January 25, and agreed to debrief in the hopes of aiding law enforcement in the investigation.   During three formal (remote) meetings with the government, Thompson spoke to multiple prosecutors and FBI Special Agents about his own conduct and the conduct of others of whom he observed.[8]   Thompson spoke openly about his own actions and those of others he witnessed on January 6, 2021.   Thompson also provided access to his electronic devices and his social media accounts.   Thompson was deemed honest and credible, but his assistance did not rise to the level of substantial assistance. To date, Thompson's information has not used in any legal process against other targets, nor has his information been used to prosecute any other person.

---

[8] Thompson's counsel also had numerous conversations with Government counsel before and after these meetings, which made these debriefs more efficient and effective.

### III.    THE CHARGES AND PLEA AGREEMENT

Thompson engaged in cooperation and expressed his willingness to plead guilty prior to any charges having been filed against him.   Thompson ultimately agreed to plead guilty during his first appearance in court, without requiring the government to arrest or indict him.   Instead, the defendant agreed to plead guilty to one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b).

On August 6, 2021, the defendant was charged and immediately pled guilty to a one count information charging him with the assault on Sgt. W.B. with the baton in violation of 18 U.S.C. §§ 111(a)(1) and (b).   He has been detained since that date.

### IV.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Assaulting, Resisting, or Impeding Certain Officers.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Probation, the government, and defense counsel all agree to the following Guidelines analysis:

<u>Count One: 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14[9] |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | +4 |
| U.S.S.G. §2A2.2(b)(7) | Conviction under §111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
| | **Total** | **26** |
| Acceptance of Responsibility Under U.S.S.G. § 3E1.1 | | -3 |
| **Total Adjusted Offense Level:** | | **<u>23</u>** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I with one criminal history point, which is not disputed.  PSR ¶¶ 39-41. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at level 23, Thompson's Guidelines range is 46 to 57 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the

---

[9]  The starting point for a violation of 18 U.S.C. § 111 is U.S.S.G. § 2A2.4.  Because the conduct constituted aggravated assault, the cross-reference in U.S.S.G. § 2A2.4(c)(1) requires the application of U.S.S.G. § 2A2.2.

offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered, or attempted to enter, the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property   destruction; (4) the defendant's reaction to acts of violence or

destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes on January 6th weigh heavily towards a significant term of incarceration.   Thompson defendant took part in some of the most violent acts of the entire day, and he personally attempted, for more than 13 minutes, to violently enter the U.S. Capitol Building with hundreds of other violent rioters who were assaulting law enforcement officers.   In addition to his own physical violence, including striking Sgt. W.B. (and the red rioter in distress) with a baton, pushing officers, and throwing a speaker at the officers, Thompson also helped other armed rioters assault officers over and over again, and he helped steal shields from officers and then help the rioters make use of those same shields.   The defendant's violence was also reckless in the extreme, as he also assaulted at least two other rioters in his efforts to harm law enforcement officers. The defendant's conduct was also not isolated to the tunnel area, as he threatened violence against officers earlier in the afternoon on the front line of the West Front Terrace and climbed over a balustrade in his eagerness to get to the Capitol Building.   Even after he had been impacted by OC spray, Thompson returned and spent nearly two hours observing a significant amount of violence and destruction.   In short, Thompson's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence.

In contrast, the other factors above favor a degree of leniency.   Thompson did not enter the U.S. Capitol, and he did not brag about his conduct afterward on social media. Moreover, Thompson cooperated extensively with law enforcement after he learned that the FBI was looking for him.   During his debriefs Thompson express regret for assaulting the officer, and indicated he wanted to apologize to the victim officer. This expression of remorse occurred before Thompson had been arrested, and long before he entered the instant plea.

**The History and Characteristics of the Defendant**

The defendant has a minor criminal history as detailed in the PSR report, including a conviction for larceny in April 2012.   Thompson was given a probationary sentence in that matter and was re-arrested and convicted for a minor offense approximately 6 months later.   The government acknowledges that the defense has put forth evidence suggesting that the defendant has a relevant mental health history, and it has provided the government with a report from Laurie Sperry, Ph.D., who is a Board-Certified Behavior Analyst.   Without taking specific issue as to that report's conclusions, the government notes that the expert report is based solely on plea paperwork and interviews with the defendant and his mother.   The expert did not review the copious video footage of Thompson's conduct at the U.S. Capitol on January 6, 2021, or attend his debriefing sessions.   Government counsel has observed that Thompson in his debriefing sessions was intelligent, articulate, and engaged for multiple hours at a time, and that he was able to follow conversations and answer pointed questions without aid or distraction.[10]

**C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

---

[10] Government counsel has not previously been provided or reviewed the expert report identified at Attachment B to Defendant Thompson's Sentencing Memorandum that was filed earlier today. Government counsel will review the material and respond orally at the sentencing hearing.

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Thompson's criminal conduct, assaulting a law enforcement officer and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law.   When Thompson attempted to enter the Capitol itself, he did so with extreme prejudice and violence, and it was abundantly clear that anyone protecting the lawmakers, including law enforcement officers, were the enemy.   Law enforcement officers were clearly overwhelmed, outnumbered, and in the tunnel area, in serious danger. The rule of law was not only disrespected; it was under attack that day.   A sentence lower than the Guidelines range would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

---

[11]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the

---

[12] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant weighs in favor of incarceration. First, although the defendant has a criminal history category of I, this is not his first criminal conviction, and he appears to have a history of violating probation. Second, although the defendant has now cooperated and accepted responsibility for his crimes, he committed violence and he remained present to observe -- close up -- multiple additional hours of violence by rioters against law enforcement officers in their effort to seize the U.S. Capitol Building.   Thompson could have left the U.S. Capitol area immediately after he was he retreated from the tunnel, but instead he stayed until law enforcement was able to fully clear the area hours later.   This activity is concerning and suggests that Thompson was enjoying the violent spectacle. Insofar as Thompson has a history of being an outspoken and self-described "passionate" political supporter, the government remains concerned that his conduct on January 6th suggests that he may believe that the use violence is an acceptable path to achieve political ends. *See* "Alt-Right Support & Black Lives Matter Supporter Smoke Weed Together" at https://www.youtube.com/watch?v=GhiyDNGDY-w   (December 9. 2017).

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines' analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

F.      **Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, only one Capitol Riot defendant has been sentenced who has been charged with a violation of 18 U.S.C. §111 – *United States v. Scott Kevin Fairlamb,* 21-CR-120 (RCL), for violating 18 U.S.C. §111(a) (unarmed assault).   Obviously the Court is very familiar with Mr. Fairlamb, as this Court recently sentenced him to 41 months incarceration.   Fairlamb, a former Mixed Martial Arts ("MMA") fighter, obtained a police baton, stormed into the U.S. Capitol, and then violently assaulted a law enforcement officer outside the U.S. Capitol Building with his hands.   Fairlamb threatened officers on January 6, 2021, filmed a video threatening future violence after January 6, 2021, and told FBI agents when he was arrested that he would go again to the U.S. Capitol building.

The facts here are similar in a number of ways.   Like Fairlamb, Thompson armed himself with a police baton and incited violence outside of the Capitol.   Neither of them caused significant injury to the officers they assaulted, and both accepted responsibility for their actions.   There are

differences, however.   Fairlamb's Sentencing Guidelines Range was level 22, 41-51 months, and

Thompson's is a level 23 with a range of 46-57 months.   Unlike Fairlamb, Thompson also assisted

other rioters in their violent attack on law enforcement in the tunnel area by throwing a speaker

and assisting with the taking and giving law enforcement shields.   Thompson also stayed in the

heart of the violent zone, watching hours of attacks against law enforcement.   On the other hand,

Fairlamb has a more violent criminal history, and displayed significantly more threatening conduct

after the incident.   Also, unlike Fairlamb, Thompson also immediately cooperated before being

approached by law enforcement.   Accordingly, the instant recommendation does not constitute an

unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[13] *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to

---

[13] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The primary victim in this case, Sgt. W.B., did not suffer significant bodily injury for which he sought medical treatment. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Thompson must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Thompson played in the riot on January 6.[14] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Thompson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* Draft PSR ¶ 98.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 48 months, which is at the lower end of the sentencing guidelines as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, three years of supervised release and the mandatory $100 special assessment for each count of conviction.

---

[14] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:          */s/ Tejpal S. Chawla*
            TEJPAL S. CHAWLA
            Assistant United States Attorney
            D.C. Bar 464012
            555 4th Street, N.W.
            Washington, D.C. 20530
            202-252-7280 (Chawla)
            Tejpal.Chawla@usdoj.gov