```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2        _____

 3        United States of America,     ) Criminal Action
                                        ) No. 1:21-cr-00461-RCL
 4                        Plaintiff,    )
                                        ) Sentencing (via Zoom)
 5        vs.                           )
                                        )
 6        Devlyn Thompson,              ) Washington, D.C.
                                        ) December 20, 2021
 7                        Defendant.    ) Time:  2:00 p.m.
          _____
 8
                        Transcript of Sentencing (via Zoom)
 9                             Held Before
                   The Honorable Royce C. Lamberth (via Zoom)
10                   United States Senior District Judge
          _____
11
                         A P P E A R A N C E S
12
          For the Government:      Tejpal S. Chawla
13        (via Zoom)               UNITED STATES ATTORNEY'S OFFICE
                                   FOR THE DISTRICT OF COLUMBIA
14                                 555 Fourth Street, Northwest
                                   Washington, D.C. 20001
15
          For the Defendant:       Elizabeth Kelley
16        (via Zoom)               ELIZABETH KELLEY, LPA, INC.
                                   2525 East 29th Avenue, Suite 10-B #225
17                                 Spokane, Washington 99223

18        Also Present (via Zoom):
                                   Jessica Reichler, Probation Officer
19        _____

20        Stenographic Official Court Reporter:
          (via Zoom)               Nancy J. Meyer
21                                 Registered Diplomate Reporter
                                   Certified Realtime Reporter
22                                 333 Constitution Avenue, Northwest
                                   Washington, D.C. 20001
23                                 202-354-3118

24

25
```

<u>P R O C E E D I N G S</u>

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  Your Honor, we're on the record for Criminal Case 21-461, United States of America v. Devlyn Thompson.

Counsel, please identify yourselves for the record, starting with the government.

MR. CHAWLA:  Good afternoon, Your Honor.  It's Tejpal Chawla for the United States.  I can see everybody and I can hear everyone clearly, although there's a little muffling or reverb that I'm hearing.

MS. KELLEY:  Good afternoon, Your Honor.  Elizabeth Kelley representing the defendant, Devlyn Thompson.

THE PROBATION OFFICER:  Good afternoon, Your Honor. Jessica Reichler on behalf of the United States Probation Office.

THE COURT:  Okay.

MS. KELLEY:  Your Honor, we can't hear you.

MS. LE VERGNE:  Am I supposed to introduce myself?

THE COURT:  All right.  Mr. Thompson is sitting there beside you, Ms. Kelley?

1          MS. KELLEY:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. KELLEY:  And also the defendant's mother is on

4     the screen, Michelle Le Vergne.

5          THE COURT:  Okay.  First of all, Counsel, both of you

6     agree, I take it, with the final presentence report which sets

7     the guidelines and custody of 46 to 57 months, supervised

8     release at 1 to 3 years.  The guideline fine range is 20,000 to

9     200,000, restitution of 200, and special assessment of a

10    hundred dollars.  The total offense category of 23 and criminal

11    history at I.

12         I take it that's all set forth in the presentence

13    report.  That's all without objection; am I correct?

14         MR. CHAWLA:  Yes, Your Honor.

15         MS. KELLEY:  That is correct, Your Honor.

16         THE COURT:  Okay.  With those -- I make those my

17    findings then.  So with those findings then, I'll hear the

18    government's allocution first as to the appropriate sentence in

19    the case, and then I'll hear from the defendant after that.

20         The government may proceed.

21         MR. CHAWLA:  Thank you, Your Honor.

22         The events of January 6th were an attack on our

23    democracy, our civil institutions, law enforcement officers

24    who were protecting the Capitol, and the elected

25    representatives of chamber, as well as the hundreds of men and

1    women in our local community who work at the Capitol who were

2    just doing their job.

3         The rioters on January 6th were told a lie, a lie that

4    they wanted to believe against all evidence to the contrary.

5    They reveled in their success as their riot was succeeding.

6    You can see it and hear it in their chants, their exuberance,

7    their reaction in the hundreds of videos they posted online,

8    and other social media accounts.

9         And, of course, the mob used that lie to justify the

10   violence of lawlessness.  They used it to justify their

11   obstruction of the constitutional succession and, of course, to

12   attack our democracy and the police who they professed to love.

13        In truth, whatever love they professed to have was

14   outweighed by their desire for control.  It's not unlike a

15   domestic abuser who assaults their loved one while professing

16   they love their victim.  The violence of January 6th is not

17   about the rioters purported -- what they purported to love.  It

18   was about control and power through group force.

19        And that brings us to Devlyn Thompson, who was someone

20   who went to rally after rally that promoted the lie.  He came

21   to the Ellipse to watch another rally, then decided to come to

22   the Capitol.  In so doing, he crossed police lines, engaged

23   with police verbally, climbed up this part of the West Terrace

24   area on the Capitol, and then participated in some of the most

25   violent activity against law enforcement that happened that

1    day.

2         And I'm referencing specifically the battle for the

3    entrance to the Capitol, the lower West Terrace tunnel, where

4    several dozen brave Metropolitan Police Department and

5    U.S. Capitol officers were among hundreds of rioters in intense

6    hand-to-hand combat for over two hours in a dimly lit tunnel

7    amidst blinding tear gas and chemical spray.

8         With limited backup or relief, these officers endured

9    attack after attack with all matter of weapons.  They held the

10   line with remarkable restraint.  The courage and valor and

11   humanity of these officers to protect our nation shines bright

12   in stark relief to the ugliness of the mob who wished to

13   destroy it.

14        Devlyn Thompson committed numerous acts of violence in

15   the 13 minutes that he was in the tunnel, and, thereafter, he

16   observed up close and personal the attack on other law

17   enforcement officers at that same tunnel entrance for hours

18   afterwards.

19        In terms of presentation, Your Honor, I'm just going to

20   address some of the sentencing -- I know the Court has reviewed

21   the sentencing materials and knows the video pretty well, but I

22   want to focus on a few key areas because I think it's important

23   to look at these as it relates to the defendant's stated

24   information in their mental health expert report.  We do

25   believe there are problems and inconsistencies with that

1  report.

2      Let me just first say, the government doesn't take

3  serious issue with the fact that Mr. Thompson suffers from a

4  mild form of autism; that is, he has the highest functioning

5  category and lowest impaired level of a person on the ASD, or

6  autism spectrum disorder, Level 1.  We do have issues with the

7  extent of that suggestion and what that means in the report's

8  analysis, and we do have serious issue with the Vineland brief

9  study report, which was based on an hour-long interview with

10  the defendant's mother.

11      First, the report itself has problems with -- the expert

12  was limited in what they looked at.  They only interviewed the

13  defendant and their [sic] mother and looked at some of the

14  paperwork the defendant signed related to his statement of

15  offense.  There was no review of any medical paperwork or

16  written history; no review of the copious video material in

17  this case, including the government exhibits that we're showing

18  today; no discussion or reach-out to the government or agencies

19  to find out what Mr. Thompson spoke to us about; no discussion

20  with defendant's former girlfriend of more than three years who

21  he lived with -- that's the PSR paragraph 54 -- or interview

22  with the brother of the defendant -- and the mother now claim

23  would have otherwise kept him out of trouble.

24      And obviously the Court, I know, is aware that numerous

25  studies indicate there's a possibility for malingering when

1    cases are -- forensic interviews occur after a case -- criminal

2    case has been brought.  In particular, I want to focus in on

3    the Vineland brief study information.  It's a little unclear

4    about whether it was historical or current, but more to the

5    point, it's inconsistent with what the government itself viewed

6    as the evidence when it spoke to Mr. Thompson, as well as the

7    videotape evidence we're about to show you.

8          And so what I'd like to do is go through a little bit of

9    the -- just momentarily point out some of the issues related to

10   the second part of the study, which is the ADOS 2.  That is the

11   gold standard the defense is indicating.  We don't have a

12   problem with that.  But there were statements made by the

13   defendant that are not accurate.  I don't to mean say the

14   defendant's willfully lying, but the information conveyed to

15   the expert is not accurate.

16         For example, on page 30 of that report, Mr. Thompson is

17   quoted as saying he was there at the Capitol to attend a speech

18   and, quote, I was told to stay behind the line.  I never tried

19   to go past the line.  As you'll hear in the videotape evidence,

20   that is inaccurate.  He says, quote, I was not trying to hit

21   him -- that being the officer, Sergeant W.B.  In the debrief he

22   told us he was trying to strike the hand of the officer who was

23   holding the pepper spray, not just the canister, but the hand

24   itself.

25         Third, he said, quote, I wanted to go into the tunnel to

1    see what was happening, close quote.  As I think we'll present

2    in the evidence, that's incorrect.  And, lastly, he says,

3    quote, they never told me to leave.  That's also incorrect.

4    And we'll show that through the videotape evidence.

5        I would also point out, specifically, Mr. Thompson was

6    found under the ADOS 2 study to be in the autism spectrum

7    disorder category because he had 10 points out of a possible --

8    with the minimum of 8.  If he had 8, he would not have had the

9    diagnosis.  Two of the points of the 10 were awarded because of

10   what she referred to as unusual eye contact; there was

11   inability to focus and talk [sic] to people in the eye,

12   including her, the examiner.

13       As I think you'll see in the video, Mr. Thompson had no

14   problem on January 6th directly talking to people, using

15   gestures, looking at them directly in the eye, and stating very

16   vile things to people while staring at them in the face.

17       And with that, let's just go to the evidence that we're

18   talking about.  Mr. Thompson showed up on January 6th.  He was

19   politically motivated.  Still is.  That's not a crime, but the

20   fact that he was motivated by believing the big lie and

21   attending the Capitol -- you can hear in his voice, which we're

22   about to play for the Court, what he actually intended to do

23   when he got there.  He may have been there for a speech.  I

24   don't doubt that, but that quickly morphed into "I want to get

25   into the Capitol."

1    And what I would like to play to the Court is Exhibit 2,

2    which we've already provided to the Court, which is body-worn

3    camera from the frontline before Mr. Thompson comes up to the

4    tunnel area, before that frontline area is breached.

5    Mr. Thompson has already crossed onto the restricted Capitol

6    grounds, crossed signs that say you cannot enter, you're not

7    supposed to be there.  And you're going to see interaction.

8    And I'm going to state, if the Court has problems with

9    the audio, please let me know, but I'll stop at a point and

10   just clarify what I hear Mr. Thompson saying.  And you'll see

11   Mr. Thompson wearing a green Seattle Seahawks jersey.

12              (The video recording was played.)

13              MR. CHAWLA:  Can the Court see the video?  I want to

14   make sure --

15              THE COURT:  I can see the video.  I'm not hearing the

16   audio.

17              MR. CHAWLA:  Okay.  I'm going to continue playing.

18   This is at 12 seconds.  And this is Government's Exhibit No. 2.

19              (The video recording was played.)

20              THE COURT:  Now I can hear audio.

21              MR. CHAWLA:  Do you hear that, sir?

22              THE COURT:  Yes.

23              (The video recording was played.)

24              MR. CHAWLA:  That's Mr. Thompson in the green hat

25   there, and he says, "Where's your boy at?"  And I'll continue

1       playing.  You'll hear his voice.

2                    (The video recording was played.)

3                    MR. CHAWLA:  I'm going to pause here to point out,

4       you can see Mr. Thompson talking to other people, talking about

5       what he thinks the police are about to do, showing eye contact

6       to the law enforcement.  He's pointing at things, using

7       gestures, which the experts suggest he didn't really do very

8       easily or had difficulty doing.  You're going to see him

9       talking to other people.  He's also going to be told to calm

10      down in a moment, and you're going to see other persons in the

11      crowd trying to calm him down and his reaction to it.

12                   (The video recording was played.)

13                   MR. CHAWLA:  He says to the officer, "Do you want to

14      fight?  Let's fight.  One on one.  Let's go."  And you see

15      another individual, who was wearing a gas mask, trying to

16      calm down Mr. Thompson.  But, again, eye contact with both

17      the officers and the other person who's tried to calm him down.

18                   (The video recording was played.)

19                   MR. CHAWLA:  I'd also note you can see Mr. Thompson

20      had his hand there on a phone.  You'll see later on he makes

21      phone calls, including to his brother and to his mother.  He

22      talked to his brother before he goes in the tunnel.  He talked

23      to his mother after he goes in the tunnel.  Several

24      conversations, but the fact that he had communication and

25      ability to communicate with other people is apparent.  He's

1    also checking his phone.

2         And I'm going to play this last bit because I do think

3    it's relevant to the point that he made to the expert, which we

4    believe is incorrect.

5              (The video recording was played.)

6         MR. CHAWLA:  He says, "What is there left if we can't

7    talk to representatives?  What is there left?"

8         Mr. Thompson indicated he was there for a speech and he

9    was there solely for a speech.  What he's saying there is we

10   want to go up.  This is not about just going for a speech.  At

11   this point before he's even breached the line, before he goes

12   up to the tunnel, he wants to go up.  And I think the next part

13   is also telling, which I'm going to continue to play until

14   3 minutes and 15 seconds.

15             (The video recording was played.)

16        MR. CHAWLA:  He says -- right now he's talking to the

17   law enforcement officer.  "You guys are part of that system.

18   You're just as bad as Antifa."  In Mr. Thompson's world, he's

19   an alt-right supporter, and totally his right to do so.  Being

20   an Antifa supporter is the enemy.  And basically what he's

21   doing at this point is now he's creating law enforcement as the

22   enemy.

23        And from that point is when you'll see more and more

24   violence and more and more activity of Mr. Thompson being

25   engaged in that violence.  But I do think it's also important

1    to show the path that Mr. Thompson takes to go up, because it

2    wasn't an easy path to get to that tunnel.  And when he gets up

3    to the tunnel, you're also going to see the breaks that he

4    takes:  smoking a cigarette, talking to his brother on the

5    phone.  You're going to see all of that, which belays the idea

6    that he was overwhelmed, confused, disoriented, suffering from

7    ASD characteristics which made it impossible for him to control

8    himself.

9          And what I'm going to do is to change the PowerPoint

10   slide, which I know is Government's Exhibit 1, which the Court

11   has seen before.  But I just want to walk through a couple of

12   the salient pieces before that so that we're all following what

13   the government is saying about what he was doing that day.

14          THE COURT REPORTER:  Mr. Chawla, this is the court

15   reporter.  It sounds like you're brushing up against the

16   microphone on your computer.

17          MR. CHAWLA:  Okay.  I'll hold it off then.  Is this

18   better?

19          THE COURT REPORTER:  Yes.

20          MR. CHAWLA:  Can you see the PowerPoint presentation?

21   Is that what's being shown?

22          THE COURT:  Yes.

23          MR. CHAWLA:  Okay.  Your Honor, I'm going to focus in

24   on just a few of these slides, which I know the Court has seen

25   already.  You see Mr. Thompson again on the frontline here, but

1    I want to start on Images 9 and 10.  Image 9 you see

2    Mr. Thompson crawling up the side of the barricades, moving up

3    to get to where he wants to go.  So he has to climb literally

4    up about 10 feet to get to the stairs and then walk up further.

5    So you see an image here of Mr. Thompson climbing up the side

6    of the building to get to where he wants to go.

7         You then see in Slide 11 him walking up the staircase

8    after climbing up, and you can see people below climbing up

9    that same area to get to where Mr. Thompson was.  You see

10   Mr. Thompson again climbing up.  These are all from videos that

11   were available either online or -- online themselves available

12   or from the government evidence that we've got -- we've

13   submitted.  That's Government's Exhibit 1A, 1B, and 1C.

14        In the video on -- that's associated with this, that's

15   the full footage trans- -- storm, you see Mr. Thompson talking

16   to people, laughing to people, engaging with them.  Again,

17   eye-to-eye contact.  No issue or problems there.

18        Then you see here on No. 15, Mr. Thompson, again, at

19   2:35 to 2:45, the incident down at the -- at the front, which

20   we saw before was at 2:28.  When he gets to the top of the --

21   this is now the inaugural stage, he takes a break.  He smokes a

22   cigarette.  He looks relaxed.  And not only that, he takes --

23   he takes out his cell phone.  He starts looking at his

24   cell phone, and he even makes a call.  You can see on page --

25   on No. 18 and the close-up on 19, he's on the phone.  We've

1    cross-checked the cell phone records we have of Mr. Thompson.

2    He's talking to his brother at that time.  It's about a

3    59-second phone call, but it's a connected call.  It's not an

4    attempt fail.  It's a 59-second phone call.

5         And I do pause here because the -- to be clear, the

6    defense expert says -- or when the defendant suggests that if

7    his brother was there, if only he could talk to his brother, no

8    violence would have occurred.  But in truth, it appears that

9    Mr. Thompson was speaking to his brother before he went in.

10   And the fact that he had the ability to reach out to him, and

11   also later to his mother, indicates he did have the ability and

12   wherewithal and presence to even talk to them as he's going

13   through this particular moment in time on the west front of the

14   Capitol.  That's who he's reaching out to.

15        From thereafter, on paragraph -- from No. 21, 22 -- you

16   see him in 21 pointing to the tunnel, talking to another

17   individual, communicating with them.  Again, eye contact.  Hand

18   gestures, pointing up to the tunnel.

19        And then for the next 13 minutes, he then goes into the

20   tunnel.  You can see him coming up through the tunnel.  You can

21   see him seeing people leave the tunnel who are bloodied and are

22   injured.  You can see the violence as he's coming up through to

23   the tunnel.  And I think the Court is aware from the

24   unbelievable video and some of the other videos we've

25   presented, some of the violence that occurs inside the tunnel,

1     which is significant.

2          And to that, I do want to play a portion of that

3     unbelievable video.  This is Exhibit 3 in the government's

4     material.  I don't want to play all 13 minutes of while he's

5     there.  I'm just going to skip through some various sections,

6     but, again, to highlight, Mr. Thompson didn't just do a

7     one-strike with an ASP.  That's sort of what was indicated in

8     some of the expert report analysis.  That's not what occurred.

9          Mr. Thompson pushed with multiple people.  He helped

10    take shields from law enforcement officers, give shields to

11    other rioters who were attacking law enforcement officers.  He

12    threw a speaker on an individual, blooding that person.  And

13    even after striking the sergeant -- W.B. in this case -- and

14    pushing at him and striking, obviously, the -- the fallen

15    rioter who was gasping for air who was literally telling the

16    officer he couldn't breathe, Mr. Thompson still stayed in the

17    tunnel, still pushing through.

18         He's trying to get to the other side.  This is not about

19    I'm upset, there was supposed to be a speech.  He's trying to

20    get through the police line to get into the building.

21         And so I'm going to move from the PowerPoint to

22    Exhibit 3, which is the unbelievable video.

23              (The video recording was played.)

24              MR. CHAWLA:  Can you see that video, Your Honor?

25              THE COURT:  Yes.

1          MR. CHAWLA:  I'm going to move forward to about 1

2    minute and 30 seconds, which I think captures right when you

3    see Mr. Thompson about to walk in, so -- 1:29.

4          (The video recording was played.)

5          MR. CHAWLA:  The Court can see there's an individual

6    wearing a gray sweater who's telling people what to do.  He's

7    telling them, "Wait here.  Then when I need help, keep going,

8    keep pushing, push, push."  This is not just a "I want to see

9    what's going on."  There's a concerted effort here to break

10   through the police line.  There's literally thousands of

11   protesters; and a handful of law enforcement officers

12   protecting members of Congress and people inside that were

13   sheltering nearby.

14        And at this moment in time, Mr. Thompson is talking with

15   people.  You see him interact with people, and you see him

16   actually put hands on people, talk with people, and use his

17   hands when discussing issues, you'll see within the video.

18          (The video recording was played.)

19          MR. CHAWLA:  You saw Mr. Thompson there help take

20   some of the shields after being pulled out from the crowd.

21   There's an individual next to Mr. Thompson in a blue jacket.

22   That individual has a TASER in his hand.  The Court may even

23   hear the buzzing even from where this photographer is taking

24   these images.  And you're going to see him show the TASER to

25   multiple people, display it to law enforcement.  It's also in

1    our government memorandum.  And that person is right next to

2    Mr. Thompson.

3              (The video recording was played.)

4              MR. CHAWLA:  The chant there is, "Let us in.  Let us

5    in.  Let us in."

6              (The video recording was played.)

7              MR. CHAWLA:  You see Mr. Thompson jumping up and

8    down.  As the Court may be aware, there's a tunnel area here

9    that was fabricated for the inauguration, which has a wooden

10   floor.  You see Mr. Thompson essentially invigorating himself

11   as he gets closer and closer to the line knowing what he's

12   about to do.

13             (The video recording was played.)

14             MR. CHAWLA:  You see now the shield's being passed

15   forward.  There's an image that Mr. Thompson is assisting in

16   pushing the shields forward.  They're using the shields now

17   against the law enforcement officers.  Having taken it from

18   them, now they use it against them.

19             (The video recording was played.)

20             MR. CHAWLA:  At this point Mr. Thompson is joining in

21   in the push.  Now that they've locked the shields together,

22   they're using them essentially as a phalanx to try to push

23   through the officers on the other side.  You see on the other

24   side as well, the law enforcement officers pushed through the

25   first -- there's two doorways in that tunnel area.  They're

1    pushed now to the second doorway.  Essentially if they can push

2    past this, they're in the Capitol.  They're that close.

3              (The video recording was played.)

4              MR. CHAWLA:  The person holding up his hand, that's

5    the victim in our case, Sergeant W.B.  You can see him.  He's

6    actually asking the crowd to stop pushing because they're

7    actually hurting another rioter.  You heard Sergeant W.B. also

8    say prior to that, "Back up.  Back up."  When we get to his

9    body-worn camera, for literally about 3 minutes -- in that

10   3-minute period he says back up 42 times, including the moment

11   right before Mr. Thompson swings down with his baton, which,

12   again, is inconsistent with what he told the expert, which was

13   that no one ever told him to leave; I think Sergeant Bogner

14   said it at least 40 times in his presence.  And he's in the

15   front yelling into the crowd.

16             (The video recording was played.)

17             MR. CHAWLA:  That's Sergeant Bogner again saying,

18   "Get out.  Get out."  He also says, "Back up."  As you see him

19   push forward as well, they're deploying pepper spray.  And

20   you'll see pepper spray being deployed by the rioters against

21   the officers as well.

22             (The video recording was played.)

23             MR. CHAWLA:  You see a person there holding the

24   shield.  That's Mr. Thompson pushing the shield forward at this

25   point as well.  And in the 13 minutes he's in the tunnel,

1    Your Honor, I counted, using the CCTV camera, 190 people came

2    in and out of the tunnel, many of them committing violent acts

3    against the officers during Mr. Thompson's time in there and

4    trying to also get to the same objective, behind the line.

5            (The video recording was played.)

6            MR. CHAWLA:  Now, Your Honor, at the moment they're

7    in the left-hand side of the screen, you saw a speaker being

8    hoisted up.  Mr. Thompson in a moment is about to assist other

9    people in throwing the speaker forward, and it hits another

10   rioter, but he's trying to hit the officers with the very heavy

11   speaker.

12           (The video recording was played.)

13           MR. CHAWLA:  You'll see the individual in the brown

14   come back toward and through and he says, "Who threw that

15   speaker?"  You'll see him put his hand to his head, showing

16   blood that he has just received, and now retreating because of

17   that speaker being thrown on his head.

18           (The video recording was played.)

19           MR. CHAWLA:  Pausing at 10:10.  You can see the

20   person in the red where they're wearing a brown backpack in

21   front of Sergeant W.B.  He's asking for help, asking for

22   assistance.  You'll hear -- in Sergeant W.B.'s video, you're

23   going to hear him say, "I'll get you an ambulance as soon as we

24   can get to the line.  I can't call for somebody now."  He tells

25   everyone, "Back up.  Back up."  And as he does that, as he's

1   yelling, "Back up," that's when Mr. Thompson hits Sergeant W.B.

2   and also hits the rioter who has fallen to the ground and needs

3   assistance.

4           (The video recording was played.)

5           MR. CHAWLA:  You'll see Sergeant Bogner make eye

6   contact directly with the defendant, and also yelling at the

7   time "Back up" after being hit as well.

8           And you're going to -- I'm going to stop the

9   unbelievable video at this point because I think it's captured

10  in the other video.  But Mr. Thompson, even after that strike,

11  stays in that same area for several minutes while other people

12  continue to assault officers in the frontline.

13          And, again, these are inconsistent -- what we're showing

14  here is inconsistent with what the expert was told by

15  Mr. Thompson.  To be fair, Mr. Thompson told us all these

16  things during his debrief with us and was candid with us.  I

17  don't know if there was a miscommunication with the expert

18  or -- because the expert didn't have these videos, didn't

19  review the videos, didn't know what to ask of him or how to ask

20  it in a way that would be on specific issues because they

21  weren't viewing the video during the interview.  But I would

22  say that Mr. -- Mr. Thompson was candid with the government

23  when he debriefed about his activity in the tunnel.

24          I'm going to play now for the Court, just briefly, the

25  few moments of Sergeant Bogner's video, just for about a minute

1    and a half, just to show how many times Sergeant Bogner is

2    yelling, "Back up.  Back up."  Shows him giving assistance to

3    that rioter.  They've pulled him through the line and provide

4    him first aid on the other side of the line.  But you're going

5    to see Sergeant Bogner being as gracious and kind as one can

6    under pressure.

7         Let me share that screen.  Can you see the screen now,

8    Your Honor?

9              THE COURT:  Not yet.  Now I can.

10             (The video recording was played.)

11             MR. CHAWLA:  There's an officer -- Sergeant W.B. is

12   telling the crowd to back up and just leave.  They're yelling

13   to him, "This is our effing country.  Get out of our way.  This

14   is our effing country."

15             (The video recording was played.)

16             MR. CHAWLA:  We're pausing at 3:26.  The gentleman

17   who's fallen on the right in the red says, "I have asthma.  I

18   can't breathe.  Help me."  And you hear Sergeant Bogner

19   engaging with him, while also trying to fend off the crowd,

20   including Mr. Thompson.

21             (The video recording was played.)

22             MR. CHAWLA:  As he says, "I will get you an

23   ambulance," that's when Mr. Thompson strikes and hits

24   Sergeant Bogner in the hand and obviously hits the rioter, who

25   has fallen onto the ground.  But as you can hear consistently,

1    he's yelling, "Back up.  Back up.  Back up."  He is, I think,

2    engaging in what everyone would hope to be best law enforcement

3    practice someone could use without using lethal force to push

4    back and also show courtesy to people who are in need,

5    something that Mr. Thompson clearly was not showing at that

6    moment.

7         At this point, Your Honor, I'm going to stop playing

8    this video.  And I think that what happens thereafter, as the

9    Court knows, Mr. Thompson is -- is in the tunnel for a little

10   while longer but then leaves.  But he then stays outside the

11   tunnel area, and he stays outside the tunnel area while some of

12   the most significant violence takes place.  This is when

13   officers are being attacked with crutches, with all manner of

14   hockey sticks, poles, and all manner of things; that

15   Mr. Thompson is sitting outside watching all these things.  So

16   I'm going to go back to the PowerPoint to show that material.

17        THE COURTROOM DEPUTY:  Mr. Chawla, we're getting a

18   lot of feedback from your microphone.

19        MR. CHAWLA:  Oh, I'm sorry.  I didn't hold it up.

20   That's my fault.  Is that better?  I will -- sorry.  That's my

21   fault.

22        After -- this is now looking after Mr. Thompson leaves.

23   He leaves at approximately 3:05.  You can see him leaving.

24   He's been hit with pepper spray.  He's leaving the area, the

25   tunnel area.  He makes a call about 6 minutes later to his

1  mother and makes another call -- I think in duration, the first

2  call is about 7 minutes.  The second call is about 14 minutes.

3  Then he calls her again at around 4:00 and 4:15.  Again, the

4  whole time he's here, he's out in front of the tunnel area

5  where this violence is occurring.

6      So looking at page 32 of Government's Exhibit No. 1,

7  you're going to see this is after officers have pushed out the

8  protesters from the tunnel, but they're being assaulted at the

9  tunnel entrance.  Officer Fanone is being pulled out at this

10  time.  Other officers from the Metropolitan Police Department

11  are being pulled out by rioters inside.  Mr. Thompson is not

12  assaulting them, but he is engaging with the crowd, talking to

13  people, again, eye-to-eye contact, visible in that video, 1C.

14      And you see him now without his cap on.  You see him

15  outside looking on when some of this additional violence is

16  occurring for an additional two hours.  This is at 4:25,

17  approximately.  You see officers being pulled out here and

18  other people being assaulted at the front of the gate -- of the

19  tunnel entrance again.

20      Again, 4:25, you see Mr. Thompson at the bottom left.

21  Page 36, this is now 4:26.  Again, you see officers being

22  pulled out at this point.  You see a man with a hockey stick

23  attacking the law enforcement officers, other people using

24  regular sticks and poles as well.

25      Again, Mr. Thompson with his university of -- his

1    Washington State jacket on.  This is at 4:27.  This is one of
2    the officers being pulled out.  You see Mr. Thompson in red
3    circled there.  That officer is being assaulted with batons and
4    crutches while he's being pulled out from the tunnel area.
5    This is on page 38 of Government Exhibit No. 1.
6        Again, 4:27, he's there.  Again, more violence, and it
7    continues.  We captured one on -- this is page 41 of Government
8    Exhibit 1, a gentleman using a piece of furniture stolen from
9    inside of the Capitol as a weapon.  There's people inside of
10   the tunnel again in front of Mr. Thompson.
11       He is in the crowd between 4:45 and 5 o'clock.  He's
12   present all the way until the Virginia State Police finally
13   break through the front line and deploy some munitions, some --
14   I think it was some tear gas grenades and other objects to
15   finally disperse the crowd from the tunnel area.
16       So Mr. Thompson arrives at the Capitol about 2:20, 2:25,
17   and he's there all the way to 5 o'clock, at the heart of the
18   violence.  Now, I -- I believe that Mr. Thompson may have been
19   disoriented, maybe his -- his autism Level 1 maybe had an
20   impact on him, but he was able to talk to other people, could
21   have left at any time, and he chose not to.
22       And so in terms of the government's view of his conduct,
23   it is very serious.  And even though the autism may be a
24   factor, this is not -- it could not amount for all the criminal
25   conduct that we've seen and just gone over.

1          In terms of weighing the 3553 factors here, Your Honor,

2     we've laid it out in our paperwork why we believe the requested

3     48 months is appropriate.  The guideline sentence is

4     appropriate.

5          Since we filed our papers, there was another sentencing

6     in a 19 U.S.C. 111 case (b).  That was *United States v. Robert*

7     *Palmer*.  That was before Judge Chutkan.  That's 21-cr-328.

8     Mr. Palmer lost, I believe, his acceptance of responsibility

9     points and was sentenced to a guideline range and got the

10    maximum of 63 months, and Mr. Palmer was involved in assaulting

11    officers with a wooden plank and a fire extinguisher.  While in

12    the same time frame that Mr. Thompson is watching on,

13    Mr. Palmer was assaulting officers at that tunnel area.

14         He did not injure an officer.  There was no finding that

15    the specific officer was injured by his throwing of the fire

16    extinguisher, deployment of the fire extinguisher or using a

17    wooden plank, but he still received 63 months.

18         And I think, as the Court is aware, Mr. Fairlamb, who

19    was also 111 but not while armed, received 41 months from this

20    Court, just over a -- about three weeks ago now.

21         The only reason why the government is not asking for a

22    higher sentence, which frankly would be appropriate given the

23    violence in the lower West Terrace and the threat to our

24    democracy that this violence caused, is because of his

25    cooperation, which was early and extensive and, I think,

1     unique.

2          I don't know of any other defendant who pled guilty to a

3     111(a) or (b) offense without having been arrested first.  He

4     agreed to cooperate.  He met multiple times with the

5     government.  I met with him three times for probably about

6     ten hours.  I can tell the Court that the suggestion of what's

7     in the Vineland-3 study was not there at all.  He was -- he was

8     able to engage, showed eye contact.  We interacted with him.

9     We didn't have masks, but it was video.  My understanding is

10    when he met with the expert, it was in person for only a couple

11    hours, but he was both masked at the time so it was hard to

12    see.

13         But Mr. Thompson understood questions, was on point when

14    responding, didn't have difficulty viewing video or

15    information, didn't show trauma from the event, was able to

16    engage, was able to talk about other people's conduct, talked

17    about communications he had with other people while there, his

18    recollection of those; and was candidly very competent, very

19    forthright, and did not sense any issues or problems in terms

20    of our communication.

21         So in terms of where he is today, I don't know what he

22    was as a child and where he has developed or where he's at, but

23    he's been able to engage in relationships, hold steady jobs,

24    travel, travel for a living, traveling for work, travel to go

25    to protests as well, which indicate to the government that if

1    he is in the ASD spectrum, he is at the very, very low end of

2    that spectrum.  He's very high performing, and it didn't impact

3    an out-of-guideline variance in this case.

4         With that, Judge, I appreciate your patience working

5    through the technical issues, and I do apologize for my

6    microphone causing the static, but with that, I am prepared to

7    answer questions if the Court has any, but the government can

8    submit on those papers.

9         THE COURT:  No.  Give me a moment.

10        (Off the record.)

11        THE COURT:  I have a deliberating jury in another

12   case.  They've sent a note that they have a verdict.  I'm going

13   to wait just to make sure I have all the counsel there, and I

14   might stop and take the verdict and then hear from the

15   defendant.  And I'll let you-all get yourselves together, but

16   until I have counsel, we'll go ahead and finish this.  But if

17   counsel are all here, I could let that jury go and go ahead and

18   take the verdict.  I don't think it will take very long to just

19   take the verdict, but I don't want to waste your time if all

20   counsel aren't here.  I'll know in just another minute.  It's

21   in another courtroom.  We don't have to stop everything here,

22   but I'll just go to another courtroom to take the verdict.

23        (Off the record.)

24        THE COURT:  All right.  They're not ready.  So we'll

25   go ahead, Ms. Kelley.  We can't hear you.  You're on mute.

```
1              THE COURTROOM DEPUTY:  I -- I will have to unmute.

2    Give me one second.  They should be able to hit something on

3    their screen to unmute themselves.

4              THE COURT:  Can you hear me now?

5              THE COURTROOM DEPUTY:  Ms. Kelley, can you click

6    anything?  There should be something popping up to unmute

7    yourself.  Well, I can't do anything further, so I need

8    somebody on your end to unmute yourself.

9         Okay.  Thank you.

10             THE COURT:  You're unmuted.

11             THE DEFENDANT:  We're good now.  It's unmuted.

12             MS. KELLEY:  All right.  With the Court's permission,

13   I'd like to move to the head of the table.

14             THE COURT:  Sure.

15             MS. KELLEY:  Thank you.

16        May it please the Court, we are not going to get into a

17   frame-by-frame recitation of the video that has been presented

18   to this Court, in large part because much of it is ambiguous

19   and because Mr. Thompson does not even figure in -- in many of

20   those frames.

21        Instead, what we are going to focus on are the answers

22   to three major questions.  Number one, why did Mr. Thompson not

23   extricate himself from the tunnel and the Capitol premises that

24   day?  Number two, why did Mr. Thompson strike the officer?  And

25   number three, what assurances can we give the Court that
```

1    Mr. Thompson will never engage in conduct like this again?

2         In terms of the first issue:  Why did Mr. Thompson not

3    extricate himself from the Capitol premises or the tunnel that

4    day?  As is noted in the presentence report, as well as

5    Dr. Sperry's report, Mr. Thompson attended numerous political

6    rallies, in part because of his passion to politics and in part

7    because of his fixation on governmental affairs.  This, in

8    short, was his social life.  And at none of those prior rallies

9    had there been any sort of violent outbreak; otherwise

10   Mr. Thompson would not have been in Washington on that fateful

11   day last January.

12        Instead, because of his autism spectrum disorder, he was

13   uniquely vulnerable to what was going on on the Capitol grounds

14   that day.  In short, people with autism spectrum disorder

15   process social cues much more slowly than you and I would, than

16   neurotypical people would.  And they do this for a number of

17   different reasons:  Number one, because of their cognitive

18   inflexibility; that is to say, Mr. Thompson was convinced that

19   the President was going to come to the Capitol grounds that day

20   and speak.

21        A neurotypical person very quickly into the events that

22   day would understand that the President was not going to appear

23   and, instead, violence was erupting.  Mr. Thompson did not

24   process that because of his cognitive inflexibility and

25   rigidity, and that's why in large part he stayed on those

1    grounds for hours and hours upon end, even after the event was

2    over.

3         And what the Court would see in footage that was not

4    shown in today's presentation is there are many shots of

5    Mr. Thompson with just a bewildered and befuddled look on his

6    face.  Clearly events got out of control, and because of his

7    suggestibility, because of his vulnerability, he was uniquely

8    subject to what went on that day.

9         However, later the gravity of what he had done, the

10   gravity of that day in history came home when he learned from

11   other people that his image was all over social media.  And at

12   that point in time Mr. Thompson's morals, his ethics, his sense

13   of citizenship kicked in.  He retained counsel.  He sat down

14   with the government, as -- as was previously noted.  He took

15   responsibility for his actions.  Again, this is unique in a

16   constellation of January 6th defendants.

17        There has been talk in filings and in today's

18   presentation that Mr. Thompson was malingering and that there

19   were problems with the Vineland test.  But in terms of the

20   malingering, this is -- this is not the case because, as was

21   shown in Dr. Sperry's report, there are other family members

22   who have autism spectrum disorder.  And, indeed, Mr. Thompson

23   was diagnosed as a child, but as is also noted in Dr. Sperry's

24   report, medical records, unfortunately, are not available of

25   what Mr. Thompson was like as a child because the physician who

1    diagnosed him died and, despite the best efforts of his mother,

2    those records are unavailable.

3         In terms of treatment records specifically for ASD

4    throughout the years, again, those are not available because

5    they do not exist.  In short, Mrs. -- Mrs. Le Vergne, Devlyn

6    Thompson -- Devlyn Thompson's mother never specifically sought

7    treatment for Devlyn's autism spectrum disorder because in her

8    words, we just wanted Devlyn to be Devlyn.

9         So with the support and the love of friends and family,

10   everyone took care of Devlyn.  They understood that while he

11   was tremendously intelligent and very kind, he also was a bit

12   different.  And because it didn't cause any type of destructive

13   social dysfunction, they let it be.

14        However, as I'll discuss later, January 6th was the

15   clarion call to Devlyn, as well as to his family.  In terms of

16   the Vineland report -- or Vineland test administered by

17   Dr. Sperry -- suffice it to say that Dr. Sperry is one of not

18   only this country's foremost experts on autism spectrum

19   disorder, but one of the world's foremost experts.  And the

20   Vineland test administered by Dr. Sperry was intent -- was

21   administered as intended; that is to say, to one person who

22   knew Mr. Thompson's adaptive facilities the best in the entire

23   world, and that, again, is his mother.

24        This is an extremely long test with a series of

25   standardized interview questions, and in short, there is no --

1    no room for fabrication, and those tests -- those -- those

2    responses were also cross-referenced with the interview that

3    Mr. Thompson gave Dr. Sperry.  In short, Dr. Sperry, given her

4    experience and education, would have been able to have detected

5    any sort of malingering or any sort of withholding of

6    information.

7         And a final note in terms of Mr. Thompson's alleged not

8    being truthful or not being forthcoming with Dr. Sperry.

9    Wanting to see, wanting to hear a speech by the President is

10   not inconsistent with being on the Capitol grounds or even

11   being in that tunnel.  But, unfortunately, it's precisely

12   because of his autism spectrum disorder that he did not have

13   the ability, the cognition, to extricate himself from the

14   events of that day.

15        And finally, in terms of the government's time spent

16   with Mr. Thompson and their -- their inability, if you will, to

17   find anything different or to find a diagnosis of autism

18   spectrum disorder, to state the obvious, the assistant U.S.

19   attorney is not an expert, and the government did not retain an

20   expert to evaluate Dr. Sperry's report.

21        However, as Your Honor knows from reading Dr. Sperry's

22   report, uneven development is a hallmark of autism spectrum

23   disorder.  That is to say, some people like Mr. Thompson can be

24   highly, highly functional in many areas.  They can be

25   articulate.  They can be intelligent.  They can master certain

1    life skills.  Yet at the same time, they can be deficient in

2    many other areas.  And that characterizes Mr. Thompson.  That

3    characterizes many people on the spectrum.

4         And also, as Your Honor will probably remember from

5    having read Dr. Sperry's report, another hallmark of autism

6    spectrum disorder is the ability of people like Mr. Thompson to

7    mask their disability.  That is to say, they can participate in

8    a conversation, they can even maintain eye contact, but they

9    taught themselves to do that.  It's mimicked behavior.  It

10   doesn't come from any innate ability, and it usually is not

11   done with any deep understanding that neurotypical people would

12   have.

13        In terms of the second issue I'd like to address:  Why

14   on earth did Devlyn strike the officer that day?  Devlyn to

15   this day doesn't know why that happened, but the significance

16   for this Court is that Devlyn is genuinely, deeply remorseful

17   for what happened.  The Court read as a part of Exhibit B,

18   Mr. Thompson's heartfelt and sincere letter to the agent who he

19   assaulted.  We will not try and minimize that offense.

20        However, as the government itself noted in the brief,

21   the officer never needed medical attention, thankfully, and

22   that baton that Devlyn used that day was one that he found on

23   the ground.  In other words, he did not go into that tunnel

24   with -- armed with his own baton bent on hurting anyone, let

25   alone a member of law enforcement.  And as Devlyn points out in

1    his letter to the officer, one of the reasons why he is so

2    troubled and why he did is because he himself has a family

3    member who is a member of law enforcement.

4         Indeed, the numerous other letters, which are attached

5    as Exhibit D in Mr. Thompson's memorandum attest to the fact

6    that Devlyn is peaceful, he is kind, and he has never, ever in

7    his life manifested any tendency of violence.

8         And the third point I would like to cover is:  What's to

9    prevent Mr. Thompson from doing this again?  He will probably

10   never lose his love for government.  He will never lose his

11   fixation with things political, and his ideology will probably

12   never change, but what is going to change in part, in large

13   part, because of the events of that day is that Devlyn and his

14   family realize the fundamental need for Devlyn receiving weekly

15   concentrated, targeted therapy.  As I said previously, the

16   family never sought out training -- or therapy, but now they

17   have.

18        One of the reasons this Court -- or one of the

19   fundamental building blocks of change, as this Court knows, is

20   accepting responsibility, and Devlyn has mastered that first

21   step.  He has taken responsibility for his actions, and he is

22   genuinely remorseful, and now he is ready to move on.

23        We have found a therapist who is willing to work with

24   Devlyn.  He has been engaged in therapy for over 35 years,

25   specializing in treating people on the autism spectrum, and he

1    is going to work with Devlyn -- or with Mr. Thompson in order

2    to rectify his cognitive inflexibility, to better understand

3    social cues, and, most importantly, to understand why he broke

4    the law that day.

5         Devlyn will never again be unsupervised.  Family will be

6    with him to make sure that things do not get out of control,

7    that he does not go into emotionally charged situations like

8    transpired on the grounds of the Capitol that day.

9         Autism spectrum disorder does not prevent you -- one

10   from learning from one's mistakes.  In fact, research shows --

11   shows that people on the autism spectrum are hugely

12   disciplined, and once rules are clearly defined for them, they

13   follow those rules rigidly and almost religiously.

14        In conclusion, Mr. Thompson does not minimize what

15   happened on January 6th.  He does not minimize the danger that

16   day posed to our democracy and to our rule of law.  But what we

17   would request the Court to do is to separate Mr. Thompson from

18   those 700 other individuals that day because of who Devlyn is

19   and because of the potential that he can become.

20        We would ask this Court to be as merciful as possible.

21   We detail in our filings the fact that the Bureau of Prisons is

22   ill equipped to accommodate someone with his disabilities, his

23   issues, and his vulnerabilities.  Indeed, someone like Devlyn

24   would be uniquely vulnerable within our prison system, and we

25   would, therefore, ask this Court to fashion a sentence that

1   will allow him to return to his friends and his family as soon

2   as possible so he can engage in a meaningful process of

3   rebuilding his life and to becoming, once again, the

4   law-abiding productive citizen that he can indeed be.

5          And at this point in time -- or if the Court would like

6   to ask me questions -- Mr. Thompson would like to address the

7   Court.

8          THE COURT:  Okay.  I'm going to take a short recess

9   and take the verdict in the other case, and I'll be back in

10  just a few minutes, probably 10, 15 minutes.  So I'll come back

11  as soon as I can.

12          (Recess taken.)

13          THE COURT:  Okay.  Is everyone ready to go forward?

14  And I'll hear from Mr. Thompson, if you're on.

15          MS. KELLEY:  Yes, thank you.

16          THE COURT:  Okay.  Mr. Thompson, I know you'd be

17  nervous at a time like this thumb.  If there's anything you'd

18  like to say, I'm certainly interested in hearing.

19          THE DEFENDANT:  Yeah.  Thank you, Your Honor, for

20  allowing me to speak.

21          There's nothing that can be said to change the events or

22  to make up for my actions that day.  Defending those decisions

23  that I made in the heat of the moment is not possible.  So I'm

24  not going to try to use my time here given preciously by the

25  Court to do so.

1        We only get one real chance at our lives, Your Honor,

2    and, unfortunately, I have scarred mine with a mistake that

3    will not be forgotten.  No matter the punishment given by the

4    Court, the real penance will forever lie within me; that of

5    which was lost by me, tangibly and intangibly, making me

6    miserable and mounting as time passes.  Indeed, the shame has

7    already been done.

8        To borrow a quote from the very great Martin Luther,

9    "This life is not about righteousness, but growth in

10   righteousness, not health, but healing" --

11            THE COURTROOM DEPUTY:  Thank you for waiting.

12            THE DEFENDANT:  -- "not being but becoming, not rest

13   but exercise.  We are not yet what we shall be, but we are on

14   the way."

15       I've never been one to use my autism as a crutch to lean

16   on, nor do I believe that it abdicates me from any sort of

17   personal responsibility.  Dr. Sperry did help me better

18   understand how these factors played into my decision-making

19   that day, and although I plan to abstain from any circumstances

20   that could become emotionally charged in the future, I do plan

21   on continuing the treatment plan recommended to me to improve

22   upon my ability to handle any such high-stress situation.

23       Since I cannot alter my thoughtless decisions, the best

24   that I can do now is embrace my mistakes as an opportunity for

25   personal growth.  C.S. Lewis said, "We can ignore even

 1    pleasure.  But pain insists on being attended to.  God whispers

 2    to us in our pleasures, speaks to our conscience, but shouts in

 3    our pains:  it is (inaudible).

 4          THE COURT REPORTER:  I'm sorry, sir.  You're going to

 5    have to repeat.

 6          THE DEFENDANT:  Yeah.  C.S. Lewis said, "We can

 7    ignore even pleasure.  But pain insists on being attended to.

 8    God whispers to us in our pleasures, speaks in our conscience,

 9    but shouts in our pains:  it is his megaphone to rouse a deaf

10    world."

11          I'll admit that before this, there are times where

12    those -- those words fell on deaf ears, and the path forward

13    for me is one of intense personal scrutiny and seeking outside

14    help to continue to become the version of myself.

15          I know the Court's time is precious so I'll work to try

16    to conclude this statement.  Quickly, I do want to say to my

17    family, including my mother watching this, thank you for all of

18    your support.  We all know that this mistake is an aberration

19    of my life, and (inaudible) that has been given, but I also

20    need to trust and love to help me become that supreme version

21    of myself.

22          It's the last quote, I promise.  In the words of Winston

23    Churchill, "To build may have to be a slow and laborious task

24    of years.  To destroy can be thoughtless act of a single day."

25    For me, the destruction happened in a matter of just a couple

1    hours, and the Court can -- rest assure, Your Honor, that I'll

2    never make the same mistake again and will return to my simple

3    life with my family.

4         All I can ask for is mercy and grace from the Court and

5    forgiveness from God.  Thank you for your time, Your Honor.

6    God bless you and God bless America.  There's no place I'd

7    rather call home.

8         That's all I have for you.

9         THE COURT:  Well, that was an impressive statement,

10   Mr. Thompson, and I'll tell you, you're a difficult case for me

11   because I am sympathetic to the cause of autism.  The

12   difficulty is in a case like this, the attack on the Capitol

13   that day was an attack on the rule -- the very rule of law in

14   our country.  And the -- the violence that happened that day

15   was such a blatant disregard for the institutions of government

16   and the orderly process of the administration of a democratic

17   process of government that it has to be viewed as a serious

18   offense.

19        And the attack on the police officers in particular,

20   autism can't excuse it.  You had a 90,000-a-year job that you

21   were able to function at adequately to hold a job like that.

22   You're working, you're an intelligent person, and there

23   really -- I understand the -- what you now say are your views

24   of expressing regret for what happened, but the Court has to

25   look at the -- not only the seriousness of the offense and

1    adequate deterrence, specific deterrence in your case, but it

2    also has to look at the general deterrence of what kind of a

3    message is sent to the public and to others who may be in the

4    same position you're in at the time of the next election or at

5    the time the next circumstances like this are presented, and

6    the Court has to take a lot into account.

7        So when I look at the sentencing guidelines, in my view

8    I really can't see a justification for going below the

9    guidelines.  I see a justification so -- you did an early plea.

10   You did cooperate from the outset.  You've done everything you

11   could to say you know you were wrong, and you say today you

12   know you were wrong.  And I give you the bottom end of the

13   guidelines as an appropriate sentence; but to actually depart

14   down from the guidelines, I don't think, can be justified, and

15   I do not agree with a downward departure from the guidelines in

16   your case.

17       I don't think I have to do any more than give you the

18   bottom end of the guidelines, because I think that's an

19   appropriate sentence for an early plea and for your acceptance

20   of responsibility here, total cooperation with the government

21   from the time you were first contacted, and your cooperation in

22   this process.  And you deserve credit for that, and you deserve

23   credit for what you've said in this sentencing process and what

24   you've said today, but -- and you deserve credit for -- I've

25   never seen such wonderful letters from your family and friends

1    about what a good person you are overall.  So I take this as an

2    anomaly that day.

3         But it's a serious offense, and, you know, the longer I

4    looked at those tapes and the length of time you were there,

5    the more difficult it is for me to figure out how to justify a

6    downward departure.  It wasn't just -- you didn't come up and

7    just sock a guy in the face as Fairlamb did; or you just didn't

8    suddenly pick up a tool and hit him over the head with it.  You

9    were shoving and pushing and cooperating and participating in

10   this riot for hours.  It -- it's not something I could justify

11   a downward departure.

12        So that's why I'm doing this.  I don't expect you to

13   agree or accept it readily, but I'm going to explain to you

14   that's what I'm doing.

15        Pursuant to the Sentencing Reform Act of 1984 and its

16   consideration of the provisions of 18 U.S.C. § 3553, as well as

17   the advisory sentencing guidelines, it is the judgment of the

18   Court that you, Devlyn Thompson, are hereby committed to the

19   custody of the Bureau of Prisons for a term of 46 months on

20   Count 1.  You're further sentenced to serve 36 months of

21   supervised release on Count 1.

22        In addition, you're ordered to pay a special assessment

23   of a hundred dollars required to be imposed by

24   18 U.S.C. § 3013.  In addition, you should pay the balance of

25   restitution owed of $2,000 as you agreed upon in your plea

1    agreement.

2         Following supervision, you shall abide by the following

3    mandatory conditions, as well as the standard conditions of

4    supervision, which are imposed to establish the basic

5    expectations for any conduct while on supervision.  The

6    mandatory conditions include:  One, you shall not commit

7    another federal, state, or local crime.  Two, you must not

8    unlawfully possess a controlled substance.  Three, you must

9    refrain from any unlawful use of a controlled substance.  You

10   must submit to one drug test within 15 days of placement on

11   supervision, at least two periodic drug tests thereafter as

12   determined by the Court.  And four, you must cooperate in the

13   collection of DNA as directed by the probation office.

14        You shall comply with the following special conditions:

15   Restitution obligation.  You must pay the balance of any

16   restitution owed as directed by the probation office at

17   whatever rate they determine.

18        Two, you must provide the probation office access to any

19   requested financial information, authorize release of any

20   financial information.  The probation office may share

21   financial information with the U.S. Attorney's Office.

22        Three, you must submit to substance abuse testing to

23   determine if you used a substance -- a prohibited substance.

24   You must not attempt to obstruct or tamper with the testing

25   method.

1      And four, you must participate in an inpatient and/or

2  outpatient substance abuse treatment program, follow the rules

3  and regulations of that program.  The probation office shall

4  supervise your participation in the program, provide a location

5  with all the duration and intensity, et cetera.

6      Five, cognition behavioral treatment.  You must

7  participate in the cognitive behavioral treatment program,

8  follow the rules and regulations of that program:  provider,

9  location, modality, duration, intensity, et cetera.  The

10  probation officer will supervise your probation.

11      Participation in the program.  Such programs may include

12  group sessions led by counselors or participation in the

13  program administered by the probation office.

14      Six, community -- that's not necessary.

15      Within 45 days of release from incarceration, you shall

16  appear before the Court for a reentry progress hearing.  The

17  probation officer in the district in which you're supervised

18  shall submit a progress report to the Court within 30 days of

19  the reentry.  Actually, I'm not going to impose that because I

20  don't know whether the court where you're living will have that

21  program.  So I'll delete that.

22      The Court finds you do not have the ability to pay a

23  fine; therefore, waives imposition of a fine in this case.

24  Restitution payments may be made to the Clerk of the Court of

25  the U.S. District Court for the District of Columbia for

1    disbursement to the following victim:  Architect of the

2    Capitol, Office of the Chief Financial Officer, Attention:

3    Kathy Sherrill, CPA, Ford House Office Building,

4    Washington, D.C. 20515.

5         Financial obligations are immediately payable to the

6    Clerk of Court, U.S. District Court, 333 Constitution Avenue,

7    Northwest, Washington, D.C.  Within 30 days of any change of

8    address, you shall notify the Clerk of the Court of the change

9    until such time as the defendant's financial obligations are

10   paid in full.

11        Probation office shall release the presentence report to

12   all appropriate agencies, which includes the probation office

13   in the approved district of residence, in order to execute the

14   sentence of the Court.

15        Pursuant to 19 U.S.C. 3742, you may have the right to

16   appeal the sentence imposed.  If you choose to appeal, you must

17   file any appeal within 14 days after I enter judgment as

18   defined in 28 U.S.C. 2255.  You have the right to challenge the

19   conviction entered and sentence imposed if new or currently

20   unavailable information becomes available to you or on the

21   claim that you received ineffective assistance of counsel in

22   entering your plea of guilty to the offense of conviction or in

23   connection with sentencing.  If you're unable to afford the

24   cost of an appeal, you may request permission from the Court to

25   file an appeal without cost to you.

1          Pursuant to the D.C. Circuit opinion in *U.S. v. Hunter*,

2     are there any objections to the sentence imposed that are not

3     already noted on the record?

4          By the government?

5               MR. CHAWLA:  No, Your Honor.

6               THE COURT:  By Ms. Kelley?

7               MS. KELLEY:  No, Your Honor.

8               THE COURT:  Time served in -- in the pretrial

9     detention will be credited.  And, Ms. Kelley, did you have a

10    specific -- I don't know whether -- the Bureau of Prisons has

11    some experience with autism and what facility they might be

12    able to send him to.  I don't know if it's better to make a

13    recommendation that he be assigned a facility that has autism

14    or whether he -- it's better to recommend confinement close to

15    where he's -- to where his relatives are or -- if that -- which

16    is more important.  What do you want me to recommend?  What

17    does he want me to recommend?

18              MS. KELLEY:  The problem with the skills program

19    offered through the Bureau of Prisons is it's only offered in

20    Danbury, Connecticut.

21              THE COURT:  Yes.

22              MS. KELLEY:  And his mother is in Seattle,

23    Washington.  And I think at this point in time, if the BOP can

24    put him in a facility within 500 miles of his -- his family,

25    that would be best.

1           THE COURT:  Better?

2       So you would say recommend confinement closer to family?

3           MS. KELLEY:  Yes, Your Honor.

4           THE COURT:  Okay.  I -- and I don't have any

5   problem -- okay.  Okay.  Supportive family is the way I'll put

6   it in the -- in the recommendations.

7       Anything else you want me to say in the recommendation

8   then?

9           MS. KELLEY:  Nothing further, Your Honor.  Thank you.

10          THE COURT:  Okay.  The report will have the -- I

11  think the report will be adequate for the Bureau of Prisons

12  when they're making the assignment.  So hopefully they'll see

13  that.

14      Danbury is probably unlikely anyway because I think all

15  of their facilities are full.  So, you know, probably a long

16  shot anyway.

17      All right.  Anything else either counsel have?

18          MR. CHAWLA:  Nothing from the government.  Thank you.

19          THE COURT:  Okay.  All right.  I will wish you the

20  best, Mr. Thompson.  I know this is disappointing, but I -- you

21  have some great potential.  You know, you did it when you were

22  working before.  You had great potential before that day.  I

23  hope to see something good come to you in the future as well.

24  I certainly don't want to see you back on violations of

25  supervised release.  Good luck to you.

1          The Court will be in recess.

2              (Proceedings were concluded at 3:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3             I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                           Dated this 3rd day of January, 2022.

10

11                     /s/ Nancy J. Meyer
                       Nancy J. Meyer
12                     Official Court Reporter
                       Registered Diplomate Reporter
13                     Certified Realtime Reporter
                       333 Constitution Avenue Northwest
14                     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25