## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | No. 21-CR-461 (RCL) |
| | | Hon. Royce C. Lamberth |
| **DEVLYN THOMPSON,** | : | |
| **Defendant.** | : | |

---

# DEFENDANT'S SENTENCING MEMORANDUM

---

Now comes the Defendant, Devlyn Thompson, by and through his attorney, Elizabeth Kelley, and submits the following Memorandum to assist the Court in fashioning a just sentence for this case.

1

**Table of Contents**

**Page**

SENTENCING RECCOMENDATION……………………………………………3
NATURE AND CIRCUMSTANCES OF THE OFFENSE……………………...5
    I.    Forensic evaluation by Dr. Laurie Sperry undoubtedly concludes Mr. Thompson is Autistic…………………………………………………………………6
    II.    Early Manifestations of Autism…………………………………………7
    III.    Mr. Thompson's Vineland Scores are indictive of his decisions on 1/6…..,9
    IV.    Mr. Thompson's suggestibility can be explained by his ASD and his Vineland Scores ……………………………………………………………12
    V.    Mr. Thompson believed that former President Donald Trump would be coming to the Capitol after his speech…………………………………………17
    VI.    Mr. Thompson has uneven development…………………………………20
    VII.    Prison is harmful to people with autism…………………………………25
OTHER SENTENCING CONSIDERATIONS………………………………31
    I.    Mr. Thompson cooperated with the authorities……………………… ..31
    II.    Mr. Thompson was compliant while on bond……………………………31
    III.    Because of the internet, the consequences will endure…………………...32
    IV.    Mr. Thompson has a history of being bullied……………………………32
    V.    Prison would be detrimental to Mr. Thompson…………………………..33
    VI.    Mr. Thompson expresses genuine remorse for his actions and apologizes to the officer in question ……………………………………………… 33
    VII.    Family and friends believe in Mr. Thompson's inherent goodness and pledge to support him in the future …………………………………………34
CONCLUSION…………………………………………………………… 34
CERTIFICATE OF SERVICE ………………………………………………..35

# SENTENCING RECCOMENDATION

At the outset, Mr. Thompson's case presents unusual and compelling mitigating circumstances, warranting a substantial downward variance in his sentence. As discussed extensively below, although Mr. Thompson is 28-years old, he functions in many ways as a young child.

On August 6th, 2021, when represented by previous Counsel Thomas Durkin, Mr. Thompson agreed that a sentence that falls within the estimated sentencing guidelines of 46 months to 57 months would be reasonable, but according to that agreement[1], either party is permitted to seek a variance from those guidelines and to ask the Court to consider both a just and merciful sentence[2]. Again, as will be detailed below, there are substantial and compelling

---

[1] From the plea agreement: "The parties further agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. However, the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)."

[2] See *United States v. Booker*, 543 U.S. 220 (2005) which holds the guidelines are advisory, not mandatory. It also holds Courts may "tailor the sentence in light of statutory concerns. (2005). See also *Gall v. United States*, 552 U.S. 38 (2007) (the guidelines serve but just one among several factors to be considered at sentencing); *Kimbrough v. United States*, 552 U.S. 85 (2007) (an individualized assessment should be used based on the facts provided.) The Supreme Court

grounds to request the Court for leniency. U.S.C § 3553 tasks the Court with the following objectives in sentencing a defendant: (A) the Court must take into account the nature and circumstances of the offense, the need for the sentence to be imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) the Court shall fashion a sentence that protects the public from any future crimes the defendant may commit and afford adequate deterrence to criminal conduct for the public; and (C) the Court will provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In light of these objectives and due to the unusual and extenuating circumstances, Mr. Thompson requests the Court to carefully consider his role in the offense to which he pleaded guilty and seeks a downward variance due to the unusual extenuating circumstances of his situation. Given these circumstances,

---

also has held that section 3582(a) of the Sentencing Reform Act (SRA) "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation," because the Act specifically mandates that "`imprisonment is not an appropriate means of promoting correction and rehabilitation.' *Tapia v. United States*, 564 U.S. 319 (2011).(quoting 18 U.S.C. § 3582(a). Finally, 18 U.S.C. § 3553(a) sets forth that a sentence must be sufficient, but not greater than necessary to serve the purposes of punishment.

Mr. Thompson requests that the Court impose a sentence of one year and one day in the custody of the Bureau of Prisons (BOP).

# <u>Nature and Circumstances of the Offense</u>
## Mr. Thompson's Autism Makes This Case Unique From Other January 6 Cases

Devlyn Thompson is not a typical January 6 defendant. His understanding of the events as they were happening in real time on January 6 was severely impacted and distorted by his diagnosed condition of autism spectrum disorder (ASD), which is a disability of social communication and understanding. His motives for proceeding from the Ellipse to the Capitol on January 6 were unlike similarly situated defendants, whose actual purpose was to overthrow the government of the United States of America. In contrast to individuals who planned to change the election results by storming the Capitol Building with brute force, Mr. Thompson's understanding of what was transpiring was naïve and inaccurate due to his autism. See Dr. Laurie A. Sperry's Report attached as Exhibit A.

Autism[3] is not and should not be an excuse for bad behavior, but rather, it should be considered when a person's individual culpability and degree of social understanding is called into question.

---

[3] Taken from Dr. Sperry's report is the definition of autism...."Autism Spectrum Disorder Autism Spectrum Disorder Diagnostic Criteria, American Psychiatric Association, DSM 5 (2013). A. Persistent deficits in social communication and social interaction across multiple

I.      **Forensic Evaluation by Dr. Laurie Sperry Undoubtedly Concludes**

**Mr. Thompson is Autistic (Autism Spectrum Disorder or ASD)**

On September 23, 2021, Dr. Laurie Sperry, a forensic psychologist and certified

behavior analyst, conducted a thorough examination of Mr. Thompson while he

was held at SeaTac Federal Detention Center. Dr. Sperry also interviewed Mr.

---

contexts, as manifested by the following, currently or by history: 1. Deficits in social-emotional
reciprocity, ranging, for example, from abnormal social approach and failure of normal back-
and-forth conversation; to reduced sharing of interests, emotions, or affect; to failure to initiate or
respond to social interactions. 2. Deficits in nonverbal communicative behaviors used for social
interaction, ranging, for example, from poorly integrated verbal and nonverbal communication;
to abnormalities in eye contact and body language or deficits in understanding and use of
gestures; to a total lack of facial expressions and nonverbal communication. 3. Deficits in
developing, maintaining, and understanding relationships, ranging, for example, from difficulties
adjusting behavior to suit various social contexts; to difficulties in sharing imaginative play or in
making friends; to absence of interest in peers. B. Restricted, repetitive patterns of behavior,
interests, or activities, as manifested by at least two of the following, currently or by history
(examples are illustrative, not exhaustive; see text): 1. Stereotyped or repetitive motor
movements, use of objects, or speech (e.g., simple motor stereotypies, lining up toys or flipping
objects, echolalia, idiosyncratic phrases). 2. Insistence on sameness, inflexible adherence to
routines, or ritualized patterns or verbal nonverbal behavior (e.g., extreme distress at small
changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take the
same route or eat food every day). 3. Highly restricted, fixated interests that are abnormal in
intensity or focus (e.g., strong attachment to or preoccupation with unusual objects, excessively
circumscribed or perseverative interest). 4. Hyper- or hypo reactivity to sensory input or unusual
interests in sensory aspects of the environment (e.g., apparent indifference to pain/temperature,
adverse response to specific sounds or textures, excessive smelling or touching of objects, visual
fascination with lights or movement). C. Symptoms must be present in the early developmental
period (but may not become fully manifest until social demands exceed limited capacities or may
be masked by learned strategies in later life). D. Symptoms cause clinically significant
impairment in social, occupational, or other important areas of current functioning. 4 E. These
disturbances are not better explained by intellectual disability (intellectual developmental
disorder) or global developmental delay. Intellectual disability and autism spectrum disorder
frequently co-occur; to make comorbid diagnoses of autism spectrum disorder and intellectual
disability, social communication should be below that expected for general developmental level"

Thompson's mother at length on September 14, 2021. Dr. Sperry administered

three diagnostic instruments[4] testing for ASD in which Mr. Thompson met, and in

most cases exceeded, the cutoff on all three tests, meriting a conclusive diagnosis

of ASD. According to Dr. Sperry, Mr. Thompson had been previously diagnosed

with Asperger's Syndrome[5] at age 5. Autism as a diagnosis is next to impossible to

feign because its behavioral manifestations must be present in early childhood[6].

This was indeed the case for Mr. Thompson as indicated by his early childhood

Asperger's diagnosis and other childhood behavioral manifestations described by

his mother to Dr. Sperry.    Additionally, Dr. Sperry's report states there is a history

of autism in Mr. Thompson's family, providing one more data point to suggest that

there is likely a genetic component to his autism that was at work before he was

even born.

## II.    Early Manifestations of Autism

Dr. Sperry's report was replete with examples of Mr. Thompson's childhood

being impacted by his autism. According to her report, Mr. Thompson's behavioral

---

[4] Autism Diagnostic Interview Revised (ADI-R) ● Vineland Adaptive Behavior Scales- 3
(VABS-3) ● The Autism Diagnostic Observation Scale-2, Module 4- Adolescent/Adult Fluent
Speech (ADOS 2)

[5] *See* page 6 of Dr. Sperry's report

[6] Item C of the DSM definition for Autism states that symptoms must be present in the early
developmental period.

symptoms of autism began manifesting on or before 36 months of age. He had an uneven pattern of development[7] which is very common in individuals with ASD. For example, Mr. Thompson attained language at an early age, yet still could not communicate his basic needs to his mother even after the acquisition of language. He preferred to play with adults rather than other children[8] because he felt more comfortable with them, but found it difficult to play with groups of children because of his difficulties reading social cues. Mr. Thompson only had a small group of friends, and his mother reported to Dr. Sperry that they only remained friends with him because they "got him" or "accepted him". According to Dr. Sperry's report, Mr. Thompson "had a lack of imaginative play and had limited interests in playing with other children…" (P.23). She also stated that he had a tendency to be "tricked by others into doing things that could harm himself or others" (P. 14). Mr. Thompson also received special services in school. [9]Clearly, Mr. Thompson's perceptions of the world have been different from his

---

[7] See. Grandin, Temple. "Perspectives on Education from a Person on the Autism Spectrum." *educational HORIZONS* 84, no. 4 (2006): 229-234.
[8] See checklist item number five under the "Social Behavior" checklist in… Attwood, Tony. "Asperger's syndrome." *Tizard Learning Disability Review* (2006).

[9] Information obtained from an email correspondence with Dr. Sperry.

neurotypical[10] peers throughout his entire life through no fault of his own[11], putting him at a profound disadvantage in making socially acceptable and appropriate decisions.

## III.    Mr. Thompson's Vineland Scores are indictive of his decisions on January 6

Dr. Sperry administered the Vineland Adaptive Behavior Scales-Third Edition to Michelle LaVergne, Mr. Thompson's mother on September 14, 2021. According to Dr. Sperry, "The Vineland-3 is a standardized measure of adaptive behavior- the things that people do to function in their everyday lives. Whereas ability measures focus on what the examinee can do in a testing situation, the Vineland-3 focuses on what he or she actually does in daily life. Because it is a norm-based instrument, the examinee's adaptive functioning is compared to that of others his or her age." (P.9.).

---

10. Definition of neurotypical: "A neurotypical person who thinks, perceives, and behaves in ways that are considering to be normal by the general population."
https://www.verywellhealth.com/what-does-it-mean-to-be-neurotypical-260047.

[11] Autism is a condition with which one is born. *See* Hazlett, Heather Cody, Michele Poe, Guido Gerig, Rachel Gimpel Smith, James Provenzale, Allison Ross, John Gilmore, and Joseph Piven. "Magnetic resonance imaging and head circumference study of brain size in autism: birth through age 2 years." *Archives of general psychiatry* 62, no. 12 1366-276 (2005): This article has been cited 738 times in the literature to date.

First, Dr. Sperry described the communication domain of the Vineland, which measured how well Mr. Thompson exchanges information with others. It measured how well he listens, understands, and expresses himself through speech, reading and writing. On this domain, he scored at the 1st percentile among peers of a similar age. Significant impairments were noted by Dr. Sperry in Mr. Thompson's expressive communication and also his receptive communication, or what he socially understands. With regards to what he socially understands, his age equivalency is that of around a 4-year-old. And with regards to how he expresses himself, he age equivalency is closer to that of a 6-year-old. As Dr. Sperry states on page 12 of the report, "The people in Devlyn's life may think he understands everything that is being said to him, but he may not be able to understand the speaker's verbal communication or use his verbal communication effectively to communicate his wants, needs and expectations." She goes on to say that… "Verbal modes of communicating are often subject to varying interpretations due to tone, inflection, and volume." (P. 13). And "It is therefore not uncommon to see a score pattern similar to Devlyn's: very low scores in the Communication and Socialization domains, and a somewhat higher score within the Daily Living Skills domain." (P.13).

Mr. Thompson's Daily Living Skills domain was, as Dr. Sperry said is typical among people with ASD, his strongest among the domains, putting his age equivalent score of between a 14-year-old to a 22-year-old.   Although this may seem like a high score, it still puts him at only the 4th percentile rank among people his age. Daily living scores measures things like hygiene, personal care, taking care of one's health, eating, dressing, household chores, and how well he functions outside of the home.

The last domain on which Mr. Thompson was tested was the socialization domain. This was based on his mother's observations.   Under the interpersonal subdomain[12] of the socialization domain, Mr. Thompson tests out with an age equivalent score of a 3 year and 3-month- old. His coping subdomain[13] skills under socialization tests him out at 4 years old. One of the items in the coping subdomain of the Vineland-3 asks whether an individual understands that a friendly appearing person may actually intend harm.[14] As previously noted in Dr. Sperry's report, Mr.

---

[12] Page 13 of Dr. Sperry's report: "Interpersonal
Relationships assesses how Devlyn responds and relates to others, including friendships, caring, social appropriateness and conversation."
[13] Also page 13 of Dr. Sperry's report: "His Coping Skills score conveys how well he demonstrates behavioral and emotional control in different situations involving others."
[14] See bottom slide on page 5 of PowerPoint
http://downloads.pearsonassessments.com/videos/041817-Vineland-3/Vineland-3-Overview-Webinar-Handout-041817.pdf.

Thompson's mother stated that he had been easily tricked by others in the past, which is perfectly consistent with this finding from the Vineland.

## IV.    Mr. Thompson's suggestibility can be explained by his ASD and his Vineland Scores

Someone like Devlyn Thompson with a coping score of a 4-year-old and a socialization score of a 3 year and 3-month old on the Vineland would be ill-equipped to handle the chaos at the Capitol on January 6. With no one to act as a guardrail in place (his brother was not there to guide him once he got there)[15], Mr. Thompson's emotional dysregulation[16] began to unfold during the course of the day and his cognitive rigidity[17] prevented him from seeing the bigger picture of the consequences flowing from his actions, unlike most of the other people present that day.

When Mr. Thompson arrived at the Capitol on January 6, he was out of his element. As Dr. Sperry states, "To get a sense of that feeling, imagine what it would be like to wake up every day in a foreign world surrounded by people

---

[15] See page 25 of report.

[16] Coping and emotional regulation are intimately related. *See* Marroquín, Brett, Howard Tennen, and Annette L. Stanton. "Coping, emotion regulation, and well-being: Intrapersonal and interpersonal processes." In *The happy mind: Cognitive contributions to well-being*, pp. 253-274. Springer, Cham, 2017.

[17] See page 24—25 of report.

adhering to foreign customs and speaking a language you cannot understand, and not receiving explicit instruction regarding those customs or the language, thus not being able to learn them. Further, imagine that the people adhering to those customs and speaking that foreign language treated you as though you should understand, even without explicit instruction or help. That is what everyday life is like for an individual with ASD." (P.23)

It might be reasonably asked: what was Mr. Thompson doing at the Capitol of his own volition if he was so ill-equipped to be there? When a neurotypical individual goes on websites like 4chan or 8chan, they have the receptive communication abilities of an adult, that is, they can reasonably filter out information while turning to other news sources. If many neurotypical Americans did not do that who were at the Capitol on January 6, it has much more to do with today's politically charged environment and less to do with their neurological wiring from birth. However, in the case of someone like Mr. Thompson, he was inherently vulnerable due to his neurological wiring. In particular, autistic individuals can be suggestible.[18] As Maras and Bowler point out, some ASD individuals accede to propositions which other individuals put forward even if they

---

[18] Maras, Katie L., and Dermot M. Bowler. "Eyewitness testimony in autism spectrum disorder: A review." *Journal of autism and developmental disorders* 44, no. 11 (2014): 2682-2697.

don't agree with them. Greenspan has stated that individuals with developmental disabilities (of which ASD is one) are more credulous and gullible than their typically developing peers.[19] One's ability to detect or avoid potentially harmful interpersonal situations known as *social vulnerability*, is lower in individuals with ASD[20]. In other words, ASD individuals can get embroiled in situations where they don't know the consequences. Payne[21] elaborates on this point by saying...."

Theory of Mind (ToM) refers to the attribution of mental states to oneself and to others (Premack & Woodruff, 1978). It has been suggested to underpin an individual's ability to detect harmful intent (Sofronoff et al., 2011). ToM has been widely shown to be diminished in ASD (e.g., Joliffe & Baron-Cohen, 1999), which may suggest that individuals with ASD are increasingly vulnerable to manipulation and coercion into crime. Thus, it may be hypothesized when considering the

---

[19] See Greenspan, Stephen, Gail Loughlin, and Rhonda S. Black. "Credulity and gullibility in people with developmental disorders: A framework for future research." In *International review of research in mental retardation*, vol. 24, pp. 101-135. Academic Press, 2001.

[20] Seward, Rebecca J., Donna M. Bayliss, and Jeneva L. Ohan. "The Children's Social Vulnerability Questionnaire (CSVQ): Validation, relationship with psychosocial functioning, and age-related differences." *International Journal of Clinical and Health Psychology* 18, no. 2 (2018): 179-188.

[21] Payne, K. L. Introducing social vulnerability and compliance as factors for understanding offending in autism spectrum disorder. PsyPAG 32nd Annual Conference 26th-28th July 2017. 21-24

factors of social vulnerability, compliance and ToM, that individuals with ASD

may commit crimes with others (co-offending rather than solo-offending)." (p. 23)

Woodbury-Smith[22] concurs by stating: "Beyond holding extremist views,

consideration also needs to be given to risk of radicalization. Those individuals

who are marginalized or otherwise socially isolated and searching for a sense of

belong are at a particularly high risk (Kruglinski et al., 2014); numbered among

such people may be some with ASD, who may be additionally vulnerable…

Communication by way of the internet also provides for the opportunity to meet

others without the challenge of interaction – itself an avenue for their recruitment,

and perhaps unbeknownst to them."   (P. 191).   Woodbury-Smith also states: "The

tendency for certain individuals with ASD to develop fixations, whether in the

pursuit of an interest or due to having a fairly strong and rigid moral compass, is

also relevant, as is the 'black and white' style of thinking that is often described

among such individuals. While the motivation for holding extremist views is

complicated (Kruglanski et al., 2014), it is certainly possible that the fixed, black

and white beliefs in ASD may develop into views that are politicized and

associated with negative emotions towards particular groups (Palmermo, 2013)."

---

[22] Woodbury-Smith, Marc. "ASD and Unlawful Behaviour: Background." In *Handbook of Autism Spectrum Disorder and the Law*, pp. 185-197. Springer, Cham, 2021.

(p.191) Specific to Mr. Thompson, Dr. Sperry states: "His suggestibility and naïveté made him more vulnerable than the average young adult viewer of radical online ideology." (P.24).

Superimposing the aforementioned academic research onto Mr. Thompson's own personal story highlights the dynamic of how he was so vulnerable to the unique event such as what occurred at the Capitol. Mr. Thompson had the socialization and communication skills of a young child, but at the same time had the intellectual capacity to maintain politics as his main special interest[23].   And because of only having a few friends, he spent hours and hours in front of his computer.   This constituted a perfect storm.   Without many friends and alone at his computer, Mr. Thompson would spend as much as 40 hours a week[24], being fed algorithm after algorithm of false information. Says Dr. Sperry: "All of this was couched in the black and white dichotomy[25] of what it means to be a patriotic citizen…" (P.24).

---

[23] Special interests are intense, focalized interests for ASD individuals in which they spend most of their time invested. They were first noticed by Dr. Leo Kanner in 1943 of Johns Hopkins University in autistic children. See Grove, Rachel, Ilona Roth, and Rosa A. Hoekstra. "The motivation for special interests in individuals with autism and controls: Development and validation of the special interest motivation scale." *Autism Research* 9, no. 6 (2016): 677-68

[24] Page 24 of Dr. Sperry's report

[25] Black and white or "either/or" thinking is typical among autistic people. See. Stark, Eloise, James Stacey, Will Mandy, Morten L. Kringelbach, and Francesca Happé. "Autistic Cognition: Charting Routes to Anxiety." *Trends in Cognitive Sciences* (2021).

Dr. Sperry also notes in her report that Mr. Thompson has "weak central coherence", which is another common characteristic among people on the spectrum. One way of thinking about someone with issues of weak central coherence is that they literally cannot see the forest for the trees. Like the myopic eye of a nearsighted person that only takes in what it is immediately in front of it but can't view the landscape, people with weak central coherence are fixated on minute details to the point where the big picture becomes a blur. Dr. Sperry elaborates on this point: "when the events of January 6, 2021 began to escalate, he focused on the details, the fallen woman, his perceived need to see what was happening, the pepper spray in the officer's hand without focusing on the larger context of how chaotic and dangerous the situation had become for everyone." (P.24). His act of hitting the officer with the baton, while in reality egregious and misdirected, was from Mr. Thompson's point of view an act of protecting a woman he believed was being harmed by the pepper spray who had fallen to the ground. His violence that day was reactionary, unplanned and completely non-premeditated--- as evidenced by the fact that the baton he picked up was not something on his person before he used it.

**V.      Mr. Thompson believed that former President Donald Trump would be coming to the Capitol after his speech**

Taking into account the previous traits of autism – that Mr. Thompson has the social understanding of a three or four-year old, that he is extremely suggestible, and that he manifests cognitive rigidity -- it is not surprising that Mr. Thompson did not believe an insurrection was about to take place after the speech by former President Trump at the Ellipse. He did not go to the Capitol to overthrow the government. Rather, he believed former President Trump when Trump said [26].... "And after this (his speech), we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down." Trump says three times in that one sentence alone that he was going to be walking down (Pennsylvania Avenue) with the protestors, adding for emphasis that he will be there "with you." Mr. Thompson literally believed this was what was going to happen, and of course it did not. For someone with a history of being tricked by others and a person with a "literal interpretation"[27] of things, it should not be completely surprising that Mr. Thompson believed former President Trump would peaceably calm things down once he arrived at the Capitol. All day long he kept an eye out for former President Trump, waiting for him to arrive at the Capitol and

---

[26] Transcript of President Trump's 1/6 speech at the Ellipse.
https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.
[27] Page 7 of the report

save the day. As Mr. Thompson told Dr. Sperry during his interview with her...

"When I was leaving, my intention was to listen to another speech at the capitol. I had gotten text messages. I got a text that there was a planned speech. There were supposed to be two speeches at the capitol. One from an Arizona legislator and one from Women for Trump. I thought Alex Jones would be there and Trump. I saw secret service cars that I now know were carrying Pence. On the way I was walking with someone talking about architecture in DC. I got there and there was no stage. I got there - on the West side and I'm standing there and there were altercations happening. I still thought there was going to be a speech…. I was told to stay behind the line. I never tried to go past the line." (P.29-30). Mr. Thompson was bewildered there was no Trump at the Capitol when Trump said he would be "with you" (the protestors). Considering that Mr. Thompson has the coping skills of a four-year old as evidenced by the Vineland, this situation was particularly challenging: "In that moment, I thought I was going to watch a speech, there was no speech. That fueled my anger. It became a lot harder to make good decisions." (P.30).

Mr. Thompson had attended other Trump rallies, and he thought this one on January 6 would be just like all the others. He was not affiliated with the Oath Keepers, The Proud Boys, The Three Percenters, other militia groups or any formal

right wing organizations there that day, but was instead a solo participant: "I went to a rally in Georgia in November 2020, it was calm, people were praying. I went to a DC rally in November 2020, people gave speeches, it was calm. I went to another rally in Valdosta in Mid-December 2020." (P. 31). Mr. Thompson's cognitively rigid brain simply couldn't conceive of the fact that former President Trump did not arrive that day like he said he would: "If he knew there was no security, no activity, why would he send upset people? There was nothing to hold their attention. His actions were inconceivable. He created a lot of problems and he didn't even go. The most underreported part of this is that there was supposed to be a speech at the Capitol." (P.31).

Although many protestors took their cues from the former President on January 6, Mr. Thompson mistook them. He should not have been there that day, because he did not know at all what he was getting himself involved with. Thankfully because this was a once in a lifetime event, Mr. Thompson will likely never be present at such an emotionally charged mass gathering of people for the rest of his life.

## VI.      Mr. Thompson has Uneven Development

An additional point must be made for the sake of clarification. Item no. 53, p. 12, of the PSR notes Mr. Thompson recalled doing fairly well in school, as well

the PSR noting Mr. Thompson attained a salary of $90,000 a year working as a portfolio manager before the instant offense occurred.[28] The Court might reasonably inquire as to how such a discrepancy could exist between Mr. Thompson's real world accomplishments and his Vineland Scores. The Court may also wonder how such a person who has had some measure of success in the world can be this cognitively rigid. It is widely accepted in the academic literature that there are often uneven gaps in a developmental profile for an ASD individual. Psychologist Lynda Geller [29] explains:

> The uneven development across skills may result in significantly discrepant maturity levels in the same person. Social and emotional maturity may severely lag, but one is expected to behave in a certain way based on age or intellect. So, while development generally marches forward in a more or less predictable manner, emotional regulation for those on the spectrum may be delayed or altered by countless subtle constitutional differences (p. 2).

ASD individuals can have uneven IQ test scores as well. For example, some ASD individuals might have difficulty with the comprehension section of an IQ test, but may score incredibly well on block design. A question could be. "Why do

---

[28] Item 69, p. 15 of the PSR

[29] Geller, L. (2005). Emotional regulation and autism spectrum disorders. Asperger Center for Education and Training. http://aspergercenter.com/articles/Emotional-Regulation-and-Autism-Spectrum.pdf

we turn the lights off in the room?"[30]  In other words, even though some

individuals on the autism spectrum do not have an intellectual disability, such as

Mr. Thompson, this doesn't mean some of those same people do not have a

genuine social disability which effects one's ability to accurately gauge the events

around them. They absolutely do. One study [31]qualitatively described the

difficulties gifted[32] individuals on the autism spectrum have:

> In addition to areas of extreme intelligence and insight, there were also areas
> of deficit, demonstrating the asynchronous development of these
> students…… All parents discussed their students' struggle with social
> issues…..This dichotomy between students' academic abilities and their
> social abilities is one example of asynchronous development that parents
> consistently discussed. In addition to low social awareness, some of these
> students struggled with fine motor skills, fiction inference and
> comprehension, and speech. (p.288).

Other researchers [33]have pointed out that:

> Gifted children can have autism spectrum disorders, be severely emotionally
> disturbed or behaviorally disordered, and have physical handicaps or

---

[30]  Melling, Richard, and Jeremy M. Swinson. "The relationship between Autism Spectrum
Quotient (AQ) and uneven intellectual development in school-age children." *Cogent
Psychology* 3, no. 1 (2016): 1149136.

[31]  Rubenstein, Lisa DaVia, Natalie Schelling, Susan M. Wilczynski, and Elizabeth N. Hooks.
"Lived experiences of parents of gifted students with autism spectrum disorder: The struggle to
find appropriate educational experiences." *Gifted Child Quarterly* 59, no. 4 (2015): 283-298.

[32] This is not to suggest one way or another whether Mr. Thompson is gifted. The point is that
even gifted individuals on the autism spectrum can and do still have a social disability.

[33]  Neihart, M. (2008). Identifying and providing services to twice exceptional children.
In *Handbook of giftedness in children* (pp. 115-137). Springer, Boston, MA.

22

specific learning disabilities (Baum, 1994; Fox et al., 1983; Moon & Reis, 2004) (p.116).

And author Maureen Bennie echoes this point: [34]

> The uneven cognitive profile, also known as splinter skills, is when a person on the autism spectrum may demonstrate great strengths in an area but be severely lacking in skills in another area. An example of this may be great academic or verbal ability alongside a weakness in self-help skills such as personal hygiene. We need to be aware of the uneven cognitive profile because we often make assumptions on a person's ability when viewing the strength(s).

Such a description describes Mr. Thompson's life course. He apparently has had tremendous strengths and an ability to be successful in some areas of life, but has needed help in other areas---help which he has not received thus far. To further emphasize this point with regards to Mr. Thompson, Ms. Bennie also states:

> The uneven cognitive profile has to be kept in mind as the person enters into adulthood. It may not be feasible to live alone in an apartment because of the amount of responsibility. If this is the person's dream, then assessment of proper supports need to take place.

In spite of the fact that Mr. Thompson made $90,000 a year before his arrest, his mother reports there has never been a time in his life where he has lived

---

[34] "The Third Part of the Triad: The Uneven Cognitive Profile - Autism Awareness." 2010. Autism Awareness. January 24, 2010. https://autismawarenesscentre.com/the-third-part-of-the-triad-the-uneven-cognitive-profile/.

completely independently.[35] Living independently would normally be expected for

a $90,000 annual income earner, but presumably because of Mr. Thompson's

uneven developmental profile due to his ASD, this has not been the case for him

thus far. In sum, the Court should be aware that Mr. Thompson, who made a good

living for himself, still had inherent communication and social issues that

influenced his behavior on January 6.

Courts are beginning to understand how these deficits can come into play in

criminal cases. For example, in *United States v. Shore, Criminal Action No. 17-502*

*(E.D. Pa. July 7, 2020)* District Court Judge Timothy J. Savage stated:

> Autism is a (sic) neuro-developmental disability involving the brain. It is
> characterized by the presence of narrow, repetitive behavior and differences
> and difficulties in social interaction, communication, and adjusting to
> change. A person suffering from ASD is neurologically impaired in his
> ability to appreciate the unacceptability of his conduct or to intuit why this
> conduct is unacceptable. Because of his difficulty observing social norms, an
> ASD individual may engage in socially disapproved or unacceptable
> behavior, with no consciousness of wrongdoing or a real sense of how his
> behavior is viewed by others……. But, the same factors bearing on the
> juvenile's mental development and appreciation of his wrongdoing are
> present in the case of a defendant with ASD……. Shore, like others with
> ASD, shares the same characteristics with juveniles whom the Supreme
> Court has found are "constitutionally different from adults for purposes of
> sentencing." *Miller v. Alabama,* 567 U.S. 460, 471 (2012). These include
> immaturity, impulsivity, and failure to appreciate the risks and consequences
> of their actions. The same analysis applies here.

---

[35] See items 54 and 56, page 12 and 13 respectively of the PSR.

Judge Savage went on to say specifically that the defendant's ASD in *Shore* mitigated the gravity of his offense, even though by statute, the Court was bound by the mandatory minimum it was obliged to give.

## VII.      Prison is harmful to people with Autism

Mr. Thompson fully recognizes that his plea agreement includes the likelihood of incarceration.   Much has been written in recent years in mainstream media regarding the problems prisons have in being ill-equipped to handle autistic inmates[36]. For example, the Commonwealth of Virginia recently enacted a law giving state judges the power to initiate diversion.[37] Dr. Sperry states specific concern specifically about Mr. Thompson serving a long sentence:

> In general, prison is a very ineffective consequence for offending behaviors committed by people with ASD (Apel & Diller, 2017). Punishment is a consequence that occurs after a problem behavior occurs, with the intent of reducing the likelihood that the problem behavior will occur again in the future. People with ASD who are incarcerated are exposed to what has been referred to as a "criminal apprenticeship" which may make them more criminally savvy (Durose, Cooper, & Snyder, 2014). Moreover, people with

---

[36] See e.g.,
>       https://www.spectrumnews.org/features/deep-dive/autism-behind-bars/
>    https://www.themarshallproject.org/2020/11/02/prison-is-even-worse-when-you-have-a-disability-like-autism
> https://www.dallasnews.com/opinion/commentary/2017/08/15/the-u-s-justice-system-has-an-autism-problem/
> https://vadogwood.com/2020/12/29/prison-is-sheer-torture-for-people-with-autism-a-new-virginia-law-might-help/

[37]   § 19.2-303.6. Deferred disposition in a criminal case; persons with autism or intellectual disabilities https://law.lis.virginia.gov/vacode/title19.2/chapter18/section19.2-303.6/.

ASD are vulnerable to developing cognitive distortions that, in the absence of appropriate peer models, could serve to justify their offending behavior. Paradoxically, prison culture may increase the likelihood of recidivism because of the social acceptance of offending behavior within prisons (Megens & Weerman, 2012). During his interview Devlyn mentioned one "friend" he had made while living in Georgia. A friend he had seen in a bar a few times and thus, determined that this passing level of familiarity made him a friend. Due to his social naivete and suggestibility, Devlyn may leave a prison setting even more indoctrinated towards maladaptive world views.

An alternate scenario is equally problematic for Devlyn. People without autism who enter prison typically quickly affiliate themselves with people who share similar characteristics and beliefs. In other words, they seek and join a group that offers belonging and protection. Given his profound social challenges, Devlyn does not know to do this, nor would he have the skill set to join a group. Thus, like most people with ASD, Devlyn would become an "unaffiliated prisoner." As such he would be extremely vulnerable to becoming the target of verbal, physical and sexual assault by all groups. Pp. 33-34.

Dr. Sperry's statement strongly suggests that the less time Mr. Thompson spends in an incarcerated setting, the greater the chances of rehabilitation.

Further attestation of this matter comes in the form of a declaration by Jack T. Donson—Vice President of Prisonology LLC who has more than thirty-three years of experience in providing expert consulting and testimony to federal courts and the Federal Bureau of Prisons (BOP) regarding appropriate placement for a particular defendant (*See* Declaration of Jack T. Donson attached as Exhibit B.) Salient concerns arising in regards to Mr. Thompson from Jack Donson's report are as follows:

26

Mr. Donson's professional opinion estimates Devlyn Thompson falling just below the cutoff for eligibility in a minimum security due to the mandatory Public Safety Factors (PSF) of "Greatest Severity Offense" and a "Threat to Government Officials" unless the BOP waives this requirement. Mr. Donson therefore concludes that Mr. Thompson will likely be classified as a low security inmate by the BOP. Mr. Donson expresses significant concern regarding this classification because even in this setting, Mr. Thompson will be placed with others who have a more extensive criminal history and orientation including sex offenders, and people serving sentences longer than 10 years.

Tying the low security classification specifically to Mr. Thompson's ASD, Mr. Donson concurs with Dr. Sperry that Mr. Thompson will be at a greater risk of exploitation and the likelihood of prolonged protective custody.   Mr. Donson states that the BOP does not provide appropriate recognition and treatment of ASD for those within their custody and care. Only one BOP facility in the United States even mentions autism in its literature, (Danbury, Connecticut), and their treatment/programs are not tailored at all for ASD individuals. Danbury is the only Low security skills program in the country, but it is significant distance across the country from Mr. Thompson's current residence in Washington State. Mr. Donson quotes the BOP Skills program as making the following statement about ASD:

27

"When describing the Skills Program, the BOP states inmates with autism spectrum disorder, 'are more likely to be victimized and/or manipulated by more sophisticated inmates. As a result, they may be placed in the special housing unit for their protection or may have frequent misconduct reports because of their limited decision-making skills." (P.5).

Autistic individuals are like fishes out of water in prison. It is the most contraindicative setting one could ever conceive of for a person on the spectrum. For example, ordinally, individuals on the spectrum benefit from direct, non-ambiguous, individualized instruction and direction on what is appropriate and what isn't[38]. But as Mr. Donson points out, the BOP has a ratio of one correctional officer for every 150 inmates. Given such drastic staff limitations, Donson echoes the concerns Dr. Sperry has regarding Mr. Thompson falling into a "criminal apprenticeship" the more time he spends in prison. Guards will not be there to hold his hand when he steps into the facility in which he is to serve time. Inmates will immediately test him upon his arrival in an informal vetting process designed to establish where in the prison hierarchy Mr. Thompson belongs. Autistic individuals are just not inherently equipped to handle this kind of harassment by instinctively joining a group to gain protection from the masses. And as Mr.

---

[38] Kemeny, M. Elizabeth, and Deborah Hutchins. "Comparative effectiveness of an individualized goal-directed approach and nongoal-directed approach for social outcomes in adolescents with autism spectrum disorder." *American Journal of Recreation Therapy* 16, no. 3 (2017): 17-28

Donson eloquently states, Mr. Thompson's history is one where there has been an absence of interest in peers and affiliation with others, suggesting he would be much more vulnerable going it alone in this setting. In addition, Mr. Donson reinforces what was painfully obvious by Mr. Thompson's Vineland Scores: His socialization, communication, coping and daily living scores are like that of a young child. Donson points out Dr. Sperry's evaluation and some of the behavioral characteristics that make up Mr. Thompson's ASD symptomatology. Among those listed were prolonged staring, fixation on objects, showering up to 5 times daily, rocking, head banging and executive functioning[39] deficits. Executive functioning challenges often produce processing delays, making responding to emergency AND ordinary situations, such as getting on the ground quickly or standing for count upon request, extremely difficult to perform on the spot. Prison staff may feel Mr. Thompson is being noncooperative if his slow auditory processing makes it harder for him to answer a question quickly or perform a specific task swiftly. These behaviors and challenges, which are inherently harmless in and of themselves towards other people and are a part of Mr. Thompson's makeup, will

---

[39] Executive functioning concerns one's planning ability, generativity, flexibility, working memory, motivation, concept of time, and ability to shift attention. Executive functioning is to human behavior what air traffic control is to aviation. Individuals on the spectrum are usually incredibly hyperfocused on specific things, but sometimes can't keep track of everything that is happening around them—which can effect decision making.

not be tolerated by the BOP. Staff will see these behaviors as issues of non-compliance. They aren't. Having not previously been incarcerated will make things more difficult for Mr. Thompson.   This constellation of traits in a custodial setting puts Mr. Thompson at a high risk for unwittingly being cited and written up by BOP staff for disciplinary citations when the behavior simply stems from autism. This will only make his situation worse, even though he is not purposefully engaging in any insolent behavior.

Mr. Donson notes that the two FCI's closest to Mr. Thompson are not necessarily within a 500-mile radius of where he currently resides. The two closest FCI's in distance to Mr. Thompson that meet his classification level are FCI Terminal Island (San Pedro, CA – 1,157 miles from Seattle) and FCI Lompoc (Lompoc, CA – 1,078 miles).

Mr. Donson concludes:

> Any correctional treatment objectives and/or program requirements would best be accomplished with stringent conditions of supervision during a period of home detention (p.9).

The undersigned recognizes this remedy is likely not available for Mr. Thompson. But hopefully the Court will encourage the BOP to ensure Mr. Thompson is placed in the setting that is best suited to meet his unique needs so that irreversible damage is not done. Perhaps the Court could request that the BOP waive its

requirement in this unique case and place Mr. Thompson in a minimum security setting instead of a Low security setting. In addition to Mr. Thompson's ASD, it is important to remind the Court that he has never behaved violently in his life prior to this incident. If a placement classification exception cannot be made, the undersigned asks the Court to keep in mind these factors when it fashions a sentence for Mr. Thompson that will mitigate the effect a custodial setting will have on his unique characteristics.

## **OTHER SENTENCING CONSIDERATIONS**

In addition to the mitigating factors already presented, there are several other issues which Mr. Thompson requests the court to consider.

**I.      Mr. Thompson cooperated with the authorities**

As soon as it was made known to Mr. Thompson that his connection to these events made him wanted, he immediately turned himself in. He cooperated with the government's investigation and participated in three proffer sessions with various members of the U.S. Attorney's office and the FBI. He also voluntarily turned over access to all his social media accounts. His timely plea saved the government time, resources and energy.

**II.     Mr. Thompson was compliant while on bond**

While on bond and before he was taken into custody, Mr. Thompson had been fully compliant with his bond conditions.

**III.      Because of the internet, the consequences of this offense will endure**

Autistic individuals are 85% likely to either be unemployed or underemployed[40]. To his credit, Mr. Thompson was employed even though he found the conditions of employment very difficult due to his autism and the social nature of the job he had. (Sperry Report, p.16-17). However, he was terminated because of the charge against him. The reality is that because his name appears on virtually every major news site on the internet, this offense will follow him for the rest of his life.

**IV.      Mr. Thompson has a history of being bullied**

Dr. Sperry states:

When asked, Devlyn admitted to being bullied by his older cousins. He spent a great deal of time growing up on a property owned by his grandmother that was shared by his uncle and cousins so he was routinely exposed to teasing about an incident where he fell and was injured in the shower when trying to pick up a bar of soap. This led to teasing, which Devlyn described as "mean spiritied" about sexual assault for a number of years. He felt his cousins recognized that he wasn't as "tough" as them. He did try chewing tobacco, splitting logs, climbing trees and dressing like his cousins to fit in. (P.17).

---

[40] https://www.forbes.com/sites/jenniferpalumbo/2021/04/27/why-autism-speaks-is-encouraging-companies-to-hire-those-on-the-autistic-spectrum/?sh=12b66e2852a2.

Thus, someone like Mr. Thompson would be particularly vulnerable in a prison

with more seasoned inmates, especially as he has not been previously incarcerated.

## V.     **A lengthy prison sentence would be detrimental to Mr. Thompson**

As mentioned earlier, Dr. Sperry states that "paradoxically, prison culture

may increase the likelihood of recidivism."   P. 24. Indeed, a recent *Wall Street

Journal* article states:[41]

> Merrick Garland has told other Justice Department officials he is concerned
> that jailing rioters who weren't hard-core extremists for extensive periods
> could further radicalize them, according to people familiar with the matter, a
> concern he has expressed more broadly about defendants entering the
> criminal justice system. But he has left recommending sentences to the
> prosecutors directly involved, who have been making decisions based on
> nine factors, court documents indicate.

## VI.   **Mr. Thompson expresses genuine remorse for his actions and apologizes to the officer in question**

Attached as Exhibit C are two letters from Mr. Thompson.   The first was

written after several months of incarceration and reflects the fact that he has had

time to consider his actions and commit to avoiding similar circumstances.   The

---

[41] https://www.wsj.com/amp/articles/judges-prosecutors-diverge-on-sentencing-jan-6-capitol-rioters-11634203801

second letter is addressed to the officer Mr. Thompson struck.   He apologizes for his actions and expresses respect for the position which the officer holds.

## VII.   Family and friends believe in Mr. Thompson's inherent goodness and pledge to support him in the future

Attached as Exhibit D are numerous letters from family and friends. Many speak to the fact that Mr. Thompson has displayed characteristics of autism spectrum disorder, and many speak to the fact that over the years, he has been capable of great acts of kindness and generosity.

## Conclusion

Based on the foregoing, Mr. Thompson requests a sentence which reflects the objectives of Section 3553. Mr. Thompson has been in custody since he pleaded guilty on August 6, 2021. A sentence of a year and a day is sufficient, but not greater than necessary, to fulfill the purposes of sentencing in Mr. Thompson's case, and taking account of the "defendant specific" circumstances. *United States v, Gardellini,* 545 F.3d 1089, 1095 (D.C. Cir. 2008) *(Kavanaugh, J)*. The Court has "far more substantive discretion" to sentence "differently from the Sentencing Guidelines" than previously. Id.   It should exercise that discretion in this case to fashion an appropriate sentence for Mr. Thompson.

Respectfully submitted,


/s/Elizabeth Kelley
ELIZABETH KELLEY
(pro hac vice)
ELIZABETH KELLEY, ATTORNEY AT LAW
2425 E. 29th Ave., Ste. 10-B, #225
Spokane, WA 99223
(509)991-7058
ZealousAdvocacy@aol.com

## CERTIFICATE OF SERVICE

Elizabeth Kelley, Attorney at Law, hereby certifies that the foregoing
was served in accordance with Fed.R.Crim.P.49,
Fed.R.Civ.P.5, LR5.5, and the General Order on Electronic Case Filing
(ECF) pursuant to the District Court's system as to ECF filers.
/s/Elizabeth Kelley
ELIZABETH KELLEY
ELIZABETH KELLEY, ATTORNEY AT LAW
2525 E. 29 th Ave., Ste. 10-B, #225
Spokane, WA 99223
(509)991-7058
ZealousAdvocacy@aol.com