UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.   No. 21-CR-461 (RCL)
     Hon. Royce C. Lamberth

DEVLYN THOMPSON,

Defendant.

DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO
18 U.S.C. § 3582(C)(1)(A).

Devlyn Thompson, through undersigned counsel, respectfully moves this Court to modify his sentence and order his immediate release on the grounds articulated by 18 U.S.C. § 3582(C)(1)(A). Mr. Thompson's Autism Spectrum Disorder (ASD) is exacerbated by and deteriorating as a result of the circumstances of his confinement and the failure of FCI Yazoo City to provide even the most basic mental health care. Mr. Thompson has been in custody since his guilty plea under the advice of prior counsel in July 2021. His continued detention, however, no longer serves the purposes of 18 U.S.C. § 3553(a). For that reason and for those stated below, Defendant respectfully requests that this Court exercise its discretion to order his immediate release pursuant to 18 U.S.C. § 3582(C)(1)(A).

**I.  Background**

**Mr. Thompson's ASD**

1

ASD is a disability of social communication and understanding. Mr. Thompson was diagnosed along this spectrum with Aspergers Syndrome[1] at age five and more recently with ASD in 2021. ECF 43 at 7.[2] Mr. Thompson's autism effects both his expressive and receptive communication, leaving him the ability to the express himself at the approximate age equivalency of a six-year old and to receive communication with the approximate age equivalency of a four-year old child. *Id.* at 10.[3]

Like other autistic individuals, Mr. Thompson's ASD has been, and will stay, with him for his entire life. *See* AUTISM SPECTRUM DISORDER ("ASD" OR "AUTISM"), Centers for Disease Control and Prevention (https://www.cdc.gov/dotw/autism/index.html) (last visited Oct. 19, 2022) ("There is no cure for ASD."). It is only through ongoing management, treatment and care that

---

[1]
> Asperger's Disorder (or Asperger's syndrome) was added as a disorder separate from Autistic Disorder in the Diagnostic and Statistical Manual of Mental Disorders — IV ("DSM-IV") in 1994. However, in 2013, the DSM-V replaced Autistic Disorder, Asperger's Disorder, and other pervasive developmental disorders with an umbrella diagnosis of autism spectrum disorder.

*Etherington v. Saul*, No. 1:19-CV-475-JVB-JPK, 2021 U.S. Dist. LEXIS 22277, at *12 n.3 (N.D. Ind. Jan. 21, 2021) (quoting AUTISM SOCIETY, *Asperger's Syndrome*, https://www.autism-society.org/what-is-aspergers-syndrome/ ).

[2] Mr. Thompson provided the Court with an extensive overview of his diagnosis and its impact on his daily life and coping abilities in his Sentencing Memorandum and incorporates the same by reference herein. *See* ECF 43.

[3] Consistent with his diagnosis, Mr. Thompson's intellectual, as opposed to social, abilities are unimpaired. It is for this reason that, when surrounded by the necessary social supports, *e.g.*, his parents, Mr. Thompson was able to hold down a job as portfolio manager. *See id.* at 21; *see also e.g.*, https://en.wikipedia.org/wiki/John_Elder_Robison (last accessed Oct. 27, 2022) (detailing the life of John Elder Robison, diagnosed with ASD and a scholar in residence at the College of William and Mary); https://planningacrossthespectrum.com/special-needs-financial-planning-team/ (last accessed on Oct. 27, 2022) (the professional biography of Andrew Komarow, a well-known and successful financial planner with ASD who founded a financial planning firm focusing on serving clients with ASD).

2

Mr. Thompson can maximize his functionality and participate successfully in society. *See* AUTISM SPECTRUM DISORDER, National Institute of Mental Health (https://www.nimh.nih.gov/health/topics/autism-spectrum-disorders-asd) (last visited Oct. 19, 2022) (describing ASD as a "lifelong disorder" within which "treatments and services can improve a person's symptoms and daily functioning."). It is in the context of this lifelong condition that Mr. Thompson is experiencing his confinement.

It was also in this context that Mr. Thompson fell into the hole of misinformation that led to his presence at U.S. Capitol on January 6, 2021 and ultimately to the conduct that forms the basis of his conviction and confinement. It was with the receptive communication ability of a neurotypical four-year old child that Mr. Thompson read and absorbed the misinformation online that led him to attend the rally on January 6 and to join the crowd as it marched to the Capitol. It was with the receptive communication ability of a neurotypical four-year old child that he expected and anticipated that Mr. Trump and others would accompany him to the Capitol and would give speeches there. And it was with the receptive communication ability of a neurotypical four-year old child and the expressive abilities of a six-year old child that Mr. Thompson experienced the mounting noise, chaos, and violence and with which he ultimately saw a woman near him fall to an officer's pepper spray. And it was with those communicative abilities, compounded by a myopic literalism that accompanies ASD, that Mr. Thompson picked up a baton and struck the officer to, in his mind, protect a fallen woman. And it is now with these child-like abilities that Mr. Thompson is experiencing and attempting to navigate a prison which has provided no treatment or mental health care in the era of COVID-19.

**Procedural Background and Sentencing**

After his arrest and immediate remand in July 2021, Mr. Thompson entered a plea agreement on August 6, 2021, the basis of his conduct at the U.S. Capitol, pleading guilty to one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). ECF 9. This Court sentenced him to forty-six months imprisonment on December 21, 2021. At the time of sentencing, the Court was aware of Mr. Thompson's ASD. It was not, however, aware that the Department of Justice (DOJ) would send Mr. Thompson to a facility thousands of miles away from his sole source of support — his parents — and that, once there, the Bureau of Prisons (BOP) would fail to provide Mr. Thompson any mental healthcare whatsoever, let alone treatment for his condition. Nor was the Court aware that the BOP would frequently, and for long periods, deprive Mr. Thompson of any means to contact his family, so that he was left to attempt to navigate a Mississippi prison facility without any of the support essential to an autistic person.

In the months after his sentencing, Mr. Thompson was sent to FCI Yazoo City Low in Yazoo City, MS, more than two thousand miles away from his parents in Washington State. Since his arrival to FCI Yazoo City and despite his attempts to request care, Mr. Thompson has not received any treatment of or care for his ASD, a condition compounded by the circumstances of the COVID-19 pandemic and response. Even during "normal" times, the BOP unit environment is loud, hectic, and crowded. This is precisely the type of environment that causes the deterioration of the condition of someone with ASD, like Mr. Thompson. Recently, however, those

4

conditions have been exacerbated as a result of FCI Yazoo City's "red" COVID status and the programming that has been suspended as a result. Lock down conditions, which have been the standard since Mr. Thompson's arrival, have meant that he has been in the unit between 23 and 24 hours a day, with little to no time or space in the recreational yard or elsewhere to recover from constant sensory overload.

In the face of this near constant sensory overload, Mr. Thompson has seen neither a psychologist nor a medical doctor. He has received no treatment whatsoever. Since entering the BOP, Mr. Thompson has been afforded only one meeting with psychology staff, an intake that occurred in August of 2021. Since that time, the BOP has failed to provide any treatment or create a treatment plan. This failure, combined with the current conditions of FCI Yazoo City, has allowed Mr. Thompson's ASD to go entirely untreated and has left him isolated, vulnerable to manipulation and abuse, and in a condition of consistent deterioration.

During this time, the facility has also frequently prevented Mr. Thompson from contacting his parents, his sole source of guidance and support. This has meant that, with the social processing capacity of a four-year old child and expressive capacity of a six-year old, Mr. Thompson has been susceptible to the whims of other inmates, who have pressured Mr. Thompson to smoke marijuana and to use and hold a counterfeit phone. With no support to ensure his functionality, Mr. Thompson is particularly susceptible to the phenomenon known as "criminal apprenticeship" as he attempts to learn and survive the prison's social strata and codes. *See* ECF 43 at 25. As a result and without access to the social cues and processing capacity of a neurotypical adult, Mr. Thompson has been placed at a heightened risk of abuse from

5

both fellow inmates and guards and has similarly deteriorated in his condition so as to put at risk any post-confinement rehabilitation so that he might rejoin society as a functioning member. *Id.* Because his mother does not hear from him for weeks at a time when he is prevented from communicating and is thousands of miles away from the facility, there is little to ensure that Mr. Thompson's condition does not entirely devolve.[4]

FCI Yazoo City's complete failure to provide any mental healthcare or treatment has rendered Mr. Thompson's confinement in contradiction to the purposes of 18 U.S.C. §3553(a). Mr. Thompson's ASD, when considered in light of prison's failures, presents an extraordinary and compelling circumstance so as to justify his release pursuant to 18 U.S.C. § 3582(C)(1)(A). For that reason, Mr. Thompson, through counsel, asked the Warden to file a motion for his compassionate release on September 16, 2022. To date, the Warden has not responded.

**II. Argument**

"Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody." *United States v. Bardell*, No. 6:11-cr-401-RBD-DAB, 2022 U.S. Dist. LEXIS 181785, at *1 (M.D. Fla. Oct. 4, 2022). When the BOP demonstrates its incapability or unwillingness to both

---

[4] In general, Mr. Thompson makes contact with his mother whenever possible. However, the BOP prevented such communication early his his sentence, and she did not hear from him for weeks on end, an occurrence that has become distressingly periodic. Most recently, immediately following his request to the Warden to seek early release on his behalf, Mr. Thomson was placed in segregation, without access to phone or email, further isolating him from any source of social guidance or support. *See* Email to counsel from YAZ-PublicInformation-S (BOP) (Oct. 7, 2022) (confirming that Mr. Thompson's communication privileges were suspended) (Ex. A).

6

administer the ordered sentence and maintain the humanity of the defendant, as it has done here, it is within this Court's discretion to order the defendant's early release.\

Compassionate release is created and governed by 18 U.S.C. § 3582(c)(1)(A). Pursuant to that section, this Court has discretion to reduce the defendant's sentence and "grant compassionate release under statutory circumstances." *United States v. Jackson*, 26 F.4th 994, 1001 (D.C. Cir. 2022). "The principal requirement of the statute is that the defendant must present 'extraordinary and compelling reasons that warrant such a reduction.' It also requires that the judge, in making such decision, act consistently with the sentencing requirements of section 3553(a)." *Id.* (quoting § 3582(c)(1)(A)(i)) (alterations omitted).

Mr. Thompson files this Motion pursuant to the statute's most recent iteration, whereby "a defendant may file a motion for compassionate relief on his or her own behalf[.]" *United States v. Johnson*, No. 02-310 (JDB), 2022 U.S. Dist. LEXIS 129168, at *10-11 (D.D.C. July 21, 2022). A defendant may do so after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a [compassionate release] motion on the defendant's behalf or [after] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Mr. Thompson has exhausted those remedies and turns to this Court to recognize the extraordinary and compelling circumstances presented by his mental health condition and exacerbated by current conditions within FCI Yazoo City.

**A. Mr. Thompson has exhausted his administrative remedies.**

Section 3582(c)(1)(A) permits a district court to reduce a sentence on a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" *or* "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" (emphasis added). In this case, Mr. Thompson has met his exhaustion requirements. He sent his request to the FCI Yazoo City Warden on September 16, 2022. Email and Attached Letter to Warden (September 16, 2022) (Ex. X). In that letter, Mr. Thompson requested that the Warden move for compassionate release on Mr. Thompson's behalf or, in the alternative, release him to home confinement, pursuant to the CARES Act, 18 U.S.C. 3624(c)(2). *Id.* As grounds, the defendant cited, as he does herein, his ASD and the conditions within FCI Yazoo City causing the deterioration of his condition and his overall mental health. *See id.*

The Warden has failed to respond in any manner, and the 30 days prescribed by statute lapsed on October 16, 2022. *See* § 3582(c)(1)(A) (counting "30 days from the receipt of such a request by the warden of the defendant's facility").[5]

### B. Mr. Thompson's mental health condition presents extraordinary and compelling circumstances compounded by the facility's COVID restrictions, lack of mental health care and security determinations.

Mr. Thompson's ASD is a serious cognitive impairment that has deteriorated already at an alarming rate since his remand and will continue to deteriorate if left

---

[5] While Mr. Thompson has met his exhaustion requirements in this matter, it is worth noting that those requirements are neither jurisdictional, *United States v. Johnson*, 464 F. Supp. 3d 22, 28-29 (D.D.C. 2020) (Jackson, J.), nor subject to "hyper-technical" application. *Johnson*, No. 02-310, 2022 U.S. Dist. LEXIS 129168, at *10-11. Rather, like the grant of compassionate release itself, they are subject to the district court's discretion. *See id.*

untreated, unsupported, and in the circumstances created by imprisonment in general and the lock down conditions sustained since the COVID-19 pandemic. It is this set of circumstances, which the BOP is either unwilling or unable to address, that is extraordinary and compelling so as to justify compassionate release.

The BOP's Policy Statement, § 1B1.13, on Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A), although not mandatory in motions filed directly by the defendant, is instructive. Application of this standard "permits a fact-specific, flexible analysis of potentially extraordinary and compelling reasons for release that turns on the defendant's age and the particular conditions and circumstances presented by his physical and mental health." *United States v. Greene*, 516 F. Supp. 3d 1, 23 (D.D.C. 2021). Pursuant to that policy statement, extraordinary circumstances exist where a defendant is "suffering from a serious functional or cognitive impairment." 18 U.S.C. Appx § 1B1.13(1)(A)(ii)(II). Mr. Thompson's ASD is just such a functional and cognitive impairment, exacerbated and worsened by prison conditions and lack of mental health care.

Even if, however, assuming *arguendo*, Mr. Thompson's ASD does not constitute a medical condition or "functional or cognitive impairment" within the meaning of § 1B1.13, it remains in this Court's discretion to find, rightly, that his circumstances are extraordinary and compelling. The D.C. Circuit recently determined that Section 1B1.13 is not "applicable" to compassionate release motions filed directly by defendants because it "applies only to motions for compassionate release filed by the Bureau of Prisons." *United States v. Long*, 997 F.3d 342, 355 U.S.

9

App. D.C. 167 (D.C. Cir. 2021).[6] Examination, therefore, of Section 1B1.13 is not necessary to trigger this Court's discretion.

Rather it is the deterioration of Mr. Thompson's mental and social condition and the facility's abject failure to address or attempt to prevent that deterioration that constitutes a compelling circumstance. This deterioration is attributable not only to the nature of the correctional system but to FCI Yazoo City's abject failure to provide any mental health care services to Mr. Thompson whatsoever, let alone of the nature necessary to manage his ASD. *See generally*, Letter from Michelle LaVergne (Ex.B; *see also United States v. Gaffney*, No. 1:95-cr-53 (LMB), 2022 U.S. Dist. LEXIS 54404, at *11-12 (E.D. Va. Mar. 25, 2022) (granting motion for compassionate release where BOP failed to provide adequate care to inmate with Hepatitis C) *compare United States v. Patino*, No. 1:19-cr-27-MOC-DCK-4, 2021 U.S. Dist. LEXIS 227559, at *2-3 (W.D.N.C. Nov. 24, 2021) (denying compassionate release where, to the extent Defendant suffered from mental health conditions, the BOP treated those conditions, including with prescription medication). This failure can only be remedied by Mr. Thompson's release, as permitted by § 3582(c)(1)(A).

**C. The factors set forth in Section 3553(a) favor of a sentence reduction.**

In addition to the extraordinary circumstance presented by Mr. Thompson's medical and cognitive condition, analysis of "the factors set forth in [S]ection 3553(a) to the extent that they are applicable," *Johnson*, No. 02-310, 2022 U.S. Dist. LEXIS

---

[6] Several other circuits join D.C. in determining that the policy statement is not binding. *See United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021); *United States Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

129168, at *34 (quoting 18 U.S.C. § 3582(c)(1)(A)), also weighs in favor of early release.

> Section 3553(a) instructs courts to "impose a sentence sufficient, but not greater than necessary" and to consider several factors including "the nature and circumstances of the offense and the history and characteristics of the defendant;" the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*Id.* Even a cursory analysis demonstrates that these factors weigh in favor of Mr. Thompson's compassionate release. His original offense, when considered in light of his complete lack of criminal history and social and cognitive disability, does not justify continued detention. This is because any further detention will not only fail to serve the intent of Congress codified in Section 3553 but will directly undermine that intent by inflicting damage such that Mr. Thompson will be increasingly unable to join society as a functional and law abiding member.

The court's reflection "on the applicable statutory sentencing factors—including 'the nature and circumstances of the offense,' 18 U.S.C. § 3553(a)(1), 'the history and characteristics of the defendant,' *id.*, and 'the need for the sentence imposed . . . to protect the public from further crimes of the defendant,' *id.* § 3553(a)(2)(C)— " should leave the court "confident that none of these factors is an impediment to the compassionate release reduction that the current extraordinary and compelling circumstances warrant for several reasons." *Johnson*, 464 F. Supp. 3d at 40 (alterations omitted).

1. **The nature of the underlying offense and Mr. Thompson's characteristics weigh in favor of compassionate release.**

Devlyn Thompson is not a typical January 6 defendant. Unlike other January 6 defendants, whose actions were informed and motivated by extreme political ideology and whose plans implicitly or explicitly contemplated violence,[7] Mr. Thompson's ASD impacted and distorted his understanding of both the events as planned and of the events as they unfolded. Unlike other January 6 defendants, Mr. Thompson did not, at any stage, contemplate violence.

Rather he went with the literal belief that Donald Trump would also march to the Capitol and that there would be another speech on Capitol grounds. *See* ECF 43 at 18-19. That these events did not occur as promised, combined with the chaos that ensued, overwhelmed Mr. Thompson's social and communicative processing abilities. With the coping ability of a small child, Mr. Thompson was particularly ill-equipped to handle the chaotic scene that unfolded once at the Capitol.

It was at the peak of this chaos that Mr. Thompson committed the act of hitting a police officer. The actions underlying Mr. Thompson's offense were the result of his weak central coherence, a condition common amongst those diagnosed with ASD manifesting in a literal inability to see the forest from the trees. As explained by Dr. Laurie Sperry, the forensic psychologist and certified behavior analyst who diagnosed Mr. Thompson and provided a report to this Court at sentencing,

---

[7] This Court and others have examined the offenses and characteristics of other January 6 defendants, including those who planned to go to Washington, D.C. armed with batons and knives and with the stated purpose of "crack[ing] some commi[e] skulls." *United States v. Neefe*, No. 1:21-cr-567-RCL, 2022 U.S. Dist. LEXIS 42196, at *2-3 (D.D.C. Mar. 9, 2022) (second alteration in original). Mr. Thompson undisputedly does not fall in such a category.

> when the events of January 6, 2021 began to escalate, [Mr. Thompson] focused on the details, the fallen woman, his perceived need to see what was happening, the pepper spray in the officer's hand without focusing on the larger context of how chaotic and dangerous the situation had become for everyone.

ECF 43-1 at 24. Based on this myopic view, to Mr. Thompson, the act of hitting the officer with the baton was an act of protecting a woman whom he believed was being harmed by pepper spray who had fallen to the ground. *Id.* And while that act remains wrong and without excuse, it was not, like the actions of other January 6 defendants, an attempt to defy authority to or to attack law enforcement. Rather, Mr. Thompson's violence that day was isolated, reactionary, unplanned and completely unpremeditated. Unlike other defendants, Mr. Thompson had *no* weapons on his person before the incident occurred; rather his choice to pick up the baton in the moment further evinces the reactionary and unpremeditated nature of Mr. Thompson's actions. *See* ECF 43.

Mr. Thompson has no criminal history apart from the present offense. Until the events of January 6, Mr. Thompson held a job as a portfolio manager without ever getting into trouble. *Id.* at 21. He was able to maintain this position, despite his social disability, with the support of his immediate family. That support system, critical to his successful functioning, is currently thousands of miles away in Washington State, a fact further weighing in favor of Mr. Thompson's release. These facts weigh in favor of a reduction in sentence.

> **2. The remainder of the sentence imposed is unnecessary to serve the purposes of § 3553(a).**

13

Requiring Mr. Thompson to serve the more than two years "outstanding on [his] original sentence would not accomplish any of the objectives identified by Congress in § 3553[.]" *Johnson*, 464 F. Supp. 3d at 31 (quoting *United States v. Wade*, No. 2:99-cr-00257-3, 2020 U.S. Dist. LEXIS 69474, 2020 WL 1864906, at *6-7 (C.D. Cal. Apr. 13, 2020)) (ellipsis omitted). In contrast, the longer Mr. Thompson is required to stay in prison, particularly under the conditions present in FCI Yazoo City, the more likely his will be to regress in his condition and increase his risk of recidivism."In general, prison is a very ineffective consequence for offending behaviors committed by people with ASD." ECF 43-1 at 33. FCI Yazoo City's inability and unwillingness to manage Mr. Thompson's ASD renders what would otherwise be a theoretical concern a reality.

In her report to the Court provided at sentencing, Dr. Sperry described the phenomenon of "criminal apprenticeship," whereby an autistic person, instead of being rehabilitated in prison, is likely instead to learn and attempt to ascribe to the social and behavioral cues provided by other offenders:

> Punishment is a consequence that occurs after a problem behavior occurs, with the intent of reducing the likelihood that the problem behavior will occur again in the future. People with ASD who are incarcerated are exposed to what has been referred to as a "criminal apprenticeship" which may make them more criminally savvy (Dulrose, Cooper, & Snyder, 2014). Moreover, people with ASD are vulnerable to developing cognitive distortions that, in the absence of appropriate peer models, could serve to justify their offending behavior. Paradoxically, prison culture may increase the likelihood of recidivism because of the social acceptance of offending behavior within prisons (Megens & Weerman, 2012).

*Id.* This tendency, directly contrary to the intent of Congress in passing Section 3553(a) is compounded by Mr. Thompson's social disability and his complete isolation from his moral and behavioral compass — his immediate family. Rather than "protect[ing] the public from further crimes of the defendant," pursuant to Section 3553(a)(2)(C), therefore, Mr. Thompson's continued imprisonment will only decrease his future functionality and put him at immediate risk.

There is, in short, no "need for the sentence imposed," as it will neither provide "just punishment," deter future criminal conduct, protect the public, nor "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2). Rather, Mr. Thompson's continued imprisonment, under the conditions present at FCI Yazoo City, fail entirely to provide him with any necessary treatment. And they similarly place Mr. Thompson at a risk of either internalizing criminal socialization or, given "his profound social challenges," place him at risk of becoming an "unaffiliated prisoner" — someone without a group and "extremely vulnerable to becoming a target of verbal, physical and sexual assault by all groups." ECF 43-1 at 34. Indeed, Mr. Thompson has repeatedly expressed fear of this outcome in communications with his mother. *See* Letter from Michelle La Vergne, Ex. (X).

Finally, Section 3553(a)(6) weighs in favor of a reduced sentence in order "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In this case, it is not only Mr. Thompson's lack of criminal record that must be considered, but also his ASD diagnosis. A review of the one other similarly situated defendant in this district

15

demonstrates that Mr. Thompson has already served a sentence exceeding that of the one other defendant diagnosed with ASD and sentenced for his conduct on January 6th.

After being charged for his conduct of smashing two windows with a flag pole at the Capitol, Nicholas Rodean received a sentence of 240 days home confinement. Kyle Cheney, *Jan. 6 rioter gets probation not prison after judge finds autism played a role*, POLITICO (Oct. 29, 2022) (<https://www.politico.com/news/2022/10/26/jan-6-rioter-gets-probation-not-prison-after-judge-finds-autism-played-a-role-00063588>) (last accessed Oct. 31, 2022). Although the sentencing court, Judge Trevor McFadden, had sentenced a defendant for similar conduct just the previous day to twenty-four months in prison, Judge McFadden accepted defense arguments that Mr. Cheney's ASD rendered him particularly susceptible to misinformation and uniquely vulnerable in prison. *Id*. These same concerns not only apply in Mr. Thompson's case but have already materialized. Mr. Thompson's time in FCI Yazoo City has "devastat[ed Mr. Thompson's] mental health and sideline[d]" his previous progress toward overall functionality. To enforce the remainder of his sentence is only to increase this disparity.

   **D. Mr. Thompson's post-release care proposal will ensure his safety, the safety of others and will meet his particular medical and mental health needs.**

It is clear that Mr. Thompson cannot get the care and support that he needs in prison. Upon his release, he proposes that he will be released to live with his parents, Michelle and James LaVergne at 6008 242nd St. E. in Graham, WA. There, Mr.

Thompson would have the financial, emotional and medical support necessary to ensure his post-release rehabilitation and success. He would also be in an environment free from sensory overload and where his needs are met, as his parents are in contact with an expert in the field of autism treatment to assist in Mr. Thompson's transition from the BOP and to attempt to repair the damage already done during incarceration.

With this support, Mr. Thompson hopes to regain the functionality he had before his incarceration and before the events of and leading up to January 6. While there are no guarantees ensuring that Mr. Thompson would regain the employment he had prior to his arrest, such would be the eventual goal, along with his mental and social rehabilitation. *See Johnson*, No. 02-310 (JDB), 2022 U.S. Dist. LEXIS 129168, at *37 ("The Court will not deny [the defendant's] motion simply because he does not have a job lined up at this point in time.").

## III. Conclusion

Mr. Thompson has already been incarcerated for nearly eighteen months. Without any prior criminal history and in the context of Mr. Thompson's ASD, this time has been more than sufficient to achieve the purposes of 18 U.S.C. § 3553(a) so that Mr. Thompson has understood and reflected upon the gravity of his offense. Continued detention, however, will only undermine those gains and serve to frustrate the intentions of Section 3553(a). For those reasons stated above, Defendant urgently asks this Court to issue his immediate release pursuant to 18 U.S.C. § 3582(C)(1)(A), so that he may receive the specialist treatment and care he requires in furtherance of his successful and lawful reentry into society and the intents of 18 U.S.C. § 3553(a).

17

Respectfully Submitted,

/s/ Elizabeth Kelley
Elizabeth Kelley (pro hac vice)
ELIZABETH KELLEY, ATTORNEY AT LAW
2425 E. 29th Ave., Ste. 10-B, £ 225
Spokane, WA 99223
(509) 991-7058
zealousadvocacy@aol.com

## CERTIFICATE OF SERVICE

Elizabeth Kelley, Attorney at Law, hereby certifies that the foregoing was served in accordance with Fed. R. Crim. P. 49, Fed. R. Crim. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the District Court's system pertaining to ECF filers.

/s/ Elizabeth Kelley
Elizabeth Kelley (pro hac vice)
ELIZABETH KELLEY, ATTORNEY AT LAW
2425 E. 29th Ave., Ste. 10-B, £ 225
Spokane, WA 99223
(509) 991-7058
zealousadvocacy@aol.com