### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-461 (RCL)** |
| **DEVLYN THOMPSON,** | |
| **Defendant.** | |

### UNITED STATES' OPPOSITION
### TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Devlyn Thompson's motion for a compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF 45 or "Mot.").

**OVERVIEW**

Defendant seeks immediate release in this matter. He claims that his Autism Spectrum Disorder ("ASD") has caused negative consequences during his incarceration, such that "[h]is continued detention . . . no longer serves the purposes of 18 U.S.C. §3553(a)."   (Mot. at 1). Specifically, the defendant claims that because his ASD has not yet been properly addressed while incarcerated during the COVID pandemic, and the defendant has suffered hardship while incarcerated, that he must be released.  Alternatively, the defendant requests a sentence reduction and early release. *Id.* at 10-12. Defendant asserts that because he asked for immediate release from the Bureau of Prisons (BOP) before filing his motion, that he has fulfilled his administrative exhaustion requirement.  *Id.* At 7-8.

We respectfully disagree on all points. As discussed herein, defendant failed to exhaust his administrative remedies, as the record is bereft of the efforts that the defendant suggests he has made to obtain medical services from the Bureau of Prisons ("BOP").  The ASD diagnosis, which

1

was fully known and briefed to the Court at sentencing, is not directly threatening to the defendant's physical health, and the defendant has made no showing through competent evidence, such as from a health report or psychiatric evaluation, that his mental or physical health has significantly atrophied.  Indeed, many of the defendant's claims appear to be related to COVID-19 restrictions and precautions which have been imposed on all BOP inmates.  The defendant's motion does not indicate which specific, needed services are unavailable at BOP, nor has he identified the steps he has taken to avail himself of services either inside or outside BOP.  For example, the defendant has not shown efforts taken to obtain these BOP services, and he could obtain counseling services through virtual (contactless) meetings with a health care provider of his own accord.  Additionally, the defendant appears to have admitted that he has engaged in criminal conduct while incarcerated at BOP (smoking drugs and keeping cell phone contraband) which suggests that an early release will not further protect the community.   Defendant's motion also fails because the 18 U.S.C. § 3553(a) factors do not weigh in favor of a reduction in sentence. Therefore, this Court should summarily deny defendant's request for immediate release, without a hearing.

## I.      ADDITIONAL BACKGROUND

### A.  The Instant Offense

The facts of this case are described in detail in the Statement of Offense (ECF 10), the PSR (ECF 23), and the government's memorandum in aid of sentencing (ECF 30 at 1-2).  In short, the defendant came to Washington, D.C. at the behest of the former President and he participated in the January 6, 2021 insurrection at the U.S. Capitol.  He unlawfully crossed onto prohibited property and engaged in efforts to push through the police line in the Lower West Terrace ("LWT"). After breaking through the initial police line around the U.S. Capitol, the defendant

engaged in direct contact with officers in the LWT tunnel area, where officers were holding back a mob of rioters who were trying to storm into the building.  Thompson pushed together with the mob against the police in the LWT tunnel and he assaulted one officer with a stolen police baton. Despite suffering from exposure to irritant gas in the LWT tunnel, the defendant remained in the area of the assault on officers in the LWT for several hours thereafter.  The defendant cooperated with law enforcement prior to his arrest, and pled guilty to one count of violating 18 U.S.C. §§ 111(a)(1) and (b).  The defendant was detained pending sentencing on August 6, 2021.

After full briefing at sentencing, including taking into the account the defendant's ASD condition and its possible impact on his incarceration, on December 22, 2021, this Court sentenced him to 46 months incarceration, to be followed by 36 months of supervised release.  An amended judgement was noted on January 4, 2022, and no appeal was noted.  The defendant is presently located at FCI Yazoo City Medium, which is medium security facility at BOP.

On December 7, 2022, defendant moved for compassionate release (ECF 60).   On December 12, 2022, this Court ordered the government to respond.  The government then sought and received leave to file this memorandum.

**B. Information Regarding BOP and Yazoo City**

Yazoo City FCC provides for numerous services for inmates, including psychiatric services. Federal Correction Complex Yazoo City, Mississippi "Admission and Orientation Handbook," located at https://www.bop.gov/locations/institutions/yaz/YAX_aohandbook.pdf. According to its most recent handbook, the services include access to psychiatric services and other life-planning programs.  The defendant has not provided any evidence indicating that he has taken specific efforts to avail himself of these programs, or to seek a transfer to another BOP facility.  Importantly the defendant claims he has been deprived the ability to talk to his mother,

but he has not established any specific cause for this lapse (which may include the defendant's personal choice, consequences imposed for violations he has incurred while incarcerated or COVID-contact valid restrictions).

As the Court is aware, from the outset of the pandemic, the BOP has made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the CDC and the World Health Organization. Those efforts continue.

We recognize that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

Under current practices, BOP institutions operate at one of three operational levels (Level1, Level 2, Level 3). The institutions determine their operational level "based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective community transmission rates." *See* https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp. Medical isolation, contact tracing and PPE appropriate for each setting are in effect for all three levels. Under Level 1 operations, fewer modifications are necessary; under Level 3 operations, the BOP's COVID-19 pandemic plan is followed. Many other modifications are in place, regardless of the operation level. For example, "inmates are tested for SARS-CoV-2 when they are symptomatic, asymptomatic but exposed, during movements, and when surveillance is needed." *Id.* Inmates who are not fully vaccinated must complete a 14-day quarantine as new intakes or if they have a known or suspected exposure to COVID-19. Staff and inmates who are not fully vaccinated should be

screened at least weekly when community transmission is substantial or high, and face coverings are to be worn at all times indoors, regardless of vaccination status. *Id*.

BOP's efforts have been fruitful. Some inmates inevitably will be infected and some of that cohort may succumb, but this also is true in the population at large.  In addition, acting under the authority granted in the CARES Act, BOP has transferred thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 15% lower, at the lowest level in decades.[1]

As the Court may recall from the sentencing, the defendant is not vaccinated against COVID-19.  Contrary to defendant's claim, as of the filing of this motion, Yazoo City Medium is presently operating at Level 2 (only 6 facilities at BOP are currently operating at Level 3). [2]

## II.   <u>ARGUMENT</u>

The government respectfully opposes defendant's request for compassionate release. As an initial matter, defendant has not shown that he exhausted his administrative remedies as required. Even if he had, defendant has not demonstrated sufficient cause for immediate release

---

[1]  Currently, the BOP has over 5,600 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is over 52,000. *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/ (accessed Feb. 7, 2023).

[2] The Court can find the overall number of BOP facilities at a particular operational level, as well as the operational level for a particular BOP institution, here: https://www.bop.gov/coronavirus/index.jsp

based on unsubstantiated claims that he has encountered negative consequences as result of his ASD diagnosis (and the failure to receive assistance for that diagnosis).   Additionally, the § 3553(a) factors do not favor a sentence reduction.

### A.   Legal Principles for Compassionate Release Motions

Generally speaking, federal courts may not modify a term of imprisonment after it has been imposed. *See Dillon v. United States*, 560 U.S. 817, 824 (2010). This rule of finality "is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011); s*ee also* 18 U.S.C. § 3582(b).  Before the enactment of the First Step Act in 2018, only the Bureau of Prisons could seek compassionate release for a defendant. *See United States v. Long*, 997 F.3d 342, 348 (D.C. Cir. 2021). With the passage of the First Step Act, however, defendants now may file for compassionate release on their own behalf. *See id.* As amended by the First Step Act, § 3582(c)(1)(A) now states in relevant part as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –

> (i)     extraordinary and compelling reasons warrant such a reduction; . . .

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).[3]

In *Long*, 997 F.3d 342, 347 (D.C. Cir. 2021), the D.C. Circuit held that the policy statement set forth at U.S.S.G. § 1B1.13 "is not applicable to compassionate release motions filed by defendants."[4] Accordingly, the Court is not bound by § 1B1.13 in deciding whether this defendant,

_____

[3] Under § 3582(c)(1)(A(ii), the Court may grant compassionate release to a defendant who has, among other things, served at least 30 years pursuant to a sentence imposed under 18 U.S.C. § 3559(c). Defendant is not serving a sentence under this provision and thus seeks early release under § 3582(c)(1)(A)(i).

[4] The "policy statement" referenced in the statute is set forth at U.S.S.G. § 1B1.13, which was promulgated before the First Step Act was enacted. However, "the Sentencing Commission has lacked a quorum since early 2019, and so it has been unable to update its preexisting policy statement concerning compassionate release to reflect the First Step Act's changes." *Long*, 997 F.3d at 348. *Long* held that the policy statement "is not applicable to compassionate release motions filed by defendants." 997 F.3d at 347. In so holding, *Long* made clear that it was analyzing whether a district court could treat the dangerousness criterion of § 1B1.13 as "controlling," so that that provision could operate "as a categorical bar on relief." 997 F.3d at 354, 357, 360. Thus, when *Long* held that § 1B1.13 was not "applicable," *id.* at 359-60, it did so in the context of the First Step Act's mandate that a court *had to* consider any "applicable policy statements issued by the Sentencing Commission." *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Accordingly, this Court is not bound by § 1B1.13 in deciding whether a defendant who has filed for compassionate release is entitled to early release under 18 U.S.C. § 3582(c)(1)(A). Still, as five circuits have correctly recognized, the § 1B1.13 policy statement continues to provide useful guidance as to the extraordinary and compelling nature of a defendant's circumstances. *See United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021) (policy statement is a "guide"); *United States v. Tomes*, 990 F.3d 500, 503 n.1 (6th Cir. 2021) ("[B]ecause district courts are free to define extraordinary and compelling on their own initiative, they may look to § 1B1.13 as relevant, even if no longer binding") (cleaned up); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (policy statement "may inform" discretion but not binding); *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) (policy statement not dispositive but "informs" the analysis); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (policy statement "can guide discretion without being conclusive"); *see also United States v. Shabazz*, No. 17-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021) ("Though no longer *binding* for compassionate release motions not brought by the Bureau of Prisons, the Policy Statement remains an important and useful guidepost for courts considering such motions, and the Court sees no reason to disregard completely the Commission's decades of expertise in assessing the substantive contours of the 'extraordinary and compelling reasons' that might justify release." (internal citations and quotation marks omitted; emphasis in original); *United States v. Wilson*, Crim. No. 96-319-01(CKK), 2021 WL 5292457, *2 (D.D.C. Aug. 6, 2021) (although not controlling in context of defendant-filed motions, policy statement "still provide[s] 'important guideposts'"); *United States v. Hicks*, No. 93-97-2 (BAH),

who has filed for compassionate release, is entitled to early release under 18 U.S.C. § 3582(c)(1)(A). This Court may, however, look to § 1B1.13 and its commentary as "as persuasive authority." *United States v. Jenkins*, 50 F.4th 1185, 1192 (D.C. Cir. 2022).

When Congress enacted the 1984 Sentencing Reform Act, which included the original compassionate release statute, the term 'extraordinary' was understood to mean 'most unusual,' 'far from common,' and 'having little or no precedent.'" *Hunter*, 12 F.4th at 562 (quoting *Webster's Third New International Dictionary: Unabridged* 807 (1971)). The D.C. Circuit has recently underscored this point, stating that neither obesity nor sleep apnea "is an extraordinary circumstance," even if they "put the prisoner at higher risk for serious illness should he contract COVID-19," given how common they are: "Indeed, it is sometimes said that the nation suffers from an epidemic of obesity." *United States v. Jackson*, 26 F.4th 994, 1002 (D.C. Cir. 2022). The Supreme Court similarly has used the word "extraordinary" to describe rare forms of equitable relief granted only due to the emergency nature of the proceeding and the lack of other available remedies. *See, e.g.*, *United States v. Morgan*, 346 U.S. 502, 511-12 (1954) (coram nobis relief); *Kugler v. Helfant*, 421 U.S. 117, 124-26 (1975) (injunctions). By contrast, the defendant's arguments would render broad swaths of the federal prison population eligible for compassionate release. Many prisoners could colorably allege that are doing poorly in prison because of the COVID-19 restrictions, and that they are being taken advantage of by other inmates, or are committing crimes while incarcerated, because of poor educational skills, low IQ, medical

---

2021 WL 1634692 at *5 (D.D.C. April 27, 2021) (policy statement is "highly persuasive authority"). The policy statement lists three examples of "extraordinary and compelling" reasons, all pertaining to grave medical or family issues. U.S.S.G. § 1B1.13 app. n.1.

conditions, or mental impairment or disability.  As *Jackson* recognized, rationales like these that apply to so many others are not "extraordinary."[5]

As the movant, defendant bears the burden to establish that early release is warranted. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).  To do so, defendant must show (a) that he has exhausted his right to appeal the BOP's failure to seek compassionate release on his behalf or that 30 days have lapsed since he sought a reduction in sentence from the warden of his BOP facility; (b) the existence of extraordinary and compelling circumstances sufficient to warrant his early release; and (c) that weighing the applicable § 3553(a) factors counsel in favor of early release.

B.  **Defendant Has Not Shown that He is Entitled to Compassionate Release.**

This Court should deny defendant's request for compassionate release because he has not exhausted his administrative remedies in seeking or obtaining treatment he claims is the cause of his current condition.  Further, even assuming *arguendo* that the defendant's request for compassionate relief to the warden sufficiently merits administrative exhaustion, the defendant's purported mental health conditions do not constitute an extraordinary and compelling reason for release.  Additionally, the § 3553(a) factors weigh against release.

---

[5] Statutory structure confirms this conclusion. The compassionate-release statute must be interpreted in the context of the broader federal sentencing scheme. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[W]e must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'"). A "general rule of finality" applies to a final criminal judgment, which "may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010).  In general, "compassionate release" means immediate release for compassion-related reasons based on extreme life circumstances, particularly medical circumstances. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) (definition of "medical parole," "[a]lso termed compassionate release," under entry for "parole") ("The release of a terminally ill prisoner to a hospital, hospice, or other healthcare facility."). And that is the role compassionate release has long played within the federal system.

9

### 1.   *Defendant Has Not Exhausted Administrative Remedies.*

As noted above, 18 U.S.C. § 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it does so "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ." 18 § 3582(c)(1)(A).   Thus, a "court may consider a defendant's [compassionate-release] motion only after the defendant has" exhausted those remedies. *United States v. Morales*, No. 06-CR-248-4 (JDB), 2021 WL 4622461, at *2 (D.D.C. Oct. 7, 2021).   The purpose of the rule is for the BOP, in the first instance, to evaluate the evidence and arguments of the defendant.  *See United States v. Jenkins*, 2020 WL 1872568 at *1 (D.Neb. Apr. 14, 2020) (Court should not consider motion "based on evidence or arguments that weren't presented to the Bureau of Prisons first").   The exhaustion requirement is a mandatory claim-processing rule that is not subject to equitable exceptions and must be applied when the government invokes it. *See Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1848 (2019); *Eberhart v. United States*, 546 U.S. 12, 16 (2005).

Here, defendant has claimed to have filed a request to the Warden at Yazoo City FCI from September 16, 2022, Mot at 8, and cited an exhibit "X," but it did not attach any such document or exhibit.  Instead, it submitted a letter dated October 6, 2022 at Exhibit 1 to its Motion that asked the Warden for assistance in contacting the defendant.  Without knowing more, or the detail of the request (if any) made to the Warden, the defendant has not come close to exhausting *all* administrative remedies to obtain relief from the Warden, including efforts to correct improper conditions or obtain the mental health care they say has not been provided.  As an example, while

10

the defendant claims of difficulty in contacting his family, he has not established any specific efforts taken by the defendant to remedy this situation: indeed the facts as presented could be caused by the defendant's personal choice, a punishment for his illicit activities while incarcerated, or COVID-19 related restrictions based on the entry and exit of prisoners from the facility.

As noted above, the exhaustion requirement is a mandatory claims processing rule that must be applied when the government invokes it. Defendant's motion fails because he has not shown that he exhausted all of potential administrative remedies as required before filing it.

**2. *Defendant Has Not Shown an Extraordinary and Compelling Reason for a Sentence Reduction.***

As explained above, a court can grant a sentence reduction, after considering the 18 U.S.C. § 3553(a) factors, only if it determines that "extraordinary and compelling reasons" justify the reduction. 18 U.S.C. § 3582(c)(1)(A)(i).  That is not the case here.  To be clear, compassionate release was not meant to unsettle the presumption of finality for criminal judgments and reopen them to constant litigation about the fairness of the underlying sentence.  Rather, the statute is for "extraordinary and compelling" circumstances like terminal illness, exceptional family circumstances, advanced age after a substantial stint in prison, or acute vulnerability to a dangerous pandemic. The Sixth Circuit recently reversed a decision granting release to a prisoner raising garden variety theories for compassionate release, holding that alleged *Booker* error, "relative youth" at the time of the crime, and disparities with a co-defendant's sentence were all impermissible grounds for finding an "extraordinary and compelling reason." *United States v. Hunter*, 12 F.4th 555, 559 (6th Cir. 2021).  This Court should similarly deny the defendant's motion.

### a. ASD Diagnosis Is Not an Extraordinary and Compelling Reason for this Vaccinated Inmate.

The defendant's ASD diagnosis, and the degree of his impairment, is not a new piece of information. It was well understood, argued and briefed before the Court at sentencing.  While the motion filed by the defendant alleges certain negative occurrences since his incarceration— without any evidence of such claims-- none of these have been demonstrated to have been caused by or exacerbated by his ASD diagnosis or lack of mental health care.  While plausible, there is no medical report, psychiatric report, mental health evaluation, or even an affidavit filed by the defendant demonstrating these negative occurrences and consequences, let alone any causation to his ASD diagnosis.  Many of the factors that the defendant has pointed to are, in fact, general issues and complaints that exist across the BOP in the time of COVID-19 precautions, and cannot alone provide a basis for a sentence reduction.  As the D.C. Circuit recently found, "a pandemic affecting not only the entire prison population, but the entire world, does not constitute an extraordinary and compelling reason." *United States v. Jackson*, 26 F.4th 994, 1002 (D.C. Cir. 2022); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"); *accord United States v. Stephens*, No. 17-243 (BAH), 2021 WL 663184, at *2 (Feb. 19, 2021).  Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Nearly 25% of the U.S. population has a diagnosable mental disorder, *see Mental Health Disorder Statistics*, Johns Hopkins Medicine, located at https://www.hopkinsmedicine.org/health/wellness-and-prevention/mental-health-disorder-statistics#:~:text=An%20estimated%2026%25%20of%20Americans,substance%20use%20and%

20anxiety%20disorders, and the prevalence of ASD is in nearly 3.7% of males over age 8.  *See Autism Spectrum Disorder (ASD),* National Institute of Mental Health, located at https://www.nimh.nih.gov/health/statistics/autism-spectrum-disorder-asd.        Moreover,   BOP "[i]nmates have a higher prevalence of chronic medical and mental health conditions than the general population."  Federal Bureau of Prisons Clinical Guidance, *Care Level Classification for Medical   and   Mental   Health   Conditions   or   Disabilities*,   at   1,   located   at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (May 2019).  Thus the defendant's claimed conditions are not particularly rare or otherwise unusual.

### b. Defendant Has Not Demonstrated Extraordinary Circumstances For Release.

Against this background, the defense has not provided any specific evidence of the defendant's current conditions, or that he is suffering in ways that other inmates at the same facility are not.  FCI Yazoo City is no longer in level 3 restriction, and the defendant appears to be given the same restrictions and liberties as other inmates.  If anything, the defendant's acknowledgment of further criminal activity since his incarceration gives pause as to whether his increased criminality and personal choice may be the true reason for the ails that he now claims.

At root, it appears that the defendant's motion is a general attack against the conditions at the BOP facility where he is currently incarcerated.  As an initial matter, the proper way to raise such claims is to use all administrative options available and file a civil suit against his current jailer in his district of confinement. *See, e.g.*, *United States v. Folse*, 2016 WL 3996386, at \*15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, 2009 WL 2852111, at \*1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the

relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action.").

Where a claim challenging conditions of confinement is erroneously filed in a defendant's criminal case, the trial court should deny the claim. *See, e.g., United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court"). Accordingly, the Court should summarily deny these claims.

Even if these claims were properly before the Court, defendant has at best made allegations: it has failed to establish an extraordinary and compelling reason by specific and competent evidence (by medical record or affidavit) for this Court or the government to review.   The defendant has the burden of proof, and he has failed to carry this burden.

### 3.   *The 18 U.S.C. § 3553(a) Factors Weigh Against Release.*

This Court must also consider the 18 U.S.C. § 3553(a) factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). The factors that the Court must consider under § 3553(a) (which sets forth factors the Court must consider at sentencing) include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and also the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner."

Even where a defendant has established an extraordinary and compelling reason for release, the Court may reduce his sentence only if the balance of the § 3553(a) factors favor release. *See United States v. Edwards*, No. 03-234 (JDP), 2020 WL 5518322 at *4 (D.D.C. September 12, 2020) ("[E]ven if Mr. Edwards *had* presented "extraordinary and compelling reasons" for release, the Court may reduce his term of imprisonment only if the balance of the § 3553(a) factors favor his release." (emphasis in original)); *see also United States v. Holroyd*, 464 F. Supp. 3d 14, 19 (D.D.C. 2020) (TNM) ("If a defendant still poses a danger to the community or if the balance of factors under § 3553(a) favor continued imprisonment, these are independent reasons to deny a motion for compassionate release."); *United States v. Sears*, 19-cr-21, 2020 WL 3250717 at *2 (D.D.C. June 16, 2020) (denying compassionate release to inmate with diabetes, hypertension and asthma who had established extraordinary and compelling reasons because "this Court does not, and cannot, find that a reduction in [Defendant]'s term of imprisonment is consistent with the § 3553(a) factors at this time").

The Court assessed the 18 U.S.C. § 3553(a) factors prior to and at sentencing in December 2021. The defendant has pointed to little change in circumstance since that time. In fact, its motion reads as a rehash of its sentencing materials from December 2021: there is no new detail or argument to be found. To the extent the defense points to lack of medical care at the FCI facility, there is no affidavit in support showing such deprivation, or that any impact on the defendant has

even occurred.[6]   Moreover, the defense has acknowledged the defendant has committed serious criminal acts while at the facility, and is now using illegal drugs.  His risk of recidivism has only increased, and makes it clear that he is not presently safe to release to the community.  Additionally, other courts in this jurisdiction have recently sentenced similarly situated defendants to greater terms of incarceration than the defendant received.

Lastly, the defendant claims that he has a re-entry plan, Mot. at 16-17, but no plan is proposed or attached to their pleading.   Such a vague description is not an adequate release plan, and it does not favor release. *See United States v. Allison*, 2020 WL 3077150, *4 (W.D. Wash. June 10, 2020) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release[d]"). The § 3553(a) factors therefore do not favor release and so defendant's motion should fail.

---

[6] The defendant further appears to cite to a letter to his mother, Mot, at 15, but this is not attached to the filing.

## **CONCLUSION**

For the reasons above, and based on the entire record, defendant has not met his burden to show that he is entitled to a sentence reduction. Accordingly, the Court should summarily deny defendant's motion.  Should the defendant attempt to provide additional detail and evidence regarding its motion in a reply brief, the government respectfully requests the right to review and comment on that information in writing before any hearing on this matter.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

_____/S/_____
TEJPAL S. CHAWLA
Assistant United States Attorney
National Security Section
D.C. Bar No. 464012
601 D Street, NW
Washington, D.C. 20530
Tejpal.chawla@usdoj.gov
(202) 252-7280

17