UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DEVLYN THOMPSON,<br><br>*Defendant.* | Case No. 21-cr-461-RCL-1 |

## MEMORANDUM ORDER

Defendant Devlyn Thompson pleaded guilty to one felony count of assaulting an officer using a dangerous weapon during the attack against the United States Capitol on January 6, 2021. *See* Plea Agreement, ECF No. 9; Statement of Offense, ECF No. 10. Mr. Thompson was sentenced to 46 months' incarceration, with credit for time served, followed by 36 months of supervised release. Minute Entry (12/20/21); Am. J., ECF No. 40.

Now, Mr. Thompson moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Def.'s Mot., ECF No. 45, at 1. In support of his request, Mr. Thompson claims that his Autism Spectrum Disorder ("ASD") diagnosis, combined with the lack of mental health treatment in prison as well as the inability to regularly communicate or visit with his family, have resulted in an rapid deterioration of his mental health and that, together, these amount to "extraordinary and compelling" circumstances justifying his release. *See* Def.'s Mot. at 4–6; Def.'s Reply, ECF No. 53, at 2–6. The government opposes Mr. Thompson's motion, arguing that he has not shown he is entitled to compassionate release because he has not presented evidence of deteriorating mental health, nor has he demonstrated a good-faith effort to obtain the services he claims he needs. Gov't Opp'n, ECF No. 50, at 1–2; Gov't Sur-Reply, ECF No. 56.

1

Upon consideration of the parties' filings, the record therein, and the applicable law, the Court will **DENY** Mr. Thompson's motion for compassionate release.

## I. BACKGROUND

On January 6, 2021, the Senate and House of Representatives assembled in a joint session to count electoral votes cast in the 2020 presidential election. Statement of Offense ¶ 5. Mr. Thompson traveled to Washington, D.C. from Atlanta, Georgia that day to attend a rally organized to protest the election results. Gov't Sent'g Mem., ECF No. 30, at 9. Shortly before 2:00 PM, Mr. Thompson and other rioters gathered outside of the U.S. Capitol building. Statement of Offense ¶ 14. A police line formed in front of the steps leading to the Capitol's west plaza in an attempt to prevent the mob from proceeding further. *Id.* Mr. Thompson yelled at one law enforcement officer, "You wanna fight, let's fight! One on one." *Id.* He told other law enforcement officers, "What is there left if we can't even talk to our representatives? . . . [Y]ou guys are protecting the system." *Id.* Around 2:30 PM, Mr. Thompson and his fellow rioters overwhelmed the police line and proceeded up the Capitol's west front and onto the inaugural stage. Gov't Sent'g Mem. at 12.

Approximately twenty minutes later, Mr. Thompson joined another group of rioters attempting to gain access to the Capitol building through the lower west terrace tunnel. *Id.*; Statement of Offense ¶ 11. Multiple D.C. Metropolitan Police Department ("MPD") and U.S. Capitol Police officers blocked the building's entrance. Statement of Offense ¶ 11. When Mr. Thompson approached the tunnel, the U.S. Capitol building alarm was both visibly and audibly sounding. *Id.* ¶ 12. Mr. Thompson observed protestors assaulting law enforcement officers in a variety of ways, including pushing, spraying pepper and bear spray, and throwing objects and projectiles such as flag poles and large speakers. *Id.* ¶ 11; Gov't Sent'g Mem. at 21.

2

Additionally, Mr. Thompson observed protestors shouting obscenities at the officers, calling for additional volunteers to assist in the assault, and grabbing riot shields from law enforcement. Statement of Offense ¶ 11. Mr. Thompson assisted in the transfer of stolen riot shields up and down the line of protestors. *Id.* ¶ 12. Finally, Mr. Thompson observed law enforcement officers verbally ordering the rioters to stop as well as physically pushing the rioters and deploying pepper spray at them to attempt to stop the riot. *Id.* ¶ 13.

At some point, Mr. Thompson obtained a metal baton from the floor of the tunnel. *Id.* By this time, he was near the front of the group of rioters and close to the line of law enforcement officers blocking the entrance to the U.S. Capitol. Gov't Sent'g Mem. at 24. Around the same time, another rioter experienced a medical emergency. *Id.* MPD Sergeant W.B., who was holding a can of chemical spray, ordered the rioters to clear the area so that a police line could be formed to provide medical attention to the fallen rioter. *Id.* In response, Mr. Thompson struck Sgt. W.B. in the hand with the baton in an apparent attempt to knock the can out of Sgt. W.B.'s hand. Statement of Offense ¶ 13. Mr. Thompson left the tunnel at approximately 3:05 PM and spent two more hours on the Capitol grounds before leaving the premises after 5:00 PM. Gov't Sent'g Mem. at 28. Mr. Thompson's actions at the Capitol that day were captured on video and posted on the Internet. Statement of Offense ¶ 13.

After January 6, 2021, the Federal Bureau of Investigation ("FBI") issued a public wanted notice for Mr. Thompson. *Id.* ¶ 16. Shortly thereafter, Mr. Thompson retained counsel, who immediately contacted the U.S. Attorney's Office. *Id.* Mr. Thompson agreed to cooperate with the investigation, participated in three separate proffer sessions with the U.S. Attorney's Office and the FBI, and voluntarily provided investigators access to his social media accounts. *Id.*

In July 2021, the government filed a criminal information against Mr. Thompson, charging him with one count of assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). *See* Information, ECF No. 1. In August 2021, Mr. Thompson pleaded guilty to that charge. *See* Minute Entry (08/06/21). Mr. Thompson and the government executed and signed a written plea agreement. In the plea agreement, Mr. Thompson agreed that he was pleading guilty to violating 18 U.S.C. §§ 111(a)(1) and (b) because he was "in fact guilty." Plea Agreement at 11.

Mr. Thompson's ASD diagnosis was extensively briefed and discussed before this Court imposed his sentence. Both Mr. Thompson and the government filed sentencing memoranda debating the appropriateness of a carceral sentence for someone with ASD and the potential impact that incarceration could have on his ASD. *See generally* Def.'s Sent'g Mem., ECF No. 25; Gov't Suppl. Sent'g Mem., ECF No. 34. The majority of Mr. Thompson's sentencing hearing focused on his ASD. *See generally* Sent'g Tr., ECF No. 42.

After considering all of this evidence and argument, the Court acknowledged and expressed sympathy for Mr. Thompson's condition, Sent'g Tr. at 39:9–11 (Dec. 20, 2021), but nevertheless concluded that "autism can't excuse" "the attack on police officers[.]" *Id.* at 39:19–20. Accordingly, the Court sentenced Mr. Thompson to 46 months' incarceration, the bottom of the U.S. Sentencing Guidelines range as calculated by the Court.[1] *Id.* at 3:5–7; Am. J. at 2. The Court further sentenced Mr. Thompson to 36 months of supervised release, a special assessment of $100, and restitution in the amount of $2,000. Am. J. at 3, 6.

---

[1] The Court calculated Mr. Thompson's total offense level to be 23. *See* Sent'g Tr. at 3:10. That offense level represented: the base offense level (14) plus enhancements for use of a dangerous weapon (baton) (6) and official victim (MPD Sgt. W.B.) (6), minus reductions for acceptance of responsibility (2) and assistance to authorities (1). *See* Final Presentence Investigation Rep. ("Final PSR"), ECF No. 23, ¶¶ 26–37. Considering an estimated total offense level of 23 and criminal history category of I, the estimated Sentencing Guidelines range was 46 to 57 months' incarceration. *See* Sent'g Tr. at 3:5–11.

4

Mr. Thompson now moves for immediate compassionate release or, in the alternative, home confinement. Def.'s Mot. at 1. Mr. Thompson also moves for a hearing on his motion. Mot. for Hearing, ECF No. 47. The government opposes both motions. Gov't Opp'n at 1. Mr. Thompson replied. Def.'s Reply. The government filed a sur-reply in support of its opposition after receiving permission from this Court. Gov't Sur-Reply.

Mr. Thompson is currently imprisoned at Federal Correctional Institution ("FCI") Yazoo City. Def.'s Mot. at 1. FCI Yazoo City is a medium-security Bureau of Prisons ("BOP") facility. Gov't Opp'n at 3. He is projected to be released in approximately a year and a half. *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (accessed May 8, 2023).

## II.    LEGAL STANDARD

A defendant seeking compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) bears the burden of establishing that he is eligible for a sentence reduction. *See United States v. Jackson*, 26 F.4th 994, 1001 (D.C. Cir. 2022). To be eligible for a reduction, two threshold requirements must be met. First, the defendant must have exhausted his administrative remedies. 18 U.S.C. § 3582(c)(1)(A). This requires a showing that "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or that thirty days have elapsed since "the receipt of such a request by the warden of the defendant's facility," whichever deadline is earlier. *Id.* Second, the defendant must show that "extraordinary and compelling reasons warrant" a reduction of his original sentence. *Id.* § 3582(c)(1)(A)(i).

If the Court finds that the defendant has met his burden of showing these two requirements, the Court has the discretion to "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved

portion of the original term of imprisonment)," after considering the relevant factors in 18 U.S.C. § 3553(a). *Id.* § 3582(c)(1)(A).

### III. DISCUSSION

Although Mr. Thompson exhausted his administrative remedies, he has failed to meet his burden of establishing "extraordinary and compelling" circumstances warranting a sentence reduction. *Id.* § 3582(c)(1)(A)(i). Accordingly, this Court must deny his motion and need not examine the § 3553(a) factors. Relatedly, the Court need not hold a hearing on the motion because the record conclusively shows that Mr. Thompson is not entitled to compassionate release.

### A. Mr. Thompson Has Exhausted His Administrative Remedies

The parties disagree that Mr. Thompson has exhausted his administrative remedies.[2] Mr. Thompson argues that he has met the exhaustion requirement because he wrote to the warden at FCI Yazoo City on September 16, 2022 requesting that the BOP file a motion to reduce his sentence and grant him compassionate release on the grounds that his ASD diagnosis, combined with the lack of adequate medical care, make him especially vulnerable to an "irreparable deterioration" of his ASD and ability to be a productive member of society upon release. Letter to Warden, Ex. A to Def.'s Reply, ECF No. 53-1, at 2–3. The government argues that Mr. Thompson has not met the exhaustion requirement because he did not follow up with the prison to obtain the services he claims he needs. Gov't Sur-Reply at 5.

Contrary to the government's assertion, 18 U.S.C. § 3582(c)(1)(A)'s exhaustion requirement may be met in either of two ways. *See United States v. Bogle*, No. 95-cr-298 (RCL),

---

[2] The government initially countered Mr. Thompson's exhaustion argument on the basis that the exhibit attached to Mr. Thompson's motion, which he claimed was a letter to the FCI Yazoo City warden requesting compassionate release, did not make such a request. Gov't Opp'n at 10–11 (citing Letter, Ex. 1 to Def.'s Mot., ECF No. 45-1). Mr. Thompson's counsel has since clarified that the original exhibit was attached in error and provided the Court with a copy of the correct exhibit. Def.'s Reply at 2–3 (citing Letter to Warden, Ex. A to Def.'s Reply, ECF No. 53-1).

6

2022 WL 9945782, at *2 (D.D.C. Oct. 17, 2022). A court may rule on a compassionate-release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added).

The documentation attached to Mr. Thompson's motion clearly satisfies the statute's second option for meeting the exhaustion requirement. The warden never responded to Mr. Thompson's letter, which was sent over seven months ago. *See* Def.'s Mot. at 8. Accordingly, Mr. Thompson's motion is properly before the Court. *See* 18 U.S.C. § 3582(c)(1)(A).

### B. Mr. Thompson Has Failed to Establish Extraordinary and Compelling Circumstances Warranting a Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)(i)

Mr. Thompson argues that his ASD diagnosis, the prison environment amidst the COVID-19 pandemic, and a lack of care for his condition amount to extraordinary and compelling circumstances justifying a sentence reduction.[3] Def.'s Mot. at 4–6; Def.'s Reply at 1. That argument is unpersuasive.

Most fundamentally, Mr. Thompson's motion impermissibly relitigates the appropriateness of his sentence of incarceration. As another court in this District has observed, "the compassionate release statute was not intended to serve as a second chance to address a defendant's sentence; it was created to address new and often unforeseen circumstances that raise unique concerns about the defendant's continued incarceration." *United States v. Jenkins*, No. 16-cr-213 (ABJ), 2021 WL 9563332, at *5 (D.D.C. Nov. 23, 2021), *aff'd*, 50 F.4th 1185 (D.C. Cir.

---

[3] Mr. Thompson does not argue that he faces any particular vulnerability to infection with the COVID-19 virus as a result of his condition. Instead, he argues that COVID-19-related restrictions at FCI Yazoo City, particularly on inmates' ability to leave their cells, along with other factors, have worked to diminish his mental health.

2022). Mr. Thompson's ASD diagnosis was well-documented prior to his sentencing. This Court explicitly considered his diagnosis and condition before imposing his sentence. *See* Sent'g Tr. at 39:9–11. Thus, Mr. Thompson may not invoke the compassionate-release statute to challenge this Court's sentencing determination.

Perhaps anticipating the Court's position, Mr. Thompson insists that it is appropriate to consider his ASD diagnosis again in the case's current posture based on the BOP's policy statement regarding a reduction in a term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13 (2018). As a threshold matter, this Circuit has held "that this policy statement is not applicable to compassionate release motions filed by defendants[.]" *United States v. Long*, 997 F.3d 342, 347 (D.C. Cir. 2021). Though the policy statement is not binding, courts have found it to be helpful in determining what is an extraordinary and compelling reason warranting release. *See, e.g., United States v. Shabazz*, No. 17-cr-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021) (finding that "the Policy Statement remains an important and useful guidepost for courts considering such motions," especially considering "the Commission's decades of expertise in assessing the substantive contours of the extraordinary and compelling reasons that might justify release") (internal citations and quotation marks omitted). Mr. Thompson argues that, under § 1B1.13, a defendant's medical condition may constitute an extraordinary and compelling reason if the defendant suffers from a "serious functional or cognitive impairment." Def.'s Mot. at 9 (citing U.S.S.G. § 1B1.13(1)(A)(ii)(II)). But Mr. Thompson only recites the first half of the applicable portion of the policy statement. Under the current version of § 1B1.13(1)(A), a defendant's "serious functional or cognitive impairment" must also "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" in order for the impairment to qualify as an

8

extraordinary and compelling reason for release. "Self-care" "typically refers to a defendant's ability to provide for his own activities of daily living, such as eating and drinking, toileting, washing and dressing, and mobilization." *United States v. Morris*, No. 12-cr-154 (BAH), 2020 WL 2735651, at *7 (D.D.C. May 24, 2020). Mr. Thompson's motion does not indicate that he is unable to provide self-care.[4] In fact, he is capable of smoking an illegal substance and possessing a counterfeit phone. *See* Def.'s Mot. at 5. Therefore, review of the BOP's policy statement does not entitle Mr. Thompson to release.

In the alternative, Mr. Thompson insists that his ASD diagnosis may still serve as the proper basis of his compassionate-release motion because he seeks relief based on information unavailable to the Court at sentencing, namely, the deprivation of mental health services that the government represented would be available. Def.'s Reply at 6 (citing Gov't Suppl. Sent'g Mem. at 3). However, as will be explained below, Mr. Thompson's alleged inability to access unspecified mental health services, without evidence of deteriorating mental or physical health, is not an extraordinary and compelling reason justifying early termination of his incarceration.

Mr. Thompson argues that "the deterioration of [his] mental and social condition and the facility's abject failure to address or attempt to prevent that deterioration" constitutes an extraordinary and compelling circumstance. Def.'s Mot. at 10. As evidence of his deteriorating condition, Mr. Thompson relies solely on a declaration from Mr. Thompson's mother stating that, since he has been incarcerated, she has noticed "a steady decline in [Mr. Thompson's] ability to communicate. He speaks less and is clearly frightened of basic social interactions. . . . I hear him shutting down and knowing his condition as well as I do, I know that his shut down could take

---

[4] Prior to his incarceration, Mr. Thompson was quite capable of providing for himself, and his motion has not demonstrated a significant deterioration of this ability. At the time of the offense, Mr. Thompson was working as a portfolio manager at a property management company, a position for which he earned annual salary of approximately $90,000. Final PSR ¶¶ 54, 69.

9

years to reverse, if ever." LaVergne Decl., Ex. C to Def.'s Reply, ECF No. 53-3, ¶¶ 8, 10. While the Court respects a mother's opinion of her son's condition, this opinion, standing alone, is not legally sufficient to demonstrate Mr. Thompson's claim of deteriorating mental health. "[B]y their very terms, 'extraordinary and compelling' reasons must be 'most unusual, far from common, and having little or no precedent.'" *United States v. Engles*, No. 19-cr-132 (JDB), 2022 WL 1062937, at *4 (D.D.C. Apr. 8, 2022) (citing *United States v. Hunter*, 12 F.4th 555, 562 (6th Cir. 2021) (internal quotation marks and citation omitted)). "[And t]here is nothing unique, of course, in the development [or exacerbation] of mental and emotional disorders as a result of prison confinement." *Roberts v. United States*, 391 F.2d 991, 991 (D.C. Cir. 1968).

Relatedly, Mr. Thompson's claims that he requested but did not receive mental health treatment do not present an extraordinary and compelling circumstance. He submitted a declaration in which he attests that, at his intake in the summer of 2021, he asked once if he "could see a psychologist or therapist" but that he never saw either.[5] Thompson Decl., Ex. D to Def.'s Reply, ECF No. 53-4, ¶ 5. His mother stated that Mr. Thompson "has asked repeatedly to see a therapist or psychologist, but that he has never been allowed to do so or told how he could be allowed to do so." LaVergne Decl. ¶ 6. "[P]ersistent inadequate medical care can constitute an extraordinary and compelling reason warranting sentence reduction if the defendant's medical needs require release." *United States v. Edwards*, No. 03-cr-234 (JDB), 2022 WL 2866703, at *5 (D.D.C. July 21, 2022). In the case that the *Edwards* court cited for that proposition, *United States v. Beck*, the district court granted the defendant's compassionate-release motion when unexplained, "grossly inadequate treatment" by her facility caused her invasive breast cancer to

---

[5] Mr. Thompson further claims that he requested services in his letter asking for compassionate release. *See* Def.'s Reply at 2–3 (citing Letter to Warden). However, the Court agrees with the government that this letter cannot be construed as such because it "specifically rejected prison mental health services[.]" Gov't Sur-Reply at 4.

metastasize such that she was "in urgent need of appropriate treatment to prevent the further spread of her disease and the potential loss of her life." 425 F. Supp. 3d 572, 580–82 (M.D.N.C. 2019). Here, Mr. Thompson's mental condition does not appear to pose similarly dire threats to his health, even if his claims of inattentiveness by prison staff are true.

The rest of Mr. Thompson's motion raises general complaints about the prison environment. The instant motion is not the proper vehicle for the Court to address such claims. What is more, Mr. Thompson's concerns are either likely to be alleviated based on recent changes in the operating environment or are contradicted by the record.

As this Court has previously explained, "a motion in a criminal case is not the proper avenue to address allegations of improper treatment within a jail or prison." *United States v. Greene*, No. 06-cr-312 (RCL), 2022 WL 3354745, at *4 (D.D.C. July 28, 2022) (citing *United States v. Hollis*, No. 08-cr-276 (OWW), 2009 WL 902062, at *1 (E.D. Cal. Apr. 1, 2009), which held that any claims related to the condition of confinement may only be raised in a civil rights complaint). Mr. Thompson nevertheless insists that the instant motion is the right vehicle to challenge his conditions of confinement because he "pursues a statutory remedy outlined within the criminal code" and because he does not seek as damages or injunctive relief, but rather early termination of his incarceration. Def.'s Reply at 10. But a compassionate-release motion's defining feature is the right it provides, not the remedy. "Compassionate release is a safety valve designed to ameliorate extraordinary individual hardships caused by incarceration." *Engles*, 2022 WL 1062937, at *4 (emphasis and internal citation omitted). It is for this reason that complaints about "prison conditions in themselves are not dispositive" in the compassionate-release context, *United States v. Brooks*, No. 18-cr-29 (JEB), 2022 WL 2340692, at *5 (D.D.C. June 29, 2022),

because such conditions affect the prison population in general, *United States v. Blanchard*, No. 18-cr-376 (JEB), 2022 WL 5241879, at *3 (D.D.C. Oct. 6, 2022).

Mr. Thompson maintains that the restriction of his freedom of movement and other COVID-19 countermeasures at FCI Yazoo City, which Mr. Thompson labels as operating at "red status," have required Mr. Thompson to remain in his unit for much of the day "with little to no time or space in the recreational yard or elsewhere to recover from constant sensory overload." Letter to Warden at 2. BOP institutions operate at one of three levels "based on two indicators of COVID-19 Risk: the facilities' COVID-19 inmate isolation rate and the COVID-19 community risk of the county where the facility is located." *COVID-19 Modified Operations Plan & Matrix*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (accessed May 8, 2023). The three levels are referred to by their numbers—1, 2, 3—or their corresponding colors—green, yellow, red. *Id.* BOP may modify prison programming and services depending on the operational level. *Id.* At the time of the parties' filings, FCI Yazoo City was operating at Level 2. Gov't Opp'n at 5. Now, FCI Yazoo City is operating at Level 1. *See COVID-19 Modified Operations Plan & Matrix*. Under Level 1 operations, no modifications to prison programming are necessary and prison facilities largely operate under normal operations. *Id.* Now that FCI Yazoo City has resumed its standard operating environment, Mr. Thompson's concerns about lack of access to outdoor space should be mitigated.

Mr. Thompson's other arguments are belied by the record. He indicates that the prison failed to approve his family as visitors even after they completed the required forms several times. Def.'s Reply at 8; LaVergne Decl. ¶ 4. However, his own counsel's communication with the warden of FCI Yazoo City stated that the geographical distance and financial cost of travelling

from the Seattle, Washington area to Mississippi was the reason that his family has not visited. *See* Letter to Warden at 3. Even if the alleged denial of visitation approvals were the actual cause of his family's inability to visit, a compassionate-release motion is not the right way to air such a grievance. *See Greene*, 2022 WL 3354745, at *4. Relatedly, Mr. Thompson argues that his incarceration thousands of miles away from his family is uniquely difficult for him. Def.'s Mot. at 4. But, as the government correctly points out, Mr. Thompson has lived apart from his family for nearly fifteen years, and he lived outside of Washington state on numerous occasions. Gov't Sur-Reply at 2. In fact, he was living in Atlanta, Georgia at the time of the instant offense. *Id.*; Final Presentence Investigation Rep. ("Final PSR"), ECF No. 23, ¶¶ 54, 69. "The Court is mindful of the pain caused by being separated from loved ones, but that is often a by-product of the punishment of incarceration." *James v. Reno*, 39 F. Supp. 2d 37, 41 (D.D.C. 1999). Without more, however, Mr. Thompson has not established his entitlement to compassionate release.

* * *

Because any impact of Mr. Thompson's incarceration on his ASD is not an extraordinary and compelling reason warranting a sentencing reduction, it is unnecessary for the Court to analyze the factors set forth in 18 U.S.C. § 3553(a).

### IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendant Devlyn Thompson's Motion [45] for Compassionate Release and Motion [47] for Hearing be **DENIED**.

**IT IS SO ORDERED**.

SIGNED this ___15th___ day of May, 2023.

Royce C. Lamberth
United States District Judge